PART 5
ADMINISTRATIVE DETERMINATIONS

A. Administrative Determinations for Purposes of Employment under Federal Civil Service. Physical disability evaluation shall include a recommendation or final decision and supporting documentation on whether the injury or disease that makes the member unfit or that contributes to unfitness was incurred in combat with an enemy of the United States; or was the result of armed conflict; or was caused by an instrumentality of war during a period of war. (These determinations pertain to whether a military retiree later employed under Federal Civil Service is entitled to the following benefits: credit of military service towards a Federal Civil Service retirement under 5 U.S.C. 8332; retention preference under 5 U.S.C. 3502; exemption from the dual compensation provisions of 5 U.S.C. 5532; and credit of military service for Civil Service annual leave accrual under 5 U.S.C. 6303) (reference (c)).

1. Incurred in Combat with an Enemy of the United States (5 U.S.C. 8332)(Reference (c)). The physical disability is a disease or injury incurred in line of duty in combat with an enemy of the United States as defined by the U.S. State Department.

2. Armed conflict (5 U.S.C. 3502, 5532, 6303)(Reference (c)). The physical disability is a disease or injury incurred in the line of duty as a direct result of armed conflict. The fact that a member may have incurred a disability during a period of war or in an area of armed conflict, or while participating in combat operations is not sufficient to support this finding. There must be a definite causal relationship between the armed conflict and the resulting unfitting disability.

a. Armed conflict includes a war, expedition, occupation of an area or territory, battle, skirmish, raid, invasion, rebellion, insurrection, guerrilla action, riot, or any other action in which Service members are engaged with a hostile or belligerent nation, faction, force, or terrorists.

b. Armed conflict may also include such situations as incidents involving a member while interned as a prisoner of war or while detained against his or her will in custody of a hostile or belligerent force or while escaping or attempting to escape from such confinement, prisoner of war, or detained status.

3. Instrumentality of War During a Period of War (5 U.S.C 3502, 5532, 6303, 8332 (Reference (c)). The injury or disease is caused by an instrumentality of war (see definitions in enclosure 2) and incurred in the line of duty during a period of war as defined in 38 U.S.C. 101 and 302 U.S.C. (reference (k))and makes the member unfit. Applicable periods are:

a. World War II. The period beginning 7 December 1941 and ending 31 December 1946 and any period of continuous service performed after 31 December 1946 and before 26 July 1947 if such period began before 1 January 1947.

b. Korea. The period beginning 27 June 1950 and ending 31 January 1955.

c. Vietnam. The period beginning 5 August 1964 and ending 7 May 1975. The "Dominican Intervention" occurred during this period.

d. Persian Gulf. The period beginning 2 August 1990 through date to be prescribed by Presidential proclamation or law.

B. Determinations for Federal Tax Benefits. Physical disability evaluation shall include a determination and supporting documentation on whether the member's physical disability compensation is excluded from Federal gross income under 26 U.S.C. 104 (reference (f)). For compensation to be excluded, the member must meet either of the criteria listed in subsection B.1. or B.2., below.

1. Status. On 24 September 1975 the individual was a member of the Armed Forces, to include the Reserve components, the National Oceanic and Atmospheric Administration (NOAA and formerly the Coast and Geodetic Survey), the U.S. Public Health Service, or was under binding written agreement to become such a member.

a. A Service member who was a member of an Armed Force of another country on that date is entitled to the exclusion.

b. A Service member who was a contracted cadet of the Reserve Officers Training Corps on that date is entitled to the exclusion.

c. Entitlement to the exclusion is based solely on the member's status on that date. A member who separates from the Service after that date and incurs a disability during a subsequent enlistment is entitled to the exclusion.

2. Combat-related. This standard covers those injuries and diseases attributable to the special dangers associated with armed conflict or the preparation or training for armed conflict. A physical disability shall be considered combat-related if it makes the member unfit or contributes to unfitness and was incurred under any of the circumstances listed in paragraphs B.2.a. through B.2.d., below.

a. As a direct result of armed conflict. The criteria are the same as in paragraph A.2., above.

b. While engaged in hazardous service. Such service includes, but is not limited to, aerial flight duty, parachute duty, demolition duty, experimental stress duty, and diving duty.

c. Under conditions simulating war. In general, this covers disabilities resulting from military training, such as war games, practice alerts, tactical exercises, airborne operations, leadership reaction courses; grenade and live fire weapons practice; bayonet training; hand-to-hand combat training; repelling, and negotiation of combat confidence and obstacle courses. It does not include physical training activities, such as calisthenics and jogging or formation running and supervised sports.

d. Caused by an instrumentality of war. Incurrence during a period of war is not required. A favorable determination is made if the disability was incurred during any period of service as a result of such diverse causes as wounds caused by a military weapon, accidents involving a military combat vehicle, injury, or sickness caused by fumes, gases, or explosion of military ordnance, vehicles, or material. However, there must be a direct causal relationship between the instrumentality of war and the disability. For example, an injury resulting from a Service member falling on the deck of a ship while participating in a sports activity would not normally be considered an injury caused by an instrumentality of war (the ship) since the sports activity and not the ship caused the fall. The exception occurs if the operation of the ship caused the fall.

PART 6
TDRL MANAGEMENT

A. Placement on the TDRL. Service members shall be placed on the TDRL when they would be qualified for permanent disability retirement but for the fact that the member's disability is not determined to be of a permanent nature and stable.

1. A disability shall be considered unstable when the preponderance of medical evidence establishes that accepted medical principles indicates the severity of the condition will change within the next five years so as to result in an increase or decrease of the disability rating percentage or a finding of fit.

2. Except for cases processed under imminent death procedures, members with unstable conditions rated at a minimum of 80 percent and which are not expected to improve to less than an 80% rating, shall be permanently retired.

B. TDRL Reevaluation

1. Administrative Finality. During TDRL reevaluation, previous determinations concerning application of any presumption established by this Instruction, line of duty, misconduct, proximate result, and whether a medical impairment was service-incurred or preexisting and aggravated shall be considered administratively final for those conditions for which the member was placed on the TDRL unless there is evidence of fraud; a change of diagnosis that warrants the application of accepted medical principles for a preexisting condition; or correction of error in favor of the member.

2. New Diagnoses. A fitness and compensable determination shall be made on all diagnoses presenting during the period of TDRL evaluation. When a member is determined fit for the condition for which he or she was placed on the TDRL, but unfit for a noncompensable condition incurred while on the TDRL, the member shall be separated from the TDRL without entitlement to disability benefits.

3. Member Medical Records. The Service member shall provide to the examining physician, for submission to the PEB, copies of all his or her medical records (civilian, Department of Veterans Affairs, and all military medical records) documenting treatment since the last TDRL reevaluation.

4. Compensability of New Diagnoses. Conditions newly diagnosed during TDRL periodic physical examinations shall be compensable when:

a. The condition is unfitting; and

b. The condition was caused by the condition for which the member was placed on the TDRL, or directly related to its treatment; or

c. The evidence of record establishes that the condition was either incurred while the member was entitled to basic pay or as the proximate result of performing duty, whichever is applicable, and was an unfitting disability at the time the member was placed on the TDRL. Otherwise, such conditions shall be deemed unfitting due to the natural progression of the condition and noncompensable under Chapter 61 of 10 U.S.C. (reference (b)), although the member may be eligible for benefits for these conditions under the DVA.

5. Current Physical Examination. Service members on the TDRL shall not be entitled to permanent retirement or separation with disability severance pay without a current TDRL or DVA periodic physical examination acceptable to the Service Secretary.

6. Refusal or Failure to Report. As provided under Chapter 61 of reference (b), when a Service member on the TDRL refuses or fails to report for a required periodic physical examination or to provide his or her medical records in accordance with Part 6, Paragraph B.3., his or her disability retired pay may be terminated. If the member later reports for the physical examination, retired pay will be resumed retroactively, to the date the examination was actually performed. If the Service member subsequently shows just cause for his or her failure to report, disability retired pay may be paid retroactively for a period not to exceed one year prior to the actual performance of the physical examination. If the member does not undergo a periodic physical examination after disability retired pay has been terminated, he or she will be administratively removed from the TDRL on the fifth anniversary of placement on the list and separated without entitlement to any of the benefits under reference Chapter 61 of 10 U.S.C. (reference (b)).

7. Priority. TDRL examinations, including hospitalization in connection with the conduct of the examination, shall be furnished on the same priority as given to active duty members.

8. Reports from Non MTFs. MTFs designated to conduct TDRL periodic physical examinations may use reports of medical examinations from medical facilities of another Service, the DVA, other Government Agencies, and authorized civilian medical facilities and physicians to complete the examination. The designated MTF remains responsible for the adequacy of the examination and the completeness of the report. The report must include the information specified in subsection B.4. of Part I.

9. Incarcerated Members. A report of medical examination shall be requested from the appropriate authorities in the case of a Service member imprisoned by civil authorities. In the

event no report, or an inadequate report, is received, documented efforts will be made to obtain an acceptable report. If an examination is not received, disposition of the case shall be in accordance with subsection E.6., above. The member shall be advised of the disposition and that remedy rests with the respective Service's Board for Correction of Military Records.

## PART 7
## FINAL DISPOSITION

A. Final Decision Authority

1. Secretary of Defense (or Secretary of Transportation). Under 10 U.S.C. 1216 (reference (b)), the Secretary of Defense, or in the case of the Coast Guard, the Secretary of Transportation shall approve the unfit findings on an officer in pay grade O-7 or higher or a medical officer in any grade who, at the time of referral for physical disability evaluation, was scheduled for nondisability retirement under any provision of reference (b) for age or length of service.

2. Secretary of the Military Department. Except as provided in subsection A.1., above, the Secretary of the Military Department shall have delegable authority to make all determinations consistent with this Instruction regarding unfitness, disability percentage, entitlement to disability severance and retired pay.

B. General Rules Regarding Disposition

1. Retirement. Except for members approved for permanent limited duty (see section C., below), any military member on active duty or in the Ready Reserves who is found to be unfit will be retired, if eligible for retirement, or, if not so eligible, separated. Disciplinary separation or other administrative separations from the Armed Forces are not prevented by this general rule.

a. Members with a disposition of separation for physical disability who have 15 but less than 20 years of service computed under Section 1208 of reference (b) and whose unfitting conditions are not due to the member's intentional misconduct or willful neglect or incurred during a period of unauthorized absence shall be afforded the opportunity to elect separation for physical disability or to apply for, and if approved, nondisability retirement under the Temporary Early Retirement Authority (TERA) under 10 U.S.C. 3911 (reference (b)) during the period of temporary special qualification authority beginning on October 23, 1993, and ending on October 1, 1999. Further, the same opportunity shall be afforded to members recommended for placement on or separation from the TDRL.

b. Ready Reserve members with 15 but less than 20 years of qualifying service under Section 12732 of reference (b) who are to be separated for physical disability other than due to the member's intentional misconduct, willful failure to comply with standards and qualifications for retention, willful neglect or incurred during a period of unauthorized absence shall be afforded the opportunity to elect either separation for physical disability or early qualification for retired pay at age 60 under Section 12731a of reference (b) during the period of temporary

special retirement qualification authority beginning on October 23, 1992, and ending on October 1, 1999. Further, the same opportunity shall be afforded to Ready Reserve members recommended for placement on or separation from the TDRL.

2. Fit off the TDRL. Service members determined fit as a result of TDRL reevaluation shall be processed as described below.

a. Appointment and/or Enlistment. Upon the Service member's request and provided he or she is otherwise eligible, the member shall be appointed or enlisted in the applicable grade and component as outlined in Section 1211 of reference (b).

b. Recall to Active Duty. Subject to paragraph B.3.c., below:

(1) Regular Component Members. Subject to their consent, Regular officers and enlisted members shall be recalled to duty, provided they are otherwise eligible and were not required to be separated under law or regulation at the time they were placed on the TDRL. They shall be deemed medically qualified for those conditions on which a finding of fit was determined. Any new condition arising between DES evaluation and recall must meet the respective Service's medical standards for retention.

(2) Reserve Component. Subject to their consent, Reserve component officers, warrant officers and enlisted members shall be reappointed or reenlisted as a Reserve for service in his or her Reserve component under 10 U.S.C. 1211 (reference (b)).

c. Separation. In accordance with Section 1210(f) of reference (b), members required to be separated or retired for nondisability reasons at the time they were referred for physical disability evaluation and placed on the TDRL shall, if determined fit, be separated or retired, as applicable.

d. Termination of TDRL status. Termination of TDRL status and retired pay shall be as outlined in 10 U.S.C. 1211 (reference (b)).

C. Continuance of Unfit Members on Active Duty or in the Ready Reserves. When, with the recommendation of the Service component, the Secretary of the Military Department concerned determines that an unfit Service member's service obligation, skill, or experience justifies the continuance of that Service member on active duty or in active status in a permanent limited duty status, the Service member may be retained as an exception to the general policy rule in subsection B.1, above.

D. Transition benefits. Active component members and Reserve component members who are on active duty are entitled to the transition benefits established by DoD Directive 1332.35

(reference (h)) when these members are being separated or retired for physical disability unless waived by DoD or prohibited by federal law.

E. Dispositions for Unfit Members

1. Permanent Disability Retirement. Retirement is directed under Section 1201 or 1204 of reference (b) when the member is unfit for a permanent and stable compensable physical disability under the standards of this Instruction; and

a. The member has at least 20 years of service computed under Section 1208 of reference (b); or

b. The total disability rating is at least 30 percent under the VASRD.

2. Placement on the TDRL. Retirement is directed under Section 1202 or 1205 of reference (b) when the requirements for permanent disability retirement are met except the physical disability is not permanent and stable.

3. Separation with disability severance pay

a. Criteria. Separation is directed under Section 1203 or 1206 of reference (b) when the member is unfit for a compensable physical disability determined under the standards of this Instruction, and the requirements listed in subparagraphs E.3.a.(1) and E.3.a.(2), below, are met. Stability is not a factor for this disposition.

(1) The member has less than 20 years of service computed under Section 1208 of reference (b); and

(2) The disability is rated at less than 30 percent, to include 0 percent.

b. Active Service. Under 10 U.S.C. 1212 (reference (b)), a part of a year of active service that is six months or more is counted as a whole year, and a part of a year that is less than six months is disregarded. Thus, members with less than six months of service at the effective date of their disability separation receive no disability severance pay.

c. Transfer to Retired Reserve. Under Section 1209 of reference (b), Ready Reserve members who have completed at least 20 qualifying years of Reserve service and who would otherwise be qualified for retirement may forfeit disability severance pay and request transfer to an Inactive Status List for the purpose of receiving nondisability retired pay at age 60. When disability severance pay is accepted, the member forfeits all rights to receive retired pay under Chapter 1223 of reference (b) at age 60. There are no provisions under reference (b) to repay

disability severance pay for the purpose of receiving retired pay.

d. Ready Reserve Early Qualification for Retired Pay. Under 10 U.S.C. 12731 of reference (b), Reserve component members with at least 15, and less than 20, years of qualifying service and who would otherwise be qualified for retirement may waive disability disposition and request early qualification for retired pay until 1 October, 1999, unless the provisions of this statute are extended or rescinded.

4. Separation under Chapter 61 of 10 U.S.C. (Reference (b)) Without Entitlement to Benefits. Discharge is directed under Section 1207 of reference (b) when the member is unfit for a disability incurred as a result of intentional misconduct, willful neglect, or during a period of unauthorized absence.

5. Discharge Under Other Than Chapter 61 of 10 U.S.C.(Reference (b)). An unfit member is directed for discharge under other provisions of reference (b) when the member is not entitled to physical disability compensation due to the circumstances listed in paragraphs E.5.a. through E.5.d., below.

a. The disability existed prior to service and was not permanently aggravated by service; or

b. The disability was incurred while the member was in an excess leave status; or

c. The disability was incurred by a Reserve component member performing duty of 30 days or less, but the disability was determined not the proximate result of performing such duty; or

d. The medical impairment of a Ready Reserve member is nonduty-related; disqualifies the member for retention in the Reserve components; and either the member does not request referral into DES for a fitness determination or such referral results in a finding of unfit. Disposition of such members shall be under appropriate Service regulations.

If a member not entitled to physical disability compensation under Chapter 61 of reference (b) due to the circumstances listed above has six years or more, but less than 20 years of active service, immediately prior to that discharge, the member shall be entitled to separation pay as an involuntary discharge or release from active duty as prescribed by Section 1174 of reference (b), unless the Secretary concerned determines that the conditions under which the member is discharged do not warrant payment of such pay.

6. Revert With Disability Benefits. This disposition is used to return to retired status a retiree recalled to active duty who was:

a. Previously retired for physical disability; or,

b. Determined unfit during the period of recall. For members previously retired for age or years of service, the compensable percentage of disability must be 30 percent or more to receive disability benefits.

GUIDELINES REGARDING MEDICAL CONDITIONS AND PHYSICAL DEFECTS THAT ARE CAUSE FOR REFERRAL INTO THE DISABILITY EVALUATION SYSTEM

A. GENERAL

1. This enclosure provides a listing, mainly by body system, of medical conditions and physical defects which are cause for referral into the Disability Evaluation System (DES).

a. This listing is not all inclusive.

b. A service member who has one or more of the listed conditions or physical defects is not automatically unfit and therefore may not qualify for separation or retirement for disability.

2. Individual Secretaries of the Military Departments may, consistent with this Instruction, modify these guidelines to fit their particular needs. These modifications may include conditions or defects, individually or in combination that:

a. Significantly interfere with the reasonable fulfillment of the purpose of the individual's employment in the Military Service;

b. May seriously compromise the health or well-being of the individual if he or she were to remain in the Military Service. This may involve dependence on certain medications, appliances, severe dietary restrictions, or frequent special treatments, or a requirement for frequent clinical monitoring.

c. May prejudice the best interests of the Government if the individual were to remain in the Military Service.

3. Any condition that appears to significantly interfere with performance of duties appropriate to a service member's, office, grade, rank or rating will be considered for MEB evaluation. The MEB shall:

a. Confirm the medical diagnosis(es).

b. Document the Service member's current medical condition to include treatment status and potential for medical recovery.

c. Review each case based on relevant facts.

d. Bolded and bracketed evaluation procedures and/or data of special importance to the assessment process shall be contained in the MEB.

e. A suggested annotated format for the MEB report is at Attachment I of this Instruction.

f. If optimal medical treatment has been received in accordance with service specific guidelines, refer to the PEB.

B. MUSCULOSKELETAL SYSTEM

1. Upper Extremity

a. The ability to pinch, grasp, or grip is prevented by disease, residuals of disease, acute injury, or chronic residuals of acute injury to the hand or fingers.

b. Amputation of a part or whole of the upper extremity.

c. Recurrent dislocation (not subluxation) when not surgically correctable.

d. Ranges of Joint Motion (ROM): Motion that is less than the measurements listed below. (Measurements should be validated by three (3) measurements that agree at the 5% level. The measuring instrument should be noted. Both active and passive ROM should be listed. When a normal paired extremity is present a comparison of the ROM of the normal to the impaired extremity should be included (See Plate I)).

(1) Shoulder: Flexion or abduction to at least 90 degrees.

(2) Elbow and/or Forearm: Flexion to 100 degrees or extension to 60 degrees. Pronation and/or Supination arc to at least 80 degrees.

(3) Wrist: A total of at least 15 degrees flexion plus extension.

(4) Hand: The motion at each of the three finger joints, when added together, must reach 135 degrees of active flexion or 75 degrees of active extension, in two or more fingers of the same hand. The thumb must be able to be opposed to at least two fingertips.

2. Lower Extremity

a. Disease, residual of disease, acute injury, or residual of injury that interferes with ambulation or the wearing of military shoes and/or boots for a period in excess of 180 days.

b. Any documented condition that precludes the ability to run or walk without a perceptible limp.

c. Shortening of an extremity that exceeds two inches (5 cms).

d. Feet: Any condition that prevents walking, running, or normal weight bearing.

e. Knee: Internal derangement of the knee when there is residual instability following remedial measures such as surgery or physical therapy.

f. Joint Ranges of Motion (ROM): Motion that is less than the measurements listed below. (Measurements should be validated by three (3) measurements that agree at the 5% level. The measuring instrument should be noted. Both active and passive ROM should be listed. When a normal paired extremity is present a comparison of the ROM of the normal to the impaired extremity should be included (See Plate II).)

(1) Hip: Flexion to 90 degrees, or extension to 0 degrees.

(2) Knee: Flexion to 90 degrees, or extension to 15 degrees.

(3) Ankle: Dorsiflexion to 10 degrees, or plantar flexion to 10 degrees.

3. Inflammatory Condition. Any inflammatory condition involving the bones, joints, or muscles of the extremities, that after accepted therapy, prevents the military member from performing the preponderance of duties assigned.

4. Prosthetic Replacement. Total or partial prosthetic replacement of a major joint, i.e., hop, knee, shoulder.

5. Muscles. Atrophy of, loss of substance of, direct injury to (or residuals thereof) one or more muscles or muscle groups that prevents satisfactory use of the upper or lower extremity. (Does not include muscular changes secondary to neurological disorders. Refer to section on the Nervous System.)

6. Tendon and/or Ligament Transplantation: If restoration of function is not sufficient to adequately perform the preponderance of duties required.

7. Spine

a. Congenital Disorders. (e.g., Spina Bifida, Coxa Vara, Spondylolysis/Spondylolisthesis, Kyphosis, Scoliosis) When more than mild symptoms cause a deterioration in performance of required duties.

b. Acquired Disorders

(1) Fractures requiring spinal cord decompression with residual neurological deficit or loss of mobility due to fusion.

(2) Spondylolysis and/or Spondylolisthesis requiring fusion with loss of mobility.

(3) Herniation of nucleus pulposus when more than mildly symptomatic, with demonstrated neurological involvement; or subsequent surgical treatment does not provide symptomatic relief sufficient for performance of duties.

8. <u>Skull</u>. Significant loss of substance without prosthetic replacement, or with prosthetic replacement in the presence of significant residuals.

9. <u>Fibromyalgia</u>. This condition must meet the definition as put forth by the American College of Rheumatology in 1990.

C. <u>Organs of Special Senses</u>

1. <u>Eyes</u>

a. <u>Eye Disease</u>. Active eye disease or any progressive organic disease or degeneration, regardless of the stage of activity, that is resistant to treatment and affects the distant visual acuity or visual fields such that distant visual acuity is significantly affected or the field of vision of the better eye is less than 40 degrees. (See "Visual Acuity" below.)

b. <u>Visual Acuity</u>. Visual acuity that cannot be corrected with ORDINARY SPECTACLE LENSES, to at least 20/40 in one eye and 20/100 in the other eye, or 20/20 in one eye and 20/400 in the other eye, or an eye has been enucleated.

c. <u>Aniseikonia</u>. With subjective eye discomfort, neurologic symptoms, sensations of motion sickness, functional difficulties and difficulties in distinguishing forms, and not corrected by standard optical lenses.

d. <u>Binocular Diplopia</u>. When not surgically or optically correctable, that is severe, and constant.

e. <u>Bilateral Hemianopsia</u>. Any type that is permanent, and based on an organic defect.

f. <u>Night Blindness</u>. Of such a degree that precludes unassisted night travel.

g. <u>Vision Fields</u>

(1) Visual fields with bilateral concentric constriction to less than 40 degrees.

(2) Visual field in better eye is less than 40 degrees.

2. Ears and/or Hearing

a. Ears

(1) Otitis Externa, chronic, severe, requiring frequent and prolonged treatment.

(2) Mastoiditis requiring frequent and prolonged treatment; or, subsequent to mastoidectomy there is constant drainage from the mastoid cavity.

(3) Meniere's syndrome or labyrinthine disorders of sufficient severity to interfere with satisfactory performance of duties.

(4) Otitis Media, chronic, resistant to conventional therapy interfering with satisfactory performance of duties.

b. Hearing

(1) Unaided hearing loss that adversely effects safe and effective performance of duty.

(2) In the assessment of hearing, when the unaided average loss in the BETTER ear is 35 Db (ANSI) or more in the normal speech range (pure tone audiometric values at the 1000, 2000, 3000, 4000 hertz) the individual will be evaluated at an audiology and speech center. Referral to an MEB will be based on the test that most accurately reflects the degree of hearing loss.

(3) Trained and experienced personnel will not be categorically disqualified if they are capable of effective performance of duty with a hearing aid. Speech discrimination test results should be included.

D. SYSTEMIC DISEASES

1. Definition. Any acute or chronic condition that affects the body as a whole (systemic) and interferes with the successful performance of duty, or requires medication for control, or needs frequent monitoring by a physician, or that requires geographic assignment limitations or requires a temporary limitation of duty exceeding 180 days, or a permanent limitation of duty that effects the whole body (systemic).

a. Infectious

(1) Systemic Mycoses, e.g. Blastomycosis.

(2) Tuberculosis. Pulmonary or generalized.

(3) Leprosy.

(4) AIDS.

(5) Sexually Transmitted Diseases.

(6) HIV Seropositivity

b. Arthritis

(1) Rheumatoid Arthritis.

(2) Spondyloarthropathy.

(a) Ankylosing spondylitis.

(b) Reiter's Syndrome.

(c) Psoriatic Arthritis.

(d) Arthritis associated with inflammatory bowel disease.

(e) Whipple's disease.

c. Other Systemic Diseases

(1) Amyloidosis.

(2) Sarcoidosis. Progressive, not responsive to therapy.

(3) Panniculitis. Relapsing, febrile, nodular.

(4) Myasthenia Gravis.

(5) Porphyria cutanea tarda.

(6) Systemic Lupus Erythematosus.

(7) Sjogren's Syndrome.

(8) Chronic Fatigue Syndrome.

(9) Myopathy. Inflammatory, metabolic, hereditary.

(10) Progressive systemic sclerosis.

(11) Systemic vasculitis.

(12) Hypersensitivity angiitis. Resistant to treatment and more than mildly symptomatic.

(13) Behcet's syndrome.

(14) Adult-onset Still's disease.

(15) Mixed connective tissue disease (overlapping syndromes).

E. RESPIRATORY SYSTEM

1. Upper Airway

a. Sinusitis. Sinusitis or rhinitis (atrophic), with Suppuration. Unresponsive to conventional therapy.

b. Larynx

(1) Obstructive edema of the glottis requiring tracheostomy.

(2) Vocal cord paralysis seriously interfering with speech or airway.

(3) Stenosis of such a degree as to cause respiratory embarrassment on moderate exertion.

c. Trachea. Stenosis or narrowing of such a degree as to cause respiratory embarrassment on moderate exertion.

2. Lower Airway. (Rating is usually based upon Pulmonary Function Tests (PFTs) measuring residual function. Tests should be validated (two of studies agreeing at the 5% level). In addition, studies before and after medication should be done).

a. Infection

(1) Pulmonary Tuberculosis.

(a) If treatable but more than 15 months will be required before service member can be returned to active duty.

(b) Cases unresponsive to therapy.

(2) Histoplasmosis, blastomycosis, toxoplasmosis, or other mycosis not responding to accepted therapy.

b. Asthma. (A clinical syndrome characterized by cough, wheeze, dyspnea and physiological evidence of reversible air flow obstruction or airway hyperreactivity that generally persists over six(6) months. Reversible air flow obstruction is defined as more than 15% increase in FEV1 following administration of an

inhaled Bronchodilator. Airway hyperreactivity is defined as the exaggerated decrease in air flow induced by a standard methacholine challenge test. Chronic asthma requires the regular use of medication to allow the individual to perform the preponderance of military duties.)

c. Bronchiectasis or bronchiolectasis. Cylindrical or saccular with residuals requiring repeated medical care.

d. Bronchitis. Chronic, severe, recurrent unresponsive to repeated medical care.

e. Atelectasis. Unresponsive to conventional therapy requiring repeated medical care.

f. Pulmonary Sarcoidosis. Progressive, unresponsive to conventional therapy.

g. Pneumoconiosis. Severe, with dyspnea on moderate exertion.

h. Cystic disease of the lung

i. Pulmonary Emphysema

j. Pulmonary Fibrosis

k. Residuals. Residuals of pneumothorax, hemothorax, empyema, or residuals of operative procedures on the lungs or chest wall.

l. Bronchial Stenosis

m. Diaphragmatic Dysfunction. Diaphragmatic dysfunction resulting in dyspnea on minimal exertion, not responsive to therapy.

n. Lung Transplant.

F. CARDIOVASCULAR SYSTEM

1. Heart. (In assessing the function of the heart, various functional therapeutic classifications (FTC) may be used as standards (New York Heart Association, Canadian Cardiovascular Society, etc.) Each of the Cardiac conditions should be given an FTC.)

a. Arteriosclerotic Heart Disease.

(1) Coronary Artery Disease.

(a) Angina Pectoris.

(b) Myocardial Ischemia.

(c) Myocardial Infarction.

(d) Congestive Heart Failure.

b. Inflammatory.

(1) Endocarditis.

(2) Pericarditis, chronic or repetitive.

(3) Rheumatic Heart Disease.

(4) Syphilitic Heart Disease.

c. Cardiac Arrhythmias and/or Pacemakers. (See also para A.2.b., above)

(1) Supraventricular Arrhythmias. When life threatening or symptomatic enough to interfere with duty performance.

(2) Heart Block (second or third degree AV block) and chronic symptomatic bradyarrhythmias with poor response to conventional therapy.

(3) Ventricular Arrhythmias. When potentially life threatening or symptomatic enough to interfere with the performance of duty.

(4) Residuals of Sudden Cardiac Death Syndrome Following Successful Resuscitation.

(5) Near or recurrent syncope of cardiac origin.

(6) Permanent indwelling pacemakers or defibrillators or other permanent antitachycardia devices.

d. Hypertrophic Cardiomyopathy.

e. Dilated Cardiomyopathy.

f. Myocardial Disease.

g. Valvular Heart Disease.

h. Hypertensive Cardiac Disease.

i. Post Operative or other invasive procedures involving the heart, pericardium, or vascular system.

(1) Permanent Prosthetic Valve Implantation.

(2) Coronary Artery Revascularization.

(3) Coronary or Valvular Angioplasty or Plaque removal.

(4) Cardiac Arrhythmia Ablation procedures, unless free of unfitting symptoms and signs.

(5) Reconstructive Cardiovascular surgery.

(6) Cardiac Transplant.

k. Any cardiovascular disorder requiring chronic drug therapy in order to prevent the occurrence of potentially fatal or severely symptomatic events that would interfere with duty performance.

2. <u>Vascular System</u>

a. <u>Arteriosclerosis Obliterans</u>. Evidence of arterial disease such as intermittent, ischemic rest pain, or gangrenous/ulcerative skin changes of a permanent nature. Involvement of one or more organs or systems, or anatomic region with symptoms of arterial insufficiency.

b. Major Cardiovascular Anomalies.

(1) Coarctation of the Aorta.

(2) Aneurysm of any major vessel.

c. Periarteritis Nodosa.

d. Chronic Venous Insufficiency.

e. Raynaud's Syndrome.

f. Thromboangiitis Obliterans. With claudication (see F.2.a., above).

g. Recurrent Thrombophlebitis.

h. Varicose Veins. Severe and symptomatic despite conventional therapy.

i. Any vascular reconstruction.

3. <u>Miscellaneous Conditions</u>.

a. Cold Injury.

(1) Frostbite, if significant or with residuals.

(2) Trench foot.

(3) Hypothermia.

b. Erythromyalgia.

c. Hypertensive Cardiovascular and/or Vascular disease.

(1) Diastolic pressure consistently greater than 100mm Hg following adequate therapy; and/or,

(2) Associated changes in the brain, heart, kidney, or optic fundi.

d. Neurocirculatory Syncope

4. <u>Anticoagulant Therapy</u>. When chronically required.

G. <u>GASTROINTESTINAL SYSTEM</u>

1. General. Any organic condition of the Gastrointestinal System that prevents adequate maintenance of the service member's nutritional status, or requires significant dietary restrictions.

2. <u>Inflammatory and/or Infectious Conditions</u>.

a. Esophagitis.

(1) Infectious (e.g., Candidiasis).

(2) Reflux. When not responsive to therapy.

(3) Hiatal hernia. When not responsive to therapy.

b. Gastritis. When not responsive to therapy.

c. Hepatitis.

(1) Persistent symptoms or persistent evidence of impaired liver function.

(2) Inability to serve as a blood donor.

(3) Persistence of biochemical markers indicating chronicity.

d. Pancreatitis, chronic, with residuals (such as malabsorption/glucose abnormality due to enzyme deficiency), or recurrent.

e. Regional Enteritis.

f. Ulcerative Colitis.

g. Proctitis, significantly symptomatic.

h. Intra-abdominal abscess. When unresponsive to therapy.

i. Hepatic abscess. When unresponsive to therapy.

3. Obstructive Conditions

a. Congenital.

(1) Diverticula.

(2) Webs.

(3) Strictures.

b. Acquired.

(1) Diverticula.

(2) Webs.

(3) Strictures.

(4) Peritoneal Adhesive Bands.

4. Dysfunctional Conditions

a. Achalasia of the Esophagus.

b. Biliary Dyskinesia.

c. Cirrhosis. Moderate with evidence of portal hypertension, abdominal veins and/or impaired liver function and/or significant impairment of health.

d. Ulcers (Duodenal, Gastric, Intestinal) when there are complications or residuals.

e. Postgastrectomy and/or Dumping Syndromes.

f. Permanent Gastrostomy, Enterostomy, Ileostomy, Colostomy, Pancreatoenterostomy.

g. Total Gastrectomy, Pancreatectomy

h. Fecal Incontinence.

5. Abdominal Wall Defects. Hernia, recurrent, when repair is contraindicated and the defect interferes with duty performance. This includes removal, e.g., post mastectomy reconstructive surgery.

H. GENITOURINARY SYSTEM

1. Urinary System. (There are three general dysfunctions of the urinary system: Renal Dysfunction, Voiding Dysfunction, Urinary Tract Infection. Some conditions involve a combination.)

a. Renal Dysfunction. (Medical workup will include Creatinine Clearance to quantitate the degree of dysfunction.(See Table 5 of DoD Instruction 1332.39(reference (i)).

(1) Retained Renal Calculus. When resulting in recurrent symptoms, abnormal renal function, or recurrent infection and is not correctable by therapy.

(2) Cystic Kidney, when renal function is impaired or the focus of recurrent infection.

(3) Glomerulonephritis.

(4) Hydronephrosis. When not correctable.

(5) Hypoplasia of the kidney. When symptomatic (high blood pressure, frequent infections, e.g.).

(6) Chronic Nephritis.

(7) Nephrosis.

(8) Stricture of the Ureter, if clinically significant and not correctable.

(9) Residuals of Ureteral Operations, including:

(a) Ureterocolostomy and/or Ureterosigmoidostomy.

(b) Ureterocystostomy.

(c) Ureteroileostomy.

(d) Ureteroplasty.

(10) Pyeloplasty, with significant residuals.

(11) Nephrectomy. When there are complications with the remaining kidney.

(12) Nephrostomy, Pyelostomy, Ureterostomy. When there is persistent drainage.

(13) Renal Transplant.

(a) Recipient.

(b) Donor. If there is malfunction of the remaining kidney.

(14) Pyelonephritis, if chronic.

b. Voiding Dysfunction

(1) Cystitis, when complications or residuals preclude satisfactory performance of duty.

(2) Urinary Incontinence, if unresponsive to treatment.

(3) Neurogenic Bladder.

(4) Epispadias. When there is an inability to perform required duty due to soilage or recurrent infection.

(5) Stricture of the Urethra, not amenable to treatment.

(6) Cystectomy

(7) Cystoplasty. When residual urines are greater than 50cc and/or there is refractory infection.

(8) Urethrostomy.

c. Urinary Tract Infection

(1) Chronic Urethritis.

(2) Chronic Pyonephrosis/Pyelonephritis.

(3) Perirenal Abscess.

(4) Cystoplasty. When there is refractory infection.

2. Female Genitourinary Conditions

a. Dysmenorrhea. When severity is such that duty performance is affected.

b. Endometriosis. When the severity is such that duty performance is affected.

c. Menopausal Syndrome. When constitutional symptoms prevent duty performance.

d. Chronic Pelvic Pain. When the severity is such that duty performance is affected.

e. Hysterectomy. When residual complications preclude satisfactory performance of duty.

f. Oophorectomy. When residual symptoms preclude satisfactory duty performance.

I. HEMIC AND LYMPHATIC SYSTEMS

1. Anemia. When symptomatic and not responsive to therapy.

2. Hemolytic Crises. When complicated, chronic, and symptomatic.

3. Leukopenia. When not responsive to therapy or when therapy is prolonged, or when complicated by recurrent infections.

4. Polycythemia. When unresponsive to therapy.

5. Purpura or Bleeding disorders.

6. Chronic Anticoagulation Therapy.

7. Hypercoagulable states with thromboembolic disease.

8. Indwelling Filter to prevent embolic phenomena.

9. Leukemia, or history thereof.

10. Lymphomas, or history thereof

a. Hodgkin's.

b. Non-Hodgkin's.

J. SKIN AND CELLULAR TISSUES

1. When conditions are severe, unresponsive to therapy, and interfere with the satisfactory performance of duty, wearing of the uniform, or using military equipment.

2. Systemic Conditions, including:

a. Amyloidosis.

b. Dermatomyositis.

c. Dermatographism.

d. Eczema.

e. Chronic Lymphedema.

f. Erythema Multiforme.

g. Hyperhidrosis.

h. Leukemia Cutis or Mycosis Fungoides.

i. Neurofibromatosis.

j. Psoriasis.

k. Parapsoriasis.

l. Scleroderma.

m. Pemphigus.

n. Exfoliative Dermatitis.

o. Epidermolysis Bullosa.

p. Urticaria.

q. Lichen Planus.

r. Cutaneous Lupus Erythematosus.

3. <u>Localized Conditions</u>

a. Radiodermatitis. Particularly if there is malignant degeneration not amenable to therapy.

b. Intractable Plantar Keratosis.

c. Scars and Keloids. Locally extensive and adherent so as to interfere with the function of a body part or prevent the wearing of the uniform.

d. Xanthoma.

e. Cysts and Tumors. When not amenable to accepted therapy.

f. Atopic Dermatitis.

g. Ulcers of the skin. When not responsive to therapy.

4. Infectious Conditions

a. Acne, Cystic, Severe. When unresponsive to therapy.

b. Dermatitis Herpetiformis.

c. Panniculitis.

d. Cutaneous Tuberculosis.

e. Elephantiasis.

5. Other Chronic Skin Disorders.

K. ENDOCRINE SYSTEM AND METABOLIC CONDITIONS

1. General. Any abnormality that does not respond to therapy satisfactorily or where replacement therapy presents significant management problems.

2. Diabetes

a. All cases requiring oral hypoglycemics.

b. All cases requiring insulin and/or restrictive diet for control.

c. When individuals requiring insulin for maintenance are under poor control ("brittle diabetics").

3. Acromegaly.

4. Adrenal Hyper or Hypofunction.

5. Diabetes Insipidus.

6. Hyper or Hypothyroidism. When not controlled by accepted therapy.

7. Hyper or Hypoparathyroidism. Especially when residuals or complications of surgical treatment (renal, skeletal or mental alterations) prevent performance of duty.

8. Hyperinsulinism. When caused by malignancy or not readily controlled.

9. Gout. In advanced cases with frequent (>3/yr) acute exacerbations or severe bone, joint, or renal damage.

10. Osteomalacia. With residuals that prevent the performance of duties.

11. Hypogammaglobulinemia.

12. Hypercoagulable States.

13. Heat Injury

a. Recurrent Heat Exhaustion. Manifested by collapse, including syncope, occurring during or immediately following exercise or in an environment of increased heat. Must occur at least three or more times in twenty-four months. No remedial factor can be identified.

b. Heat Stroke. Hyperpyrexia (core temperature >106 degrees Fahrenheit), collapse, encephalopathy and organ damage and/or systemic inflammatory activation during the episode. In the absence of encephalopathy, exertional rhabdomyolysis and myoglobinuria are sufficient. A trial of duty may be recommended if complicating factors have been identified and there are no residuals.

L. NERVOUS SYSTEM

1. General. (To better measure conditions involving the nervous system, it is mandatory that certain yardsticks be employed. In DEMENTIA AND HEAD TRAUMA CASES , neuropsychiatric measurements should be performed as early as possible. In MIGRAINE CASES , the number of incapacitating episodes (those that require the individual to stop the activity in which engaged and seek medical treatment) per week, month or year should be noted and verified by a physician. In SEIZURE DISORDER CASES , the evaluation will be done by a neurologist. An EEG, MRI/CT will be included in the initial examination. When subsequent seizure episodes occur while on medical therapy, blood levels of prescribed medication(s) will be determined. All cases of neuropathies will have EMG and nerve conduction studies performed. Cases of multiple sclerosis will have an MRI. Estimation of the degree of social and industrial impairment incurred by the Service member due to migraine and seizure disorder should be included.)

2. Neurogenic Muscular Atrophy

a. Amyotrophic Lateral Sclerosis.

b. All Primary Muscle Disorders.

(1) Facioscapulohumeral Dystrophy.

(2) Limb Girdle Dystrophy.

(3) Myotonia Dystrophy.

c. Myasthenia Gravis. Other than solely ocular.

d. Polio.

3. Progressive Degenerative Disorders.

a. Parkinson's Disease.

b. Huntington's Chorea.

c. Hepatolenticular Degeneration.

d. Friedreich's Ataxia.

4. Demyelinating Disorders.

a. Multiple Sclerosis.

b. Optic Neuritis, recurrent or with residuals.

c. Transverse Myelitis.

5. Residuals of Cerebrovascular Accidents.

6. Residuals of Traumatic Brain Injury.

7. Headaches. Headaches, Migraine, Tension, Vascular, Cluster Types. When manifested by documented frequent incapacitating attacks.

8. Seizure disorders.

9. Narcolepsy.

10. Sleep Apnea Syndrome, when complicated by requirement for an appliance such as CPAP for control.

11. Peripheral Nerve Dysfunctions

a. Neuralgia. When severe, persistent, and not responsive to therapy.

b. Neuritis.

c. Paralysis.

12. Syringomyelia.

13. General Neurological Disorders. Any other neurological condition, regardless of etiology, when, after adequate treatment, residual symptoms prevent the satisfactory performance of duty.

M. PSYCHIATRIC DISORDERS

1. General

a. The terminology and diagnostic concepts used in this section are in consonance with the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV).

b. The Multiaxial System of Diagnosis will be used for all psychiatric conditions that are the subject of an MEB:

| | |
|---|---|
| AXIS I. | Clinical Psychiatric Disorders and Other Psychiatric conditions that may be a focus of clinical attention. |
| AXIS II. | Personality Disorders; Mental Retardation. |
| AXIS III. | General Medical Disorders |
| AXIS IV. | Psychosocial and Environmental problems. |
| AXIS V. | Global Assessment of Function (GAF). |

c. All AXES I and II diagnoses will be assessed as to the Impairment for Military Duty as well as the Impairment for Social and Industrial functioning. This applies even though conditions normally placed on Axis II do not render a Service member medically unable to perform assigned duties. (See Enclosure 1 of DOD Instruction 1332.39 (reference (i)) on VASRD under "Psychoses".)

d. Personality, Sexual, or Factitious Disorders, Disorders of impulse control not elsewhere classified, Adjustment Disorders, Substance-related Disorders, Mental Retardation (primary), or Learning Disabilities are conditions that may render an individual administratively unable to perform duties rather than medically unable, and may become the basis for administrative separation. These conditions do not constitute a physical disability despite the fact they may render a member unable to perform his or her duties.

e. Any MEB listing a psychiatric diagnosis must contain a thorough psychiatric evaluation and include the signature of at least one psychiatrist (identified as such) on the MEB signatory face sheet.

2. Disorders with Psychotic Features (Delusions or prominent Hallucinations). One or more psychotic episodes, existing symptoms or residuals thereof, or a recent history of a psychotic disorder.

3. Affective Disorders (Mood Disorders). When the persistence or recurrence of symptoms requires extended or recurrent hospitalization, or the need for continuing psychiatric support.

4. Anxiety, Somatoform, Dissociative Disorders (Neurotic Disorders). When symptoms are persistent, recurrent, unresponsive to treatment, require continuing psychiatric support, and/or are severe enough to interfere with satisfactory duty performance.

5. Organic Mental Disorders. Dementia or organic personality disorders that significantly impair duty performance.

6. Eating Disorders. When unresponsive to a reasonable trial of therapy or interferes with the satisfactory performance of duty.

N. NEOPLASMS

1. Malignant Neoplasms

a. Malignancies which are unresponsive to therapy or whose residuals prevent satisfactory performance of duty.

b. When the service member with a malignant neoplasm refuses accepted therapy.

c. When, for a variety of reasons, a service member, who has been treated for a malignant neoplasm, will leave active duty before having had an adequate period of observation to determine whether a cure has been effected. These do not include basal cell carcinomas or small squamous cell carcinomas.

2. Benign Neoplasms. Usually benign tumors do not prevent satisfactory performance of duty.

a. When the Service member refuses accepted medical treatment.

b. Ganglioneuroma.

c. Meningeal Fibroblastoma.

d. Pigmented Villonodular Synovitis.

O. GULF WAR CASES

1. Comprehensive Clinical Evaluation Program (CCEP) participants who are diagnosed with conditions that are cause for referral into the DES shall receive a MEB to determine if the case is to be referred to the PEB. Referral of a CCEP participant can occur at any point during CCEP process once a condition which is cause for referral into the DES is identified. However, CCEP participants who have undiagnosed medical complaints should not be referred until they have completed Phase II of the CCEP protocol.

2. All disability cases that involve service members who have undergone any part of the CCEP shall include:

a. A medical board report, or addendum to an original medical board report, with a summary of the CCEP findings.

b. Copies of all CCEP documentation (e.g., test results, consultation reports, et al).

3. Failure to include the foregoing information in any case referred to the PEB for adjudication shall result in its return to the convening authority.

Attachment
Minimum Requirements For Medical Evaluation Board (MEB) Addenda and Narrative Summary With Annotations

MINIMUM REQUIREMENTS FOR MEDICAL EVALUATION BOARD (MEB) ADDENDA AND NARRATIVE SUMMARY WITH ANNOTATIONS

1. PURPOSE. This attachment details the minimum medical information requirements to be annotated in any Medical Evaluation Board or addendum. This information must be documented and approved prior to forwarding the case to the Physical Evaluation Board (PEB).

2. MEDICAL EVALUATION BOARD (MEB) DOCUMENTATION

a. Required Information

(1) Member's name, rank, grade, and social security number

(2) The specialty of the signatory physicians.

(3) The Clinical Department and/or Service.

(4) The Medical Treatment Facility and its location.

(5) Date Medical Evaluation Board (MEB) was conducted.

b. On each page:

(1) Member's Last name, last four digits of Social Security Number, and date typed or transcribed in bottom margin.

(2) Page number will be annotated at the bottom center of the page.

c. Reason for Doing the MEB (e.g., physician-directed, command-directed).

d. Service Member's Eligibility for MEB.

e. Military History

(1) Date of first and most recent entry into service.

(2) Estimated termination of Service.

(3) Administrative Actions ongoing, pending, or completed (e.g., Line of Duty Investigations, Courts-martial, Selective Early Retirement, Bars, Retirement or Separation Dates).

f. Chief Complaint. Preferably stated in Service member's own words.

g. History of Present Illness. Exact details, including pertinent dates regarding injuries, how incurred, and a statement

of the final Line of Duty (LOD) determination, if available. Enclose and summarize any pertinent previous MEBs.

h. Past Medical History

(1) Past injuries and illnesses.

(2) Prior disability ratings (e.g., given by the DES or Department of Veterans Affairs).

(3) Past hospitalizations and relevant outpatient treatment, including documentation of diagnosis and therapy, pertinent dates, and location should be listed.

(4) Social information should be provided which includes but is not limited to:

(a) Living arrangements (e.g., by oneself, with spouse and children, with parents and siblings).

(b) Marital status (single, married, separated, divorced, and the type of relationship (harmony or strife)).

(c) Leisure activity (sports, hobbies, TV, reading)

(d) Acquaintances (male, female, both sexes, many, few).

(e) Substance use or abuse (alcohol, drugs)

(f) Police encounters/record.

(5) Illnesses, conditions, and prodromal symptoms, existing prior to service (referred to as EPTS or EPTE conditions).

i. Laboratory Studies. All studies that support and quantify the diagnosis(es) should be included as should any studies that conflict with the diagnosis(es).

j. Present Condition and Current Functional Status

(1) The current clinical condition of the service member should be noted including required medications and any non-medication treatment regimens (e.g., physical therapy) in progress.

(2) Functional status.

(a) The Service member's functional status as to the ability to perform his or her required duty should be indicated.

(b) If possible, a summation of the member's ability to perform the civilian equivalent of their assigned duties should be indicated.

(3) A statement should be given regarding the prognosis for functional status after completion of treatment if chronic treatment is not necessary.

(4) A statement should be given regarding the prognosis for functional status in cases requiring chronic treatment.

(5) The stability of the current clinical condition and functional status should be addressed.

(6) Statement of compliance with treatment recommendations and reasonableness of any refusal of recommended treatment procedures.

(7) Requirement for monitoring including frequency of indicated treatment and/or therapy visits and associated operational assignment limitations.

k. <u>Conclusions</u>

(1) An informed opinion should be stated as to the Service member's ability to meet current Retention Standards.

(2) If a Service member does not meet Retention Standards, the specific reasons why should be stated.

(3) Treatment recommendations including medications, procedures, and behavior and/or lifestyle modifications. Include a statement concerning the member's compliance. If non-compliant, indicate whether the non-compliance is reasonable.

(4) Under no circumstances is the narrative to indicate the members is unfit, nor recommend a disability percentage rating. It is the PEB's responsibility to determine fitness and disability percentage ratings. The MEB may state something to the effect, "the member is referred to the PEB because we are of the opinion that the member's condition may interfere with the performance of his or her duties because the member does not meet medical retention standards as described in..."

l. <u>Diagnosis(es)</u>. The diagnostic terminology used by the MEB should correlate, if at all possible, with that of the Veterans Affairs Schedule for Rating Disabilities (VASRD). Because the Physical Evaluation Boards are required to assess a Service member's status based on the VASRD, a clearer understanding of that status is facilitated when the same terminology is used by the MEBs and the PEBs.

m. <u>Profile</u>. (If required by service regulation).

(1) The Physical Profile of the service member should agree with the severity of the medical impairment as expressed in by the MEB.

(2) The Physical Profile (PULHES) of the SF-88 should agree with that of the Physical Profile Form as well as that noted in the MEB cover sheet.

3. PHYSICAL EXAMINATION (PE). A complete Physical Examination must be recorded in the MEB. For all conditions, hand dominance must be stated. Selected specialty-related considerations and guidelines follow.

a. Cardiology

(1) Results of special studies to support and quantify the cardiac impairment should be noted e.g. treadmill and thallium stress tests, angiography, and other special studies.

(2) It is imperative that the Functional Therapeutic Classification of the cardiac condition be included. Either the New York or Canadian classification system may be used.

b. Gastroenterology. Service members with fecal incontinence should have recorded findings of rectal examination e.g., digital exam, manometric studies as indicated, and radiographic studies. The degree and frequency of the incontinence should be noted as well as the incapacitation caused by the condition.

c. Neurosurgery

(1) For Vertebral Disc problems, radicular findings on PE should be supported by laboratory studies such as CAT scan, MRI, EMG, NCV. In cases where surgery has been performed, both pre- and postoperative deep tendon reflexes should be documented.

(2) For head injuries neuropsychiatric assessment should be accomplished in all head injury cases. Results of any clinically indicated neuropsychological testing should be included.

d. Ophthalmology. If retention standards are not met for reasons related to vision, visual fields must be included in the PE and verified by an ophthalmologist. Specialist examination should include uncorrected and corrected central visual acuity. Snellen's test or its equivalent will be used and if indicated measurements of the Goldman Perimeter chart will be included.

e. Orthopedics

(1) Range of Motion (ROM) measurements must be documented for injuries to the extremities. The results of the

measurement should be validated and the method of measurement and validation should be stated.

(2) In cases involving back pain, the use of Waddell's signs should be included in assessing the severity and character of the pain. (Waddell G, McCulloch JA, Kummel E, Venner RM. Non-organic physical signs in low back pain. Spine. 1980;5:117-125. Waddell G. Somerville D, Henderson I, Newton M. Objective clinical evaluation of physical impairment in chronic low back pain. Spine. 1992;17:617-628.)

f. <u>Otolaryngology</u>: Audiograms must include speech discrimination scores.

g. <u>Psychiatry (Also refer to pages 4-20/21 paragraph M)</u>

(1) Particular attention should be paid to documenting all prior psychiatric care. Supportive data should be obtained for verification of the patient's verbal history.

(2) Psychometric assessment should be carried out if such assessment will help quantify the severity of certain conditions and allow a reference point for future evaluation.

(3) The Diagnostic and Statistical Manual of Mental Disorders (most recent edition) will be used for diagnostic terminology. The Multiaxial System of Assessment will be used to include Axes I-V. The degree of industrial and industrially related social impairment must be individually determined and documented, for each Axis I and Axis II diagnosis, and correlated to the Service member's clinical manifestations. Increased severity of symptoms due to transient stressors associated with the PEB and prospect of separation or retirement and relocation or re-employment will not be considered in determining the degree of impairment. In addition relationship of the impairment to military and civilian performance is required. The service member's total impairment for civilian industrial adaptability from all sources (Axes I, II, III) should be determined and documented. The contribution of each condition to the total adaptability impairment should then be individually noted and correlated with the service member's clinical manifestations.

(4) Every effort must be made to distinguish symptoms and impairment resulting from personality disorder or maladaptive traits from impairments based on other psychiatric conditions.

h. <u>Pulmonary</u>. When an MEB is held for restrictive or obstructive pulmonary disease, documentation will be provided of pulmonary function testing carried out when service member is on and off therapeutic medication. There must be three pulmonary function tests (PFTs) done off medication, two of which must be in agreement within the five percent (5%) level, and three done

on medication, two of which must agree within the five percent level.

i. Urology

(1) Cases involving neurogenic bladder must include studies that document the condition.

(2) All cases involving incontinence must include studies that document the condition.

(3) Cases involving incontinence and/or neurogenic bladder should have documentation regarding severity as indicated by the number of times self-catheterization is required, the number and type of pads required in a day, or the soilage frequency.

CONDITIONS NOT CONSTITUTING A PHYSICAL DISABILITY

1. PURPOSE. To detail conditions which do not constitute a physical disability.

2. GENERAL CONSIDERATIONS

a. Certain conditions and defects of a developmental nature designated by the Secretary of Defense do not constitute a physical disability and are not ratable in the absence of an underlying ratable causative disorder. If there is a causative disorder it will be rated in accordance with other provisions of this Instruction.

b. These conditions include but are not limited to those listed in paragraph 3., below.

c. Such conditions should be referred for appropriate administrative action under other laws and regulations.

3. DEVELOPMENT DEFECTS AND OTHER SPECIFIC CONDITIONS

a. Enuresis

b. Sleepwalking and/or Somnambulism

c. Dyslexia and Other Learning Disorders

d. Attention Deficit Hyperactivity Disorder

e. Stammering or Stuttering

f. Incapacitating fear of flying confirmed by a psychiatric evaluation

g. Airsickness, Motion, and/or Travel Sickness.

h. Phobic fear of Air, Sea and Submarine Modes of Transportation

i. Certain Mental Disorders including:

(1) Uncomplicated Alcoholism or other Substance Use Disorder

(2) Personality Disorders

(3) Mental Retardation

(4) Adjustment Disorders

(5) Impulse Control Disorders

(6) Homosexuality

(7) Sexual Gender and Identity Disorders, including Sexual Dysfunctions and Paraphilias

(8) Factitious Disorder

j. Obesity.

k. Overheight.

l. Psuedofolliculitis barbae of the face and/or neck.

m. Medical Contraindication to the Administration of Required Immunizations.

n. Significant allergic reaction to stinging insect venom.

o. Unsanitary habits including repeated venereal disease infections.

p. Certain Anemias (in the absence of unfitting sequelae) including G6PD Deficiency, other inherited Anemia Trait, and Von Willebrand's Disease.

q. Allergy to Uniformed Clothing.