**PART 2 - FORMAL ODRB HEARINGS**

**7201 Legal Counsel**

a. An officer of the Judge Advocate's General Corps shall be assigned by the Commanding Officer, Naval Legal Service Office, North Central, Washington Navy Yard, when a formal hearing is conducted. The officer shall function as Counsel for the Board.

b. The petitioner may be represented by civilian counsel, provided by the petitioner, at no expense to the government.

**7202 Conduct Of Formal ODRB Hearings**

a. Open Sessions. Conduct formal hearings in open session unless, in the opinion of the President, ODRB, an open session would be prejudicial to the objective of attaining a full and fair hearing, or a closed hearing is requested by the petitioner.

b. Interlocutory Issues. The President of the Board shall rule on all interlocutory issues except challenges. His or her rulings may be objected to by other board members, in which case the matter will be decided by a majority vote of the members in closed session.

c. Recesses and Continuances. The President of the Board may recess or grant a continuance where good cause is shown.

d. Presiding Officer. The President of the Board shall preside over all sessions and shall speak for the Board in announcing recommended findings and the result of any interlocutory vote.

e. Decorum. Board sessions shall be conducted with dignity and decorum and with the objective of eliciting all facts bearing on a case.

**7203 Administration Of Oaths**. Once a formal hearing has been called to order by the President, Legal Counsel for the Panel shall administer any required oaths.

**7204 Evidence At Formal ODRB Hearings**

a. Before taking testimony, Legal Counsel for the Board shall, for the record, present all papers pertaining to the case to the Board in open session. These documents may be inspected by the petitioner and Counsel. The petitioner or Counsel may cross-examine the author of a document, record, or statement by calling the author as a witness, if reasonably available, or by taking a deposition.

b. The ODRB shall consider all documentary evidence transmitted to it by proper authority. The Board, in addition, may require and examine such records as may be in the files of the Department of the Navy that relate to the issues before the Board. All evidence tendered to the Board having probative value as to the determination of issues before the Board shall be considered. In consideration of the weight or probative value to be accorded evidence, the members of the Board are expected to utilize their background and experience, their common sense, and their knowledge of human nature and behavior. In every case, the testimony of the petitioner concerned shall be considered in connection with all evidence adduced and given such weight as the Board may believe it merits. When the testimony presented at the hearing indicated that the petitioner claims to have disabilities not disclosed by the official medical records or presents evidence sharply in conflict with official medical records, and the issue thus drawn is not one that can be readily resolved by the observation of the Board, there shall be further development of the case by requesting further physical examination, special studies, or further investigation by appropriate agencies; and the hearing shall be adjourned until such development has been accomplished. Recommended findings of the Board shall be based upon evidence consistent with a reasonable probability of truth.

c. A petitioner at a formal hearing before the ODRB shall be permitted to introduce witnesses, depositions, documents, sworn or unsworn statements, or other evidence in their behalf and to question all other witnesses who testify at the hearing.

d. A petitioner may make oral or written arguments personally and through Legal Counsel.

e. A petitioner may elect not to offer evidence or testimony.

f. A petitioner may not be required to make any statement touching upon circumstances surrounding the origin or aggravation of any disease or injury (10 U.S.C. 1219).

g. A petitioner, subject to (e) and (f) above, may be questioned by members of the Board regarding evidence or testimony submitted.

h. Testimony of witnesses will be taken under oath or affirmation unless otherwise requested by the petitioner, Legal Counsel, or trustee (guardian).

**7205 Objections**. Objections may be made to any action (other than a challenge) taken or proposed to be taken by the Board, as well as to the admission of evidence. Objections are recorded as part of the proceedings. The Board must note in the record its ruling on any objections that may be offered. Ordinarily, the objections are passed upon by the President of the Board. However, if any other member dissents from the President's ruling, the objection is

ruled upon by the Board in closed session. The ruling is the decision of the majority of the Board and is announced on the reopening of the hearing.

**7206 Challenges**

a. Any member of the Board may be challenged for cause at any time during the hearing. The Board will not receive a challenge to more than one member at a time. After disclosing grounds for challenge, the petitioner may examine the challenged member. Counsel for the Board may cross-examine the challenged member. After such examination and cross-examination, any other evidence bearing on the member's Fitness to serve shall be heard.

b. The burden of sustaining the challenge is on the person who made the challenge. The challenged member shall withdraw when the Board is closed to vote upon the challenge. A tie or majority vote is sufficient to sustain the challenge. The Board shall decide the challenge according to the preponderance of the evidence. When a challenge reduces the Board below the required number of members, alternate members will be called by the President of the Board, or the senior remaining member, if the President is removed as a result of a challenge.

**7207 Recording Proceedings And Transcript Requirements**. Record the entire hearing, and prepare a verbatim transcript

**7208 Record Of Proceedings**

a. Record votes of individual members in the report of proceedings.

b. The record of proceedings shall include copies of the appointing order and any other communications from the convening authority. Where a formal hearing was conducted, include a verbatim transcript. A transcript of the proceedings is not required in the case of a documentary review. Include the advisory opinions of the Board, together with documents, testimony and other information presented to the Board for its consideration.

c. Assemble documents constituting the remainder of the record of proceedings, if applicable, as follows:

(1) ODRB letter of transmittal with record of proceedings (formal) or (documentary review)

(2) Notification to petitioner of formal hearing

(3) Rights letter to petitioner

(4) SECNAV action

(5) Any PEB actions

(6) Medical Board Report (with copy of Health Record and Clinical Record)

(7) NAVMED 6100/2 - Statement of Patient concerning findings of medical board

(8) Line of Duty Investigation with endorsements

(9) Statement of Service

d. The President of the Board and the Recorder shall sign the record of proceedings.

e. The President of the Board shall initial any corrections to the proceedings and advisory opinions.

f. Provide a copy of the record of proceedings to the petitioner and his or her Counsel.

**7209** **Transmittal Of Proceedings**. In both documentary reviews and formal hearings, transmit the record of proceedings to the Judge Advocate General for review and for further forwarding to the Secretary of the Navy (ASN (M&RA)) for resolution.

**7210 – 7299** **Reserved**

# MEDICAL CONDITIONS AND PHYSICAL DEFECTS WHICH NORMALLY ARE CAUSE FOR REFERRAL TO THE PHYSICAL EVALUATION BOARD (PEB)

**8001** **General**

a. This enclosure provides a listing, mainly by body system, of medical conditions and physical defects which are cause for referral into the Disability Evaluation System (DES). The major objective of the list is to achieve uniform disposition under the law.

(1) This listing is not all-inclusive.

(2) A service member who has one or more of the listed conditions or physical defects is not automatically Unfit and therefore may not qualify for separation or retirement for disability.

b. In modifying these guidelines, SECNAV will consider conditions and defects not listed in this enclosure which justify referral of an individual to the PEB because the conditions or defects, individually or in combination:

(1) Significantly interfere with the reasonable fulfillment of the purpose of the individual's employment in the military service;

(2) May seriously compromise the health or well-being of the individual if he or she were to remain in the military service. This may involve dependence on certain medications, appliances, severe dietary restrictions, or frequent special treatments, or a requirement for frequent clinical monitoring;

(3) May prejudice the best interests of the Government if the individual were to remain in the military service.

c. Physicians who prepare MEB reports and TDRL periodic physical examinations for referral for physical disability evaluation are encouraged to use the DVA's Physician's Guide for Disability Evaluation Examinations to describe the nature and degree of severity of the functional impairment consequent to each of the member's conditions.

d. Any drug therapy which in and of itself presents significant medical hazards or potential significant complications and/or requires frequent monitoring may render a member Unfit even if the condition in and of itself does not. This treatment may preclude the full performance of duties.

e. Any condition that appears to significantly interfere with performance of duties appropriate to a service member's, office, grade, rank or rating will be considered for MEB evaluation. The MEB shall conform to the following general requirements.

(1) Confirm the medical diagnosis(es).

(2) Document the service member's current medical condition to include treatment status and potential for medical recovery.

(3) Review each case based on relevant facts.

(4) Contain bolded and bracketed evaluation procedures and/or data of special importance to the assessment process.

(5) Follow the suggested annotated format for the MEB report in attachment (a) of this enclosure.

(6) Refer to the PEB if optimal medical treatment has been received in accordance with service specific guidelines.

f. Whenever possible members should be placed on LIMDU for an appropriate period of time before determining that the member is Unfit to continue naval service.

g. Although not specifically mentioned after each of these illnesses/injuries, the physician should be aware that the presence of the condition alone is often not a criteria for submission of a MEB report - the member must have been tried on appropriate courses of medication (and proper use of LIMDU status), been unresponsive to them, required untoward number of visits for medical care or hospitalizations and, just as importantly, the condition must be Unfitting. The physician writing the MEB report must document why a certain condition is Unfitting.

**8002 Musculoskeletal System**

a. Upper Extremity

(1) The ability to pinch, grasp, or grip is prevented by disease, residuals of disease, acute injury, or chronic residuals of acute injury to the hand or fingers.

(2) Amputation of a part or whole of the upper extremity. Amputation of part or parts of an upper extremity which results in impairment equivalent to the loss of use of a hand.

(3) Recurrent dislocation (not subluxation) when not surgically correctable.

(4) Ranges of Joint Motion (ROM): Motion that is less than the measurements listed below. Measurements should be validated by three measurements that agree at the 5 percent level. The measuring instrument should be noted. Both active and passive ROM should be listed. When a normal paired extremity is present a comparison of the ROM of the normal to the impaired extremity should be included (See plate I).

(a) Shoulder: Flexion (forward elevation) or abduction to at least 90 degrees.

(b) Elbow and/or Forearm: Flexion to 100 degrees or extension to 60 degrees. Pronation and/or Supination arc to at least 80 degrees.

(c) Wrist: At least 15 degrees flexion plus extension total.

(d) Hand: The motion at each of the three finger joints, when added together, must reach 135 degrees of active flexion or 75 degrees of active extension, in two or more fingers of the same hand. The thumb must be able to be opposed to at least two fingertips.

b. Lower Extremity

(1) Disease, residual of disease, acute injury, or residual of injury that interferes with ambulation or the wearing of military shoes and/or boots for a period in excess of 180 days.

(2) Any documented condition that precludes the ability to run or walk without a perceptible limp.

(3) Shortening of an extremity that exceeds 2 inches (5 cms).

(4) Feet. Any condition that prevents walking, running, or normal weight bearing.

(a) Hallux valgus. When moderately severe, with exostosis or rigidity and pronounced symptoms; or severe with arthritic changes.

(b) Pes Planus, Symptomatic. When more than moderate, with pronation on weight bearing that prevents the wearing of a military shoe, or when associated with vascular changes.

(c) Talipes Cavus. When moderately severe, with moderate discomfort on prolonged standing and walking, metatarsalgia, that prevents the wearing of a military shoe.

(5) Knee. Internal derangement of the knee when there is residual instability following remedial measures such as surgery or physical therapy.

(6) Joint Ranges of Motion (ROM). Motion that is less than the measurements listed below. Measurements should be validated by three (3) measurements that agree at the 5 percent level. The measuring instrument should be noted. Both active and passive ROM should be listed. When a normal paired extremity is present a comparison of the ROM of the normal to the impaired extremity should be included (See plate II).

(a) Hip. Flexion to 90 degrees, or extension to 0 degrees.

(b) Knee. Flexion to 90 degrees, or extension to 15 degrees.

(c) Ankle. Dorsiflexion to 10 degrees, or plantar flexion to 10 degrees.

(7) Amputations

(a) Loss of a toe or toes which precludes the ability to run or walk without a perceptible limp, or to engage in fairly strenuous jobs.

(b) Any loss greater than that specified above to include foot, leg, or thigh.

c. Inflammatory Conditions. Any inflammatory condition involving the bones, joints, or muscles of the extremities that, after accepted therapy, prevents the military member from performing the preponderance of duties assigned.

(1) Arthritis

(a) Arthritis due to infection associated with persistent pain and marked loss of function, with X-ray evidence, and documented history of recurrent incapacity.

(b) Arthritis due to trauma. When surgical treatment fails or is contraindicated and there is functional impairment of the involved joint which precludes the satisfactory performance of duty.

(c) Osteoarthritis. When severe symptoms are associated with impairment of function, supported by X-ray evidence and documented history of recurrent incapacity for prolonged periods.

(d) Rheumatoid arthritis or rheumatoid myositis. If the history of repeated incapacitating episodes is supported by objective and subjective findings.

(2) Chondromalacia or Osteochrondritis Dessicans. Severe, manifested by frequent joint effusion, more than moderate interference with function or with severe residuals from surgery.

d. Prosthetic Replacement. Total or partial prosthetic replacement of a major joint; i.e., hip, knee, shoulder.

e. Muscles. Atrophy of, loss of substance of, direct injury to (or residuals thereof) one or more muscles or muscle groups that prevents satisfactory use of the upper or lower extremity. (Does not include muscular changes secondary to neurological disorders. Refer to section on the Nervous System.)

f. Tendon and/or Ligament Transplantation. If restoration of function is not sufficient to adequately perform the preponderance of duties required.

g. Fractures

(1) Malunion. When, after appropriate treatment, there is more than moderate malunion with marked deformity or there is more than moderate loss of function.

(2) Nonunion. When it persists after an appropriate healing period with more than moderate loss of function.

(3) Bone fusion defect. When manifested by more than moderate pain or loss of function.

(4) Callus, excessive, following fracture. When functional impairment precludes satisfactory performance of duty and the callus does not respond to adequate treatment.

h. Joints

(1) Arthroplasty with severe pain, limitation of motion and limitation of function, joint prosthesis or total joint replacement.

(2) Bony or fibrous ankylosis with severe pain involving major joints or spinal segments, or ankylosis in unfavorable position, or ankylosis with marked loss of function.

(3) Contracture of a joint with marked loss of function and the condition is not remediable by surgery.

(4) Loose bodies within a joint with marked functional impairment complicated by arthritis to such a degree as to preclude favorable results of treatment.

i. Miscellaneous

(1) Myotonia Congenita. Significantly symptomatic and precluding the satisfactory performance of duty.

(2) Osteitis Deformans. Involvement of single or multiple bones with resultant deformities, or symptoms severely interfering with function.

(3) Osteoarthropathy, Hypertrophic, Secondary. More than moderate pain present in one or multiple joints and with at least moderate loss of function.

(4) Osteomyelitis, Chronic. Recurrent episodes not responsive to treatment, and involving the bone to a degree which interferes with stability and function.

j. Spine

(1) Congenital Disorders. When more than mild symptoms cause a deterioration in performance of required duties or if fusion is required, resulting in loss of mobility. Examples are Spina Bifida, Coxa Vara, Spondylolysis, Spondylolisthesis, Kyphosis, Scoliosis.

(2) Acquired Disorders

(a) Fractures requiring spinal cord decompression with residual neurological deficit or loss of mobility due to fusion.

(b) Spondylolysis and/or Spondylolisthesis requiring fusion with loss of mobility.

(c) Herniated nucleus pulposus when more than mildly symptomatic with demonstrated neurological involvement; or subsequent surgical treatment does not provide symptomatic relief sufficient for performance of duties.

(d) When reporting on compression (or other) fractures that have "demonstrable deformity" the medical board must realize that this refers to a physical deformity, not a radiological one.

(e) Deviation or Curvature of Spine. More than moderate, or interfering with function, or causing unmilitary appearance.

k. Skull. Significant loss of substance without prosthetic replacement, or with prosthetic replacement in the presence of significant residuals.

l. Fibromyalgia. This condition must meet the criteria as put forth by the American College of Rheumatology (current edition). The diagnosis must be made by a rheumatologist and it is preferable that the MEB report be dictated by a rheumatologist when Fibromyalgia is the diagnosis.

m. Tendon/Ligament Transplant. Unsatisfactory restoration of function, significantly interfering with the satisfactory performance of duty.

n. Muscles. Flaccid paralysis, spastic paralysis, or loss of substance of one or more muscles producing loss of function that precludes satisfactory performance of duty. Atrophy of, loss of substance of, direct injury to (or residuals) one or more muscles or muscle groups that prevents satisfactory use of the upper or lower extremity. Does not include muscular changes secondary to neurological disorders. Refer to section on the Nervous System.

**8003 Organs Of Special Senses**

a. Eyes

(1) Eye Disease. Active eye disease or any progressive organic disease or degeneration, regardless of the stage of activity, that is resistant to treatment and affects the distant visual acuity or visual fields such that distant visual acuity is significantly affected or the field of vision of the better eye is less than 40 degrees. (See "Visual Acuity" below.)

(2) Visual Acuity

(a) Visual acuity that cannot be corrected with ORDINARY SPECTACLE LENSES, to at least 20/40 in one eye and 20/100 in the other eye, or 20/20 in one eye and 20/400 in the other eye, or

(b) Eye has been enucleated,

(c) When vision is correctable only by the use of contact lenses or other specified corrective devices (telescopic lenses, etc.).

(3) Aniseikonia. With subjective eye discomfort, neurologic symptoms, sensations of motion sickness, functional difficulties and difficulties in distinguishing forms, and not corrected by standard optical lenses.

(4) Binocular Diplopia. Which is severe, constant, and in zone less than 20 degrees from the primary position and not surgically or optically correctable.

(5) Bilateral Hemianopsia. Any type that is permanent, and based on an organic defect. Those due to functional neurosis and those due to transitory conditions, such as periodic migraine, are not normally considered to render an individual Unfit.

(6) Night Blindness. Of such a degree that precludes unassisted night travel.

(7) Visual Fields

(a) Visual fields with bilateral concentric constriction to less than 40 degrees.

(b) Visual field in better eye is less than 40 degrees.

(8) Aphakia, Bilateral.

(9) Chronic Congestive (Closed Angle) Glaucoma or Chronic Non-congestive (Open Angle) Glaucoma. If well established with demonstrable changes in the optic disk or visual fields, or not amenable to treatment.

(10) Diseases and Infections of the Eye. When chronic, more than mildly symptomatic, progressive and resistant to treatment after a reasonable period.

(11) Ocular Manifestations of Endocrine or Metabolic Disorders. Not disqualifying per se; however, residuals or complications, or the underlying disease may render a service member Unfit.

(12) Residuals or Complications of Injury. When progressive, or when reduced visual acuity or fields do not meet the criteria of paragraphs a, b, or g, above.

(13) Retina, Detachment of

(a) Unilateral Detachment

1. When visual acuity does not meet the standard of paragraph a (2) of this section.

2. When the visual field in the better eye is constricted to less than 20 degrees.

3. When uncorrectable diplopia exists.

4. When detachment results from organic progressive disease or new growth, regardless of the condition of the better eye.

(b) Bilateral Detachment, regardless of etiology or results of corrective surgery.

b. Ears and Hearing

(1) Ears

(a) Otitis Externa, chronic, severe, requiring frequent and prolonged treatment.

(b) Mastoiditis requiring frequent and prolonged treatment; or, subsequent to mastoidectomy there is constant drainage from the mastoid cavity.

(c) Meniere's syndrome or labyrinthine disorders of sufficient severity to interfere with satisfactory performance of duties.

(d) Otitis Media, chronic, resistant to conventional therapy interfering with satisfactory performance of duties and necessitating frequent or prolonged medical care.

(2) Hearing

(a) Unaided hearing loss that adversely effects safe and effective performance of duty.

(b) In the assessment of hearing, when the unaided average loss in the better ear is 35 dB (ANSI) or more in the normal speech range (pure tone audiometric values at the 1000, 2000, 3000, 4000 hertz) the individual will be evaluated at an audiology and speech center. Audiology specialists at the center will recommend referral to a PEB when appropriate. This recommendation may be based on the results of either pure tone audiometry or speech reception threshold and discrimination, whichever in the judgment of the specialists most accurately reflects the degree of the hearing loss.

(c) The MEB report will indicate whether the member is capable of effective performance with a hearing aid.

(d) The MEB report must include:

1. Current audiograms (not just the summary);

2. Reference audiograms and especially entry audiogram;

3. Speech discrimination test results.

**8004 Systemic Diseases**

a. Definition. Any acute or chronic condition that affects the body as a whole (systemic) and interferes with the successful performance of duty, or requires medication for control, or needs frequent monitoring by a physician, or that requires geographic assignment limitations or requires a temporary limitation of duty exceeding 180 days, or permanent limitation of duty that effects the whole body (systemic).

b. Infectious

(1) Systemic Mycoses; e.g., Blastomycosis.

(2) Tuberculosis. Pulmonary or generalized.

(3) Leprosy.

(4) Systemic sexually transmitted diseases.

(a) Complications or residuals of venereal diseases.

(b) When chronicity or degree of severity is such that the individual is incapable of performing useful duty.

(5) AIDS/HIV Related Illness. Service members confirmed to be HIV antibody positive and who demonstrate immunologic deficiency, neurologic involvement, decreased capacity to respond to infection, or progressive clinical or laboratory abnormalities associated with HIV, which include Acquired Immune Deficiency Syndrome (AIDS). Uncomplicated HIV seropositivity should not result in referral to the PEB, but warrants the convening of a MEB for a public health monitoring purposes in accordance with appropriate regulations.

c. Arthritis

(1) Rheumatoid Arthritis.

(2) Spondyloarthropathy.

(a) Ankylosing spondylitis.

(b) Reiter's Syndrome.

(c) Psoriatic Arthritis.

(d) Arthritis associated with inflammatory bowel disease.

(e) Whipple's disease.

d. Other Systemic Diseases

(1) Amyloidosis.

(2) Sarcoidosis. Progressive, not responsive to therapy or with severe or multiple organ involvement.

(3) Panniculitis. Relapsing, febrile, nodular.

(4) Myasthenia Gravis.

(5) Porphyria cutanea tarda.

(6) Systemic Lupus Erythematosus.

(7) Sjogren's Syndrome.

(8) Chronic Fatigue Syndrome.

(9) Myopathy. Inflammatory, metabolic, hereditary.

(10) Progressive systemic sclerosis/Scleroderma.

(11) Systemic vasculitis.

(12) Hypersensitivity angiitis. Resistant to treatment and more than mildly symptomatic.

(13) Behcet's Syndrome.

(14) Adult-onset Still's Disease.

(15) Mixed connective tissue disease (overlapping syndromes).

(16) Dermatomyositis and polymyositis.

**8005 Respiratory System**

a. Upper Airway

(1) Sinusitis. Sinusitis or rhinitis (atrophic), with suppuration, unresponsive to conventional therapy.

(2) Rhinitis. Atrophic rhinitis characterized by bilateral atrophy of nasal mucous membrane with severe crusting, concomitant severe headaches, and foul, fetid odor.

(3) Larynx

(a) Obstructive edema of the glottis requiring tracheostomy.

(b) Vocal cord paralysis seriously interfering with speech or airway.

(c) Stenosis of such a degree as to cause respiratory embarrassment on moderate exertion.

(4) Trachea. Stenosis or narrowing of such a degree as to cause respiratory embarrassment on moderate exertion.

b. Lower Airway. Rating is usually based upon Pulmonary Function Tests (PFTs) measuring residual function. There must be a minimum of one set of PFTs.

(1) Studies should be performed both before and after medication:

(a) When the results of pre-bronchodilator PFTs are normal, post-bronchodilator studies are not required.

(b) In all other cases, post-bronchodilator studies should be done unless contraindicated (because of allergy to medication, etc.) or if a patient was on bronchodilators before the test and had taken his/her medication within a few hours of the study.

(c) A physician who determines that a post-bronchodilator study should not be done in a given case should provide an explanation.

(2) Where warranted, the member should have a methcholine challenge, especially when the original set of PFTs are "normal".

(3) In cases of exercise-induced asthma, PFTs after exercise should be performed.

(4) Infection

(a) Pulmonary Tuberculosis

1. If treatable but more than 15 months will be required before service member can be returned to full duty.

2. Cases unresponsive to therapy.

(b) Histoplasmosis, blastomycosis, toxoplasmosis, or other mycosis not responding to accepted therapy.

(5) Asthma. A clinical syndrome characterized by cough, wheeze, dyspnea and physiological evidence of reversible airflow obstruction or airway hyperreactivity that generally persists over 6 months. Reversible air flow obstruction is defined as more than 15 percent increase in FEV-1 following administration of an inhaled Bronchodilator. Airway hyperreactivity is defined as the exaggerated decrease in airflow induced by a standard methcholine challenge test. Chronic asthma requires the regular use of medication to allow the individual to perform the preponderance of military duties.

(6) Bronchiectasis or bronchiolectasis. Cylindrical or saccular with residuals requiring repeated medical care or moderately symptomatic, with productive cough at frequent intervals throughout the day, or with moderate other associated lung disease to include recurrent pneumonia, or with residuals or complications which require repeated hospitalization.

(7) Bronchitis. Chronic, severe, recurrent unresponsive to repeated medical care.

(8) Atelectasis. Unresponsive to conventional therapy requiring repeated medical care.

(9) Pulmonary Sarcoidosis. Progressive, unresponsive to conventional therapy or complicated by demonstrable moderate reduction in pulmonary function.

(10) Pneumoconiosis. Severe, with dyspnea on moderate exertion.

(11) Cystic disease of the lung.

(12) Pulmonary Emphysema. Resulting in dyspnea on mild exertion and supported by demonstrable moderate reduction in pulmonary function or when present, to at least a moderate degree, as a complication of any other respiratory condition.

(13) Pulmonary Fibrosis. Linear fibrosis or fibrocalcific residuals of such a degree as to cause dyspnea on mild exertion and demonstrable moderate reduction in pulmonary function.

(14) Residuals. Residuals of pneumothorax, hemothorax, empyema, or residuals of operative procedures on the lungs or chest wall.

(a) Hemopneumothorax, Hemothorax, Pyopneumothorax or Chronic Fibrotic Pleurisy. More than moderate restriction of respiratory excursions and chest deformity, or weakness and fatigability on slight exertion.

(b) Surgery of Lungs and Chest. If surgery results in impairment of pulmonary function to a moderate degree or more, as demonstrated by ventilatory tests.

(15) Bronchial Stenosis. Severe stenosis associated with repeated attacks of bronchopulmonary infections requiring frequent hospitalization.

(16) Diaphragmatic Dysfunction. Diaphragmatic dysfunction resulting in dyspnea on minimal exertion, not responsive to therapy.

(17) Lung Transplant

**8006 Cardiovascular System**

a. General. Evaluation and reporting of cardiovascular function should be in terms of metabolic equivalents (METs) of energy expended to produce a certain level of symptoms.

(1) Objective measurements of the level of physical activity, expressed as METs, at which cardiac symptoms develop is the main method of evaluating cardiovascular entities now.

(2) The exercise capacity of skeletal muscle depends on the ability of the cardiovascular system to deliver oxygen to the muscle, and measuring exercise capacity can, therefore, also measure cardiovascular function. The most accurate measure of exercise capacity is the maximal oxygen uptake, which is the amount of oxygen, in liters per minute, transported from the lungs and skeletal muscle at peak effort. Because measurement of the maximal oxygen uptake is impractical, multiples of resting oxygen consumption (or METs) are used to calculate the energy cost of physical activity. One MET is the energy cost of standing quietly at rest and represents an oxygen uptake of 3.5 milliliters per kilogram of body weight per minute. The calculation of work activities in multiples of METs is a useful measurement for assessing disability and standardizing the reporting of exercise workloads when different exercise protocols are used.

(3) Alternative methods of evaluating function are provided for situations where treadmill stress testing is medically contraindicated – the examiner's estimation of the level of

activity, expressed in METs and supported by examples of specific activities, such as slow stair climbing or shoveling snow that results in dyspnea, fatigue, angina, dizziness or syncope is acceptable.

b. Heart. In assessing the function of the heart, various functional therapeutic classifications (FTC) may be used as standards (New York Heart Association, Canadian Cardiovascular Society, etc.). Each of the cardiac conditions should be given an FTC. See enclosure (9), attachment (b), table (3).

(1) Arteriosclerotic Heart Disease. Associated with congestive heart failure, repeated anginal attacks or objective evidence of myocardial infarction.

(2) Inflammatory

(a) Endocarditis. Resulting in significant residuals (e.g., myocardial insufficiency).

(b) Pericarditis, chronic or repetitive.

(c) Rheumatic Heart Disease

(d) Syphilitic Heart Disease

(3) Cardiac Arrhythmias and/or Pacemakers

(a) Supraventricular Arrhythmias. When life threatening or symptomatic enough to interfere with duty performance.

1. Paroxysmal Supraventricular Tachycardia. If associated with organic heart disease or when life threatening or symptomatic enough to interfere with duty performance, if not adequately controlled by medication.

2. Atrial Fibrillation and Flutter. Associated with organic heart disease, or if not adequately controlled by medication.

(b) Heart Block (second or third degree AV block) and chronic symptomatic bradyarrhythmias with poor response to conventional therapy.

(c) Paroxysmal ventricular tachycardia/Ventricular Arrhythmias. When potentially life threatening or symptomatic enough to interfere with the performance of duty.

(d) Residuals of Sudden Cardiac Death Syndrome following successful resuscitation.

(e) Near or recurrent syncope of cardiac origin.

(f) Permanent indwelling pacemakers or defibrillators or other permanent anti-tachycardia devices.

(4) Hypertrophic Cardiomyopathy

(5) Dilated Cardiomyopathy

(6) Myocardial Disease. Myocarditis and Degeneration of the Myocardium. Myocardial damage producing symptoms such as fatigue, palpitation and dyspnea with ordinary physical activity.

(7) Valvular Heart Disease

(8) Hypertensive Cardiac Disease

(9) Reconstructive Surgery, Including Grafts. When:

(a) The individual is being evaluated for separation or retirement and the observation period following surgery is deemed inadequate to determine the patient's ability to perform duty as evidenced by a cardiovascular surgical consultation.

(b) Prosthetic devices are attached to or implanted in the heart.

(c) Unproved procedures have been accomplished and the patient is unable to satisfactorily perform duty or cannot be returned to duty under circumstances permitting close medical supervision of his activities.

(10) Post Operative or other invasive procedures involving the heart, pericardium, or vascular system

(a) Permanent Prosthetic Valve Implantation.

(b) Coronary Artery Revascularization.

(c) Coronary or Valvular Angioplasty (including PTCA) or plaque removal.

(d) Cardiac Arrhythmia Ablation procedures, unless free of Unfitting symptoms and signs.

(e) Reconstructive Cardiovascular surgery.

(f) Cardiac Transplant.

(11) Any consequences of chronic cardiovascular drug therapy which would interfere with the performance of duty and is required to prevent a potentially fatal outcome or severely symptomatic events.

c. <u>Vascular System</u>

(1) Arteriosclerosis Obliterans. Evidence of arterial disease such as intermittent, ischemic rest pain, or gangrenous/ulcerative skin changes of a permanent nature. Involvement of one or more organs or systems, or anatomic region with symptoms of arterial insufficiency. When any of the following pertain:

(a) Intermittent claudication of sufficient severity to produce pain and inability to complete a walk of 200 yards or less on level ground at 112 steps per minute without a rest, or

(b) Objective evidence of arterial disease with symptoms of claudication, ischemic rest pain or with gangrenous or ulcerative skin changes of a permanent degree in the distal extremity, or

(c) Involvement of more than one organ system or anatomic region (the lower extremities are considered one region for this purpose) with symptoms of arterial insufficiency.

(2) Major Cardiovascular Anomalies

(a) Coarctation of the Aorta.

(b) Aneurysm of any major vessel, including those corrected by surgery.

(3) Periarteritis Nodosa

(4) Chronic Venous Insufficiency. When symptomatic despite elastic support, significantly interfering with the satisfactory performance of duty.

(5) Raynaud's Phenomenon/Syndrome. Manifested by trophic changes of the involved parts characterized by scarring of the skin, or ulceration.

(6) Thromboangiitis Obliterans. With claudication. Intermittent claudication of sufficient severity to produce pain and inability to complete a walk of 200 yards or less on level ground at 112 steps per minute without rest, or other equally significant complications.

(7) Recurrent Thrombophlebitis

(8) Varicose Veins. Severe and symptomatic despite conventional therapy.

(9) Any vascular reconstruction

d. Miscellaneous Conditions

(1) Cold Injury

(a) Frostbite, if significant or with residuals.

(b) Trench foot.

(c) Hypothermia.

(2) Erythromelalgia

(3) Hypertensive Cardiovascular and/or Vascular disease

(a) Diastolic pressure consistently greater than 100mm Hg following adequate therapy; and/or,

(b) Associated changes in the brain, heart, kidney, or optic fundi.

(c) Blood pressure readings must have 5 readings, each reading taken after the member has been sitting for at least 15 minutes.

(4) Neurocirculatory Syncope

e. Anticoagulant Therapy. When chronically required.

**8007 Gastrointestinal System**

a. General. Any organic condition of the Gastrointestinal System that prevents adequate maintenance of the service member's nutritional status, or requires significant dietary restrictions.

b. Inflammatory and/or Infectious Conditions

(1) Esophagitis. Persistent and not responsive to therapy.

(a) Infectious (e.g., Candidiasis).

(b) Reflux. When not responsive to therapy.

(c) Hiatal hernia. With severe symptoms not relieved by dietary or medical therapy, or bleeding is recurrent in spite of prescribed treatment.

(2) Gastritis. When not responsive to therapy. Severe, chronic gastritis with repeated symptoms requiring hospitalization and confirmed by gastroscopic examination.

(3) Hepatitis

(a) Persistent symptoms or persistent evidence of impaired liver function.

(b) Inability to serve as a blood donor.

(c) Persistence of biochemical markers indicating chronicity.

(4) Pancreatitis, chronic, with residuals (such as malabsorption/glucose abnormality due to enzyme deficiency), or recurrent.

(5) Regional Enteritis

(6) Ulcerative Colitis/Crohn's disease

(7) Proctitis. Moderate to severe symptoms of bleeding, or painful defecation, or tenesmus and diarrhea, with repeated admissions to the hospital.

(8) Intra-abdominal abscess. When unresponsive to therapy.

(9) Hepatic abscess. When unresponsive to therapy.

c. <u>Obstructive Conditions</u>

(1) Congenital

(a) Diverticula

(b) Webs

(c) Strictures. Stricture of the esophagus of such a degree as to require an essentially liquid diet, frequent dilation, and hospitalization, and/or which causes difficulty in maintaining weight and nutrition.

(2) Acquired

(a) Diverticula

(b) Webs

(c) Strictures. Same as above.

(d) Peritoneal Adhesive Bands. Recurring episodes of intestinal obstruction characterized by abdominal colicky pain and vomiting, and requiring frequent admissions to the hospital.

d. <u>Dysfunctional Conditions</u>

(1) Achalasia of the Esophagus. Manifested by dysphagia not controlled by dilatation with frequent discomfort, or inability to maintain normal vigor and nutrition.

(2) Biliary Dyskinesia

(3) Cirrhosis. Moderate with evidence of portal hypertension, esophageal varices, distended abdominal veins and/or impaired liver function and/or significant impairment of health.

(4) Ulcers (Duodenal, Gastric, Intestinal) when there are complications or residuals. Repeated incapacitation or absences from duty because of recurrence of symptoms (pain, vomiting, or bleeding) in spite of good medical management, and supported by laboratory and X-ray evidence of activity or severe deformity.

(5) Gastrectomy

(a) Total

(b) Subtotal, with or without vagotomy, or gastrojejunostomy or pyloroplasty with or without vagotomy, when in spite of good medical management, the individual experiences any of the following:

<u>1</u>. Develops incapacitating dumping syndrome. Postoperative symptoms such as a moderate feeling of fullness after eating, or the need to avoid or restrict the ingestion of high carbohydrate foods, or the need for a daily schedule for a number of small meals should not be confused with dumping syndrome.

2. Develops frequent episodes of incapacitating epigastric distress with characteristic circulatory symptoms or diarrhea.

3. Continues to demonstrate significant weight loss. (Preoperative weight representative of obesity should not be taken as a reference point in making this assessment.)

(6) Permanent Gastrostomy, Enterostomy, Ileostomy, Colostomy, Pancreatoenterostomy

(7) Total Pancreatectomy

(8) Fecal Incontinence

(9) Pancreaticoduodenostomy, Pancreaticogastrostomy, Pancreaticojejunostomy

(10) Proctopexy, Proctoplasty, Proctorrhaphy, or Proctotomy. If fecal incontinence remains after appropriate treatment.

e. Abdominal Wall Defects. Hernia, recurrent, when repair is contraindicated and the defect interferes with duty performance. This includes removal; e.g., post mastectomy reconstructive surgery.

**8008 Genitourinary System**

a. Urinary System. There are three general dysfunctions of the urinary system: Renal Dysfunction, Voiding Dysfunction, Urinary Tract Infection. Some conditions involve a combination.

(1) Renal Dysfunction. Medical workup will include creatinine clearance to quantitate the degree of dysfunction (see table 5 of attachment (b) to enclosure (9)). In addition, the report should contain current BUN, creatinine values and creatinine clearance.

(a) Retained Renal Calculus. When resulting in recurrent symptoms, abnormal renal function, or recurrent infection and is not correctable by therapy.

(b) Cystic Kidney, when renal function is impaired or the focus of recurrent infection. Congenital renal anomaly, resulting in frequent or recurring infections, or when there is evidence of obstructive uropathy not responding to medical or surgical treatment.

(c) Glomerulonephritis

(d) Hydronephrosis. When not correctable and with continuous or frequent symptoms.

(e) Hypoplasia of the kidney. When complicated (e.g., high blood pressure, frequent infections).

(f) Chronic Nephritis. With renal function impairment.

(g) Nephrosis. With renal function impairment.

(h) Stricture of the Ureter, if clinically significant and not correctable.

(i) Residuals of Ureteral Operations, including:

1. Ureterocolostomy and/or Ureterosigmoidostomy.

2. Ureterocystostomy. When both ureters are markedly dilated with irreversible changes.

3. Ureteroileostomy

4. Ureteroplasty. When unilateral procedure is unsuccessful and nephrectomy is necessary, consider on the basis of the standard for a nephrectomy.

5. When bilateral, evaluate residual obstruction or hydronephrosis and consider Unfitness based on residuals.

6. Ureterosigmoidostomy

(j) Pyeloplasty, with significant residuals.

(k) Nephrectomy. When there are complications with the remaining kidney.

(l) Nephrostomy, Pyelostomy, Ureterostomy. When there is persistent drainage.

(m) Renal Transplant

1. Recipient

2. Donor. If there is malfunction of the remaining kidney.

(n) Pyelonephritis, if chronic and has not responded to medical or surgical treatment, with evidence of persistent hypertension or reduction in renal function.

(2) Voiding Dysfunction

(a) Cystitis, when complications or residuals preclude satisfactory performance of duty.

(b) Urinary Incontinence, if unresponsive to treatment.

(c) Neurogenic Bladder

(d) Epispadias. When there is an inability to perform required duty due to soilage or recurrent infection.

(e) Stricture of the Urethra, not amenable to treatment.

(f) Cystectomy

(g) Cystoplasty. When residual urines are greater than 50 cc and/or refractory infection.

(h) Urethrostomy

(i) Penis, Amputation of. When urine is voided in such a manner as to soil clothing or surroundings, or result in severe mental symptoms.

(3) Urinary Tract Infection

(a) Chronic Urethritis

(b) Chronic Pyonephrosis/Pyelonephritis which has not responded to medical or surgical treatment, with evidence of persistent hypertension or reduction in renal function.

(c) Perirenal Abscess

(d) Cystoplasty. When there is refractory infection.

b. Female Genitourinary Conditions

(1) Dysmenorrhea. When severity is such that duty performance is affected.

(2) Endometriosis. When the severity is such that duty performance is affected.

(3) Menopausal Syndrome. When constitutional symptoms prevent duty performance.

(4) Chronic Pelvic Pain. When the severity is such that duty performance is affected.

(5) Hysterectomy. When residual complications preclude satisfactory performance of duty.

(6) Oophorectomy. When residual symptoms preclude satisfactory duty performance.

**8009 Hemic And Lymphatic Systems**

a. Anemia. When symptomatic and not responsive to therapy.

b. Hemolytic Crises. When complicated, chronic, and symptomatic.

c. Leukopenia. When not responsive to therapy or when therapy is prolonged, or when complicated by recurrent infections.

d. Polycythemia. When unresponsive to therapy.

e. Purpura or Bleeding disorders

f. Chronic Anticoagulation Therapy

g. Hypercoagulable states with thromboembolic disease.

h. Indwelling Filter to prevent embolic phenomena.

i. Leukemia, or history thereof.

j. Lymphomas, or history thereof.

(1) Hodgkin's

(2) Non-Hodgkin's

k. Splenomegaly, Chronic.

**8010 Skin And Cellular Tissues**

a. General: Regardless of whether specifically stated under each diagnosis, the following encompassing statement applies to all: a MEB report shall be submitted when conditions are severe, unresponsive to therapy, and interfere with the satisfactory performance of duty, wearing of the uniform, or using military equipment.

b. Systemic Conditions including:

(1) Amyloidosis

(2) Dermatomyositis/polymyositis

(3) Eczema

(4) Chronic Lymphedema

(5) Erythema Multiforme. More than moderate and chronic or recurrent.

(6) Hyperhidrosis

(7) Leukemia Cutis or Mycosis Fungoides

(8) Neurofibromatosis

(9) Psoriasis

(10) Parapsoriasis

(11) Scleroderma

(12) Pemphigus. Not responsive to treatment and with moderate constitutional or systemic symptoms.

(13) Exfoliative Dermatitis

(14) Epidermolysis Bullosa

(15) Urticaria

(16) Lichen Planus

(17) Cutaneous Lupus Erythematosus

c. Localized Conditions

(1) Radiodermatitis. Particularly if there is malignant degeneration not amenable to therapy.

(2) Intractable Plantar Keratosis

(3) Scars and Keloids. Locally extensive and adherent, interfering with the function of a body part or preventing the wearing of the uniform.

(4) Xanthoma

(5) Cysts and Tumors. When not amenable to accepted therapy.

(6) Atopic Dermatitis. More than moderate or requiring frequent hospitalization.

(7) Ulcers of the skin. When not responsive to therapy; e.g., Fungus Infections, Superficial - if not responsive to therapy and resulting in frequent absences from duty.

(8) Hidradenitis, Suppurative, and Folliculitis Decalvans.

d. Infectious Conditions

(1) Acne, Cystic, Severe. When unresponsive to therapy.

(2) Dermatitis Herpetiformis

(3) Panniculitis

(4) Cutaneous Tuberculosis

(5) Elephantiasis

e. Other Chronic Skin Disorders

**8011 Endocrine System And Metabolic Conditions**

a. General. Any abnormality that does not respond to therapy satisfactorily or where replacement therapy presents significant management problems.

b. Diabetes

(1) All cases requiring oral hypoglycemics where control is not adequate, excluding the "honeymoon" period.

(2) All cases requiring insulin and/or restrictive diet for control.

(3) When individuals requiring insulin for maintenance are under poor control ("brittle diabetics").

c. Acromegaly

d. Adrenal Hyper or Hypofunction

e. Diabetes Insipidus

f. Hyper- or Hypothyroidism. Severe symptoms not controlled by accepted therapy.

g. Hyper- or Hypoparathyroidism. Especially when residuals or complications of surgical treatment (renal, skeletal or mental alterations) prevent performance of duty.

h. Hyperinsulinism. When caused by malignancy or not readily controlled.

i. Gout. In advanced cases with frequent (>3/yr) acute exacerbations or severe bone, joint, or renal damage.

j. Osteomalacia. Residuals preventing performance of duties.

k. Hypogammaglobulinemia

l. Hypercoaguable States

m. Heat Injury

(1) Recurrent Heat Exhaustion. Manifested by collapse, including syncope, occurring during or immediately following exercise or in an environment of increased heat. Must occur at least three or more times in 24 months. No complicating factor can be identified.

(2) Heat Stroke. Hyperpyrexia (core temperature >106 degrees Fahrenheit), collapse, encephalopathy and organ damage and/or systemic inflammatory activation during the episode. In the absence of encephalopathy, exertional rhabdomyolysis and myoglobinuria are sufficient. A trial of duty may be recommended if complicating factors have been identified and there are no residuals.

n. Malignant Hyperthermia

**8012 Nervous System**

a. General. To better measure conditions involving the nervous system, it is mandatory that certain yardsticks be employed:

(1) Dementia And Head Trauma. Neuropsychologic or neuropsychiatric measurements should be performed as early as possible. There should also be a set of current neuropsychologic or neuropsychiatric measurements submitted with the MEB report. Current here means within 6 weeks of submission of the board.

(2) Migraine Headaches. The number of incapacitating episodes (those that require the individual to stop the activity in which engaged and seek medical treatment) per week, month or year should be noted and verified by a physician.

(3) Seizure Disorders. The evaluation will be done by a neurologist. An EEG, MRI/CT will be included in the initial examination. When subsequent seizure episodes occur while on medical therapy, blood levels of prescribed medication(s) will be determined. The date of the most recent seizure and seizure frequency must be recorded.

(4) Neuropathies. EMG and nerve conduction studies will be performed.

(5) Multiple Sclerosis. All cases will have an MRI of the head or spinal cord.

(6) Impairment Estimate. Estimation of the degree of industrial and (industrially related) social impairment incurred by the service member due to migraine and seizure disorder should be included.

b. Neurogenic Muscular Atrophy

(1) Amyotrophic Lateral Sclerosis

(2) All Primary Muscle Disorders

(a) Facioscapulohumeral Dystrophy

(b) Limb Girdle Dystrophy

(c) Myotonia Dystrophy

(d) Myelopathic Muscular Atrophy

(3) Myasthenia Gravis. Other than solely ocular.

(4) Polio

(5) Progressive Muscular Atrophy

c. Progressive Degenerative Disorders

(1) Parkinson's Disease. Paralysis Agitans.

(2) Huntington's Chorea

(3) Hepatolenticular Degeneration

(4) Friedreich's Ataxia

d. Demyelinating Disorders

(1) Multiple Sclerosis

(2) Optic Neuritis. Recurrent or with residuals.

(3) Transverse Myelitis/Myelopathy

e. Cerebrovascular Accidents, Residuals

f. Traumatic Brain Injuries, Residuals

g. Headaches. Headaches, Migraine, Tension, Vascular, Cluster Types When manifested by documented frequent incapacitating (e.g., lasting for several consecutive days, and unrelieved by treatment) attacks.

h. Seizure disorders

i. Narcolepsy. Documented with sleep clinic workup

j. Sleep Apnea Syndrome, when complicated by requirement for an appliance such as CPAP for control.

k. Peripheral Nerve Dysfunctions

(1) Neuralgia. When severe, persistent, and not responsive to therapy.

(2) Neuritis. When manifested by more than moderate, permanent functional impairment.

(3) Paralysis due to Peripheral Nerve Injury. When manifested by more than moderate, permanent functional impairment.

l. Syringomyelia

m. General Neurological Disorders. Any other neurological condition, regardless of etiology, when, after adequate treatment, residual symptoms prevent the satisfactory performance of duty.

**8013 Psychiatric Disorders**

a. General

(1) The terminology and diagnostic concepts used in this section are in consonance with the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV). As the DSM is updated, appropriate revisions in the disability system will be made in conjunction with VA approval of use of any new editions.

(2) The Multiaxial System of Diagnosis will be used for all psychiatric conditions that are the subject of an MEB:

AXIS I. Clinical Psychiatric Disorders and Other Psychiatric conditions that may be a focus of clinical attention.

AXIS II. Personality Disorders; Mental Retardation.

AXIS III. General Medical Disorders.

AXIS IV. Psychosocial and Environmental problems.

AXIS V. Global Assessment of Function (GAF).

(3) All AXIS I and II diagnoses will be assessed as to the impairment for military duty as well as the impairment for social and industrial functioning. This applies even though

conditions normally placed on Axis II do not render a service member medically unable to perform assigned duties.

(4) Personality, Sexual, or Factitious Disorders, Disorders of impulse control not elsewhere classified, Adjustment Disorders, Substance-related Disorders, Mental Retardation (primary), or Learning Disabilities are conditions that may render an individual administratively unable to perform duties rather than medically unable, and may become the basis for administrative separation. These conditions do not constitute a physical disability despite the fact they may render a member unable to perform his or her duties.

(5) Any MEB report listing a psychiatric diagnosis must contain a thorough psychiatric evaluation and include the signature of at least one psychiatrist (identified as such) on the MEB report signatory face sheet.

(6) MEB reports with psychiatric diagnoses must have a statement of the member's competency to handle their financial affairs and to understand the proceedings of the board.

b. Disorders with Psychotic Features (Delusions or prominent Hallucinations). One or more psychotic episodes, existing symptoms or residuals thereof, or a recent history of a psychotic disorder.

c. Affective Disorders (Mood Disorders). When the persistence or recurrence of symptoms requires extended or recurrent hospitalization, or the need for continuing psychiatric support.

d. Anxiety, Somatoform, Dissociative Disorders (Neurotic Disorders). When symptoms are persistent, recurrent, unresponsive to treatment, require continuing psychiatric support, and/or are severe enough to interfere with satisfactory duty performance.

e. Organic Mental Disorders. Dementia or organic personality disorders that significantly impair duty performance.

f. Eating Disorders. When unresponsive to a reasonable trial of therapy or interferes with the satisfactory performance of duty.

**8014 Venereal Diseases**. Complications or Residuals of Venereal Diseases. When chronicity or degree of severity is such that the individual is incapable of performing useful duty.

**8015 Neoplasms**

a. Malignant Neoplasms

(1) Malignancies which are unresponsive to therapy or whose residuals prevent satisfactory performance of duty.

(2) When the service member with a malignant neoplasm refuses accepted therapy.

(3) When, for a variety of reasons, a service member, who has been treated for a malignant neoplasm, will leave active duty before having had an adequate period of observation to determine whether a cure has been effected. These do not include basal cell carcinomas or small squamous cell carcinomas without metastases.

b. Benign Neoplasms. Usually benign tumors do not prevent satisfactory performance of duty.

(1) However, there may be residuals of treatment, which do make the individual Unfit and thus require a medical board.

(2) There are instances in which a benign tumor behaves like a malignant tumor or has the potential to be aggressive and damaging as a malignant tumor. These tumors may be rated by analogy to the VA rating for malignancies.

(3) Examples of benign tumors which might interfere with the performance of duties (and might be considered analogous to malignant tumors) are:

(a) Ganglioneuroma

(b) Meningeal Fibroblastoma

(c) Pigmented Villonodular Synovitis

**8016 Southwest Asia Theater Of Operations (SWATO) Cases**

a. General. All service members who are referred to the PEB, who have served in SWATO during the period 2 August 1990 to present will be afforded the opportunity to undergo a Comprehensive Clinical Evaluation Program (CCEP) examination if the medical diagnoses included in the MEB report are assessed to be related to illnesses that are directly and causally related to service in this theater. The results of the CCEP evaluation (submitted as an official addendum in narrative form) will be forwarded to the PEB along with the MEB report. If the member waives this right, the member's waiver must accompany the MEB report. Also, NAVMED Form 6100/1 must indicate whether or not the service member has served in SWATO during the period 2 August 1990 to present.

b. CCEP participants who are diagnosed with conditions referred to as "undiagnosed symptom complex attributed to service in SWATO" that are cause for referral into the DES shall receive a MEB to determine if the case is to be referred to the PEB. Referral of a CCEP participant can occur at any point during the CCEP process once a condition which is cause for referral into the DES is identified. However, CCEP participants who have undiagnosed medical conditions should not be referred until they have completed Phase II and III of the CCEP protocol.

c. Anyone for whom SWATO time of service is an issue in the production of symptoms for which an MEB is contemplated must have been evaluated by CCEP, with an addendum dictated by CCEP prior to referral to the Informal Board.

d. All disability cases that involve service members who have undergone any part of the CCEP shall include:

(1) A medical board report, or addendum to an original medical board report, with a summary of the CCEP findings.

(2) Copies of all CCEP documentation (e.g., test results, consultation reports, et al).

e. Failure to include the foregoing information in any case referred to the PEB for adjudication shall result in its return to the convening authority.

f. Members reporting for TDRL periodic examinations are subject to these same guidelines unless previously evaluated or waived.

g. Enclosure (9), attachment (a) (1) SWATO Undiagnosed Symptom Complex Coding applies.

**8017** **Dental**. Diseases and abnormalities of the jaws or associated tissues when, following restorative surgery, there remain residuals which are incapacitating, or deformities which are severely disfiguring.

Attachment (a) to Enclosure (8)

**MINIMUM REQUIREMENTS FOR MEDICAL EVALUATION BOARD (MEB), ADDENDA AND NARRATIVE SUMMARY WITH ANNOTATIONS**

**1. Purpose**. This attachment details the minimum medical information requirements to be annotated in any Medical Evaluation Board or addendum. This information must be documented and approved prior to forwarding the case to the Physical Evaluation Board (PEB).

a. Fulfillment of these requirements is a joint responsibility. The physicians must work closely with the Medical Boards Section of the Medical Treatment Facility to ensure compliance with these guidelines.

b. Attachment (c) is an example of a comprehensive MEB report.

**2. Medical Evaluation Board (MEB) Documentation**

a. Required Information:

(1) Member's name, rank, grade, and social security number.

(2) The specialty of the signatory physicians.

(3) The Clinical Department and/or service authoring or sponsoring the document.

(4) The Medical Treatment Facility and its location.

(5) Date Medical Evaluation Board (MEB) report was conducted.

(6) A copy of the member's health record should accompany the MEB report. Although helpful, "shadow files" should NOT be submitted in place of the health record. Any supplemental records should be submitted.

b. On Each Page:

(1) Member's last name, social security number, and date typed or transcribed in bottom margin.

(2) Page number will be annotated at the bottom center of the page.

(3) Document is marked "For Offical Use Only – Privacy Act Protected

c. Reason For Doing The MEB (e.g., physician-directed, command-directed).

(1) The mere presence of a diagnosis is not synonymous with disability. It must be established that the medical disease or condition underlying the diagnosis actually interferes significantly with the member's ability to carry out the duties of his/her rank and rate.

(2) When assessing the severity of symptoms, evaluate the subjective symptoms in light of objective findings; report discrepancies in addition to positive findings.

d. Eligibility for MEB.

e. Military Information

(1) Date of first and most recent entry into service.

(2) Estimated termination of Service.

(3) Administrative actions ongoing, pending, or completed (e.g., Line of Duty Investigations, Courts-martial, Selective Early Retirement, Retirement or Separation Dates).

f. Chief Complaint. Preferably stated in service member's own words.

g. History Of Present Illness. Exact details, including pertinent dates regarding illnesses/injuries, how injuries were incurred. Enclose and summarize any pertinent previous MEB reports. The oft used terms "interval history" are inappropriate and assume that the PEB has access to the previous boards which is not always the case. The author of the MEB report must give a complete history chronologically as well as simply event-based.

h. Past Medical History

(1) Past injuries and illnesses.

(2) Prior disability ratings (e.g., given by the DES or Department of Veterans Affairs).

(3) Past hospitalizations and relevant outpatient treatment, including documentation of diagnosis and therapy, pertinent dates, and location should be listed.

(4) Social information pertinent to the member's condition (e.g., activity level and sports activities engaged in would be pertinent to orthopaedic evaluation; alcohol and drug usage rates must also be included) should be provided. There is an inclusive list under the specialty specific section for psychiatric disorders.

(5) Illnesses, conditions, and prodromal symptoms, existing prior to service (referred to as EPTS or EPTE conditions).

i. Laboratory And X-Ray Studies. All studies that support and quantify the diagnosis(es) should be included as should any studies that conflict with the diagnosis(es).

j. Present Condition/Review Of Systems And Current Functional Status

(1) Current clinical condition(s) should be noted including all current complaints and review of systems; required medications and any non-medication treatment regimens (e.g., physical therapy) in progress.

(2) Functional status

(a) The service member's functional status as to the ability to perform his or her required duty should be indicated.

(b) If possible, a summation of the member's ability to perform the civilian equivalent of their assigned duties should be indicated.

(3) A statement should be given regarding the prognosis for functional status after completion of treatment if chronic treatment is not necessary.

(4) A statement should be given regarding the prognosis for functional status in cases requiring chronic treatment.

(5) The stability of the current clinical condition and functional status should be addressed.

(6) Statement of compliance with treatment recommendations and reasonableness of any refusal of recommended treatment procedures, including surgery. NAVMED Form 6100/4 must be submitted when refusal of surgery or treatment is considered unreasonable.

(7) Requirement for monitoring including frequency of indicated treatment and/or therapy visits and associated operational assignment limitations.

k. Conclusions

(1) An informed opinion should be stated as to the service member's ability to meet current retention standards.

(2) If a service member does not meet retention standards, the specific reasons why should be stated.

(3) Treatment recommendations including medications, procedures, and behavior and/or lifestyle modifications. Include a statement concerning the member's compliance. If non-compliant, indicate whether the non-compliance is reasonable.

(4) **Under no circumstances is the narrative to indicate that the member is Unfit, nor recommend a disability percentage rating.** It is the PEB's responsibility to determine Fitness and disability percentage ratings. The MEB report may state something to the effect, "the member is referred to the PEB because we are of the opinion that the member's condition may interfere with the performance of his or her duties because the member does not meet medical retention standards as described in..."

l. Drug Therapy. There may be certain instances where a specific drug therapy may in and of itself preclude the full performance of duties. This must be stated specifically if it is the reason for the board.

m. Limited Duty. The authoring physician should not only address previous periods of limited duty (and what they were for) but also consider whether a member might obtain greater benefit by being referred to a LIMDU Board for placement on LIMDU vice direct submission to the Informal PEB.

n. Surrebuttal. When the member submits a rebuttal to a medical board or an addendum, the authoring physician MUST address the member's specific issues.

o. Referral. Referral to PEB while a member is still hospitalized. The MEB report will cite the reasons for continued retention in the hospital:

(1) When it is necessary that a member be transferred to a VA hospital for continued, extended treatment and he/she is not ready to be released on his/her own recognizance, the evidence presented in the MEB report will support taking these actions and the rating will most likely be 100 percent.

(2) If a member is retained in the hospital for transfer to a VA facility as a convenience for transition to civilian care and life without anticipated problems, the rating will generally be a minimum of 30 percent and not more than 50 percent.

(3) For members who are hospitalized for an acute psychiatric emergency, the MEB report should include a mental status exam and statement of functional status within 30 days of submission of the medical board.

p. Competency Statements. Competency statements are required on all psychiatric diagnoses (except where the psychiatric condition has resolved). The statement of competency

MUST be made by a psychiatrist as the specific determination is to be made in accordance with the JAG Manual. Therefore, most cases that contain a psychiatric diagnosis, should be referred to/evaluated by a psychiatrist.

q. Trauma. Severe trauma and acute clinical, fulminant presentations. In clinical situations where the level of impairment is likely to change significantly within or over the following 2 months, submission of the MEB report should be delayed until this period of time has elapsed.

(1) It is important that the MEB report be dictated at the latest possible time prior to submission. This is particularly important when the MEB report is done and then months pass while waiting for completion of the LODI. If the MEB report has previously been dictated, an addendum should be included stating current condition. Statements such as "There has been no change since the previous medical board was dictated" are generally insufficient, especially since they are not usually correct.

(2) Ensure that all of the member's complaints/conditions are addressed by the appropriate specialty in attached addenda. The authoring service in conjunction with the Medical Boards Department of the MTF is responsible for ensuring that all required addenda and non-medical information are included in the original package.

r. Submission Of Photographs. Current photographs are essential in burn cases and very useful in cases with significantly disfiguring scars. Photographs submitted should be certified, by the medical photography department, to have been taken within 1 month of the date of dictation of the MEB report.

s. Organ Transplants. When the MTF has opted to retain the member to receive his/her transplant, the MTF will place the member on a Limited Duty Status pending the transplant. MEB report referral to the PEB should be delayed until the procedure has been done and the maximum benefit of treatment has been achieved.

t. "Death Imminent" Cases. When it is anticipated that a member will die within 72 hours, the case may be submitted as a "death imminent" case for rapid processing. The physicians must explain why the member is deteriorating so rapidly (see enclosure (12) for full details). The need for an LODI in these cases is addressed in other sections of this document. Competency statements are required for complete processing of the case when a member is deemed incompetent to manage their personal and financial affairs. The MEB report in these cases will be signed by three physicians, one of whom will be a psychiatrist. Death imminent cases will be placed on the TDRL, not PDRL in accordance with policies in this instruction. "Death Imminent" should not be used to simply expedite a case.

u. TDRL Evaluations. Physicians performing TDRL evaluations are responsible for knowing the information contained in the enclosure (3), part 6 that addresses TDRL.

3. **References**. Physicians and medical board personnel should be familiar with the pertinent instructions, some of which are:

a. The Manual of the Medical Department

b. Secretary of the Navy Instructions. Those governing TDRLs and the Disability System.

c. DVA's physician's guide for Disability Evaluation Examinations

4. **Physical Examination (PE)**. A complete physical examination must be recorded in the MEB report and have been conducted within 6 months of the date of the MEB report. For all conditions, hand dominance must be stated. Height and weight must be documented in all MEBs (in the narrative).

5. **Selected Specialty-Related Considerations And Guidelines**

a. CARDIOLOGY

(1) Results of special studies to support and quantify the cardiac impairment should be noted e.g., treadmill and thallium stress tests, angiography, and other special studies.

(2) The Functional Therapeutic Classification of the cardiac condition must be included. Either the New York or Canadian classification system may be used (see enclosure (9) attachment (b), table (3))

(3) General Information. Evaluation and reporting of cardiovascular function should be in terms of METs of energy expended to produce a certain level of symptoms.

(a) Objective measurements of the level of physical activity, expressed as METs (metabolic equivalents), at which cardiac symptoms develop is the main method of evaluating cardiovascular entities now.

(b) Exercise capacity of skeletal muscle depends on the ability of the cardiovascular system to deliver oxygen to the muscle, and measuring exercise capacity can, therefore, also measure cardiovascular function. The most accurate measure of exercise capacity is the maximal oxygen uptake, which is the amount of oxygen, in liters per minute, transported from the lungs and skeletal muscle at peak effort. Because measurement of the maximal oxygen uptake is impractical, multiples of resting oxygen consumption (or METs) are used to calculate the energy cost of physical activity. One MET is the energy cost of standing quietly at rest and represents an oxygen uptake of 3.5 milliliters per kilogram of body weight per minute. The

calculation of work activities in multiples of METs is a useful measurement for assessing disability and standardizing the reporting of exercise workloads when different exercise protocols are used.

(c) Alternative methods of evaluating function are provided for situations where treadmill stress testing is medically contraindicated – the examiner's estimation of the level of activity, expressed in METs and supported by examples of specific activities, such as slow stair climbing or shoveling snow that results in dyspnea, fatigue, angina, dizziness or syncope is acceptable.

b. GASTROENTEROLOGY. Service members with fecal incontinence should have recorded findings of rectal examination e.g., digital exam, manometric studies as indicated, and radiographic studies. The degree and frequency of the incontinence should be noted as well as the incapacitation caused by the condition.

c. NEUROSURGERY/NEUROLOGY

(1) For Vertebral Disc problems, radicular findings on PE should be supported by laboratory studies such as CAT scan, MRI, EMG, NCV. In cases where surgery has been performed, both pre- and postoperative deep tendon reflexes should be documented.

(2) General

(a) DEMENTIA AND HEAD TRAUMA. Neuropsychiatric or neuropsychological assessment should be accomplished in all head injury cases. Results should be included. Neuropsychiatric or neuropsychological measurements should be performed as early as possible. Current tests (performed within 6 weeks of submission of the board) are also required.

(b) MIGRAINE HEADACHES. The number of incapacitating episodes (those that require the individual to stop the activity in which engaged and seek medical treatment) per week, month or year should be noted and verified by a physician.

(c) SEIZURE DISORDER. The evaluation will be done by a neurologist. An EEG, MRI/CT will be included in the initial examination. When subsequent seizure episodes occur while on medical therapy, blood levels of prescribed medication(s) will be determined.

(d) NEUROPATHIES. EMG and nerve conduction studies will be performed.

(e) MULTIPLE SCLEROSIS. Appropriate MRI(s) will be performed.

(f) INDUSTRIAL AND (INDUSTRIALLY RELATED) SOCIAL IMPAIRMENT. Estimate the degree of impairment that will be incurred by the service member.

(g) IMAGING STUDIES. For all neurological and neurosurgical conditions appropriate imaging studies should be obtained in concert with current standards of practice.

d. OPHTHALMOLOGY

(1) If retention standards are not met for reasons related to vision, visual fields must be included in the PE and verified by an ophthalmologist. Specialist examination should include uncorrected and corrected central visual acuity. Snellen's test or its equivalent will be used and if indicated measurements of the Goldmann Perimeter chart will be included.

(2) Visual Field Deficits must be documented on a Goldmann Field chart using the III-4-e objective. Cases of diplopia must be documented using a Goldmann Perimeter Chart plotting the fields of diplopia.

e. ORTHOPAEDICS

(1) Range of Motion (ROM) measurements must be documented for injuries to the extremities. The results of the measurement should be validated and the method of measurement and validation should be stated.

(2) In cases involving back pain, the use of Waddell's signs should be included in assessing the severity and character of the pain. (Waddell G, McCulloch JA, Kummel E, Venner RM. Non-organic physical signs in low back pain. Spine. 1980;5:117125. Waddell G. Somerville D, Henderson I, Newton M. Objective clinical evaluation of physical impairment in chronic low back pain. Spine. 1992;17:617-628.)

(3) For Vertebral Disc problems, radicular findings on PE should be supported by laboratory studies such as CAT scan, MRI, EMG, NCV. In cases where surgery has been performed, both pre- and postoperative deep tendon reflexes should be documented.

f. OTOLARYNGOLOGY. Audiograms must include speech discrimination scores. Current and entry level audiograms must also be included.

g. PSYCHIATRY

(1) Particular attention should be paid to documenting all prior psychiatric care. Supportive data should be obtained for verification of the patient's verbal history.

(2) Psychiatric hospitalization is not prima facie evidence of an Unfitting psychiatric disorder. It may, however, be evidence that the condition is administratively unsuiting.

(3) Psychometric assessment should be carried out if such assessment will help quantify the severity of certain conditions and allow a reference point for future evaluation.

(4) The Diagnostic and Statistical Manual of Mental Disorders (most recent edition) will be used for diagnostic terminology. The Multiaxial System of Assessment will be used to include Axes I-V. The degree of industrial and industrially related social impairment must be individually determined and documented, for each Axis I and Axis II diagnosis, and correlated to the service member's clinical manifestations. Increased severity of symptoms due to transient stressors associated with the PEB and prospect of separation, retirement, relocation or re-employment will not be considered in determining the degree of impairment. The service member's total impairment for civilian industrial adaptability from all sources (Axes I, II, III) should be determined and documented. The contribution of each condition to the total adaptability impairment should then be individually noted and correlated with the service member's clinical manifestations.

(5) Every effort must be made to distinguish symptoms and impairment resulting from personality disorder or maladaptive traits from impairments based on other psychiatric conditions. The MEB report must specifically address the issues of relative contribution of not compensable conditions (e.g., personality disorders, adjustment disorder, impulse control disorder, substance abuse etc.).

(6) Documentation shall be submitted addressing the following:

(a) Living arrangements (e.g., by oneself, with spouse and children, with parents and siblings).

(b) Marital status. Single, married, separated, divorced, and the type of relationship (harmony or strife).

(c) Leisure activity. Sports, hobbies, TV, reading.

(d) Acquaintances. Male, female, both sexes, many, few.

(e) Substance use or abuse. Alcohol, drugs.

(f) Police encounters/record

h. PULMONARY. When the MEB is held for restrictive or obstructive pulmonary disease, rating is usually based upon Pulmonary Function Tests (PFTs) measuring residual function. There must be a minimum of one set of PFTs.

(1) Studies should be performed both before and after medication.

(a) Pre-bronchodilator PFTs. When the results of are normal, post-bronchodilator studies are not required.

(b) In all other cases, post-bronchodilator studies should be done unless contraindicated (because of allergy to medication, etc.) or if a patient was on bronchodilators before the test and had taken his/her medication within a few hours of the study.

1. A physician who determines that a post-bronchodilator study should not be done in a given case should provide an explanation.

2. The members of the Informal PEB shall request either the explanation when not provided or a repeat of the studies.

3. The post-bronchodilator results will be used in applying the evaluation criteria in the rating schedule. There is a small group of patients (5 percent or less) in whom there may be a paradoxical reaction to bronchodilators; i.e., the post-bronchodilator results will be poorer than the pre-bronchodilator results. When there is a paradoxical response, the better (pre-bronchodilator) values will be used in the rating.

4. When there is disparity between the results of different tests (FEV-1, FVC, etc.) so that the level of evaluation would differ depending on which test result is used, the test with the better (higher) values (i.e., that would give the lower evaluation) will be used. This is because such tests are effort-dependent, and such a difference is ordinarily due to a difference in effort from test to test. However, if there is a substantial disparity in the results, the MEB physician may be asked for an explanation and/or request that the test be repeated if there is no clear reason.

5. When the FEV-1 is greater than 100 percent, an FEV-1/FVC ratio that is below normal should be considered a physiological variant rather than an abnormal value.

(2) Where warranted, the member should have a methcholine challenge, especially when the original set of PFTs are "normal".

(3) In cases of exercise-induced asthma, PFTs after exercise should be performed.

i. UROLOGY

(1) Cases involving neurogenic bladder must include studies that document the condition.

(2) All cases involving incontinence must include studies that document the condition.

(3) Cases involving incontinence and/or neurogenic bladder should have documentation regarding severity as indicated by the number of times self catheterization is required, the number and type of pads required in a day, or the soilage frequency.