# 18-11 Determining Disability Evaluation Cases To Be Referred to the DON PEB

(1) ***General.*** The Navy DES derives from Title 10 USC 61 and is the mechanism by which retirement or separation for disability is effected for Navy and Marine Corps members. The DES provides for the removal from active duty of those members who can no longer perform the duties of their office, grade, rank, or rating owing to disability, and ensures that fair compensation is awarded to members whose military careers are cut short due to a service-incurred or service-aggravated disability.

(2) ***Implementing Directive for DES.*** The directive used for DES in the Navy and Marine Corps is the current edition of the SECNAVINST 1850.4 , the Disability Evaluation Manual. Throughout this chapter, SECNAVINST 1850.4 series and Disability Evaluation Manual are used interchangeably and are synonymous.

(3) ***Cases where a Navy or Marine Corps member's fitness for continued Naval service,*** owing to a condition that may constitute a disability, is called into question will be referred to the DON PEB for adjudication in accordance with the DON Disability Evaluation Manual. The PEB is in the organizational chain of command of the DIRSECNAVCORB, not of the Chief, BUMED. Some members may petition to waive their entitlement to PEB processing; these patients will predominantly be at the end of their obligated service and must be unwilling to be extended on active duty while their PEB case is being adjudicated. Waivers to PEB processing are submitted to the President, PEB for final approval. These voluntary waiver cases are to be contrasted with those Reserve Component (RC) patients who request to be released from active duty while their cases are being adjudicated (see article 18-23), and from those patients who have sufficient years to qualify for longevity retirement and wish to pursue this avenue rather than disability retirement or separation following a PEB determina-tion of unfitness for continued naval service (refer to SECNAVINST 1850.4, sections 3209, 3709, and enclosure (13)).

(4) ***Determining Fit or Unfit for Continued Naval Service.*** The determination that a member is fit (or unfit) for continued naval service (and if unfit, at what percentage of disability rating and which disability benefits apply) is solely and exclusively the responsibility of the PEB. Accordingly, MTFs do not determine fitness for continued service (this is not the same as determining "fit for duty" terminating a period of LIMDU, which MTFs do accomplish, as further explained in articles 18-1(2) and 18-10(11)). MTFs refer disability evaluation cases to the PEB for determination of fitness and of eligibility for disability benefits (refer to SECNAVINST 1850.4 series). As such, MTFs must be diligent in this regard to ensure that their staffs:

(a) Refrain from conveying to patients opinions on the patients' fitness to continue naval service and/or opinions on disability percentage rating and potential disability benefits until findings are received from the DON PEB.

(b) Refrain in their MEBRs from direct statements regarding whether patients are fit or unfit for continued naval service and/or opinions on disability percentage rating and potential disability benefits until findings are received from the PEB.

(5) ***Line of Duty Determinations/Line of Duty Investigations (LODD/LODI).*** MTFs shall not unilaterally decline to process and forward to the PEB MEBRs in which parent command LODD/LODI indicate a member's condition was incurred outside the line of duty and due to the member's misconduct, as final decision-making authority of this decision also rests definitively with the PEB. Article 18-16 provides more detail on LODD cases.

(6) ***Cases Involving Conditions Which May Have Existed Prior to Service (EPTS) merit special consideration.*** DOD Instruction 1332.38 (E3.P4. 5.2) and articles 3804m-3804p of the DON Disability Evaluation Manual delineate the following characteristics of EPTS considerations, but it is critical to note that exclusive and final authority for rendering EPTS determinations rests with the DON PEB, and MEBRs should accordingly refrain from presumptively labeling any condition "EPTS":

(a) Except for medical defects and physical disabilities noted and recorded at the time of entrance, any injury or disease discovered after a

servicemember enters active duty, with the exception of congenital and hereditary conditions, is presumed to have been incurred in the line of duty.

(b) Hereditary and genetic conditions shall be presumed to have been incurred prior to entry into active duty. They will be presumed service aggravated unless evidence clearly establishes that the condition is solely the time result of the condition's natural progression.

(c) Generally recognized risks associated with treating preexisting conditions shall not be considered service aggravation.

(d) Signs or symptoms of chronic disease identified so soon after the day of entry on military service (usually within 180 days) that the disease could not have originated in that short a period will be accepted as proof that the disease manifested prior to entrance into active military service (See DOD Instruction 1332.38 (E3.P4.5.4)).

(e) Signs or symptoms of communicable disease within less than the medically recognized minimum incubation period after entry on active service will be accepted as evidence that the disease existed prior to military service (See DOD Instruction 1332.38 (E3.P4.5.4)).

(f) Per service headquarters directives (e.g., MILPERSMAN 1910-130) the PEB is the final arbiter of EPTS disputes; any case which cannot be conclusively determined at the MTF level as to whether the condition actually EPTS or whether the condition was aggravated at any time after the member was enlisted or inducted will result in the convening of an MEB for referring the case to the PEB for final determination.

(g) Per the SECNAVINST 1850.4 series, enclosure (10), "servicemembers found unfit for continued naval service whose medical conditions have not been permanently aggravated by military service, i.e., "Unfit-EPTS" are not eligible for disability severance pay or disability retirement if they have less than 8 years cumulative active service." Further details on this "8-year rule" are found at enclosure (10) of the DON Disability Evaluation Manual.

(7) ***Determining Which Cases Merit Referral to the PEB for Disability Evaluation.*** MANMED article 18-4 provides guidance on determining those patients for whom referral to the PEB may be appropriate. Moreover, dilemmas at the MTF level over whether a disabling condition exists that renders a member unfit for continued naval service will be resolved by referral of the case to the PEB.

(8) ***Identifying Cases for Which PEB Referral May Not Be Appropriate.*** There are cases in which PEB referral is not appropriate; the following decision criteria will be helpful in allowing the MTF CA to determine whether an MEB for PEB referral will be convened. Additional guidance is available at article 3202 of the SECNAVINST 1850.4 series:

(a) ***The mere presence of a diagnosis does not constitute a disability.*** As stipulated in the Navy Disability Evaluation Manual (article 2068), "a medical impairment or physical defect standing alone does not constitute a physical disability. To constitute a physical disability, the medical impairment or physical defect must be of such a nature and degree of severity as to interfere with the member's ability to adequately perform his or her duties." Article 2068 of the Navy Disability Evaluation Manual continues, "that the term "physical disability" includes mental disease, but not such inherent defects as behavioral disorders, adjustment disorders, personality disorders, and primary mental deficiencies."

(b) ***Certain conditions and defects of a developmental nature are not ratable in the absence of an underlying ratable causative disorder and accordingly referral to the PEB is not appropriate.*** (Examples of these conditions appear in MANMED article 18-5 above, and in the SECNAVINST 1850.4 series, sections 2016, 3202, and attachment (b) to enclosure (8).) The PEB will reject all cases in which the sole diagnoses involve conditions not constituting a physical disability, as defined in article 2016 of the Navy Disability Evaluation Manual.

(c) Lack of motivation for performance of duty does not justify referral to the PEB.

(d) Request for referral to the PEB by the servicemember is not an independently sufficient reason for referral of a case to the PEB.

(e) Physical disqualification from special duties, such as flying, serving on submarines, or in a medical specialty, does not necessarily imply unfitness for continued naval service. Referral to the PEB is appropriate only in cases where the member's ability to reasonably perform active military service is in doubt.

(f) ***Inability to Meet Initial Enlistment/Appointment Standards.*** Once enlisted or commissioned, the fact that a member may fall below initial entry or appointment standards, specified in MANMED chapter 15, does not require that an MEBR be referred for disability evaluation. Additional information on issues involving "Fitness to Separate" is found in article 18-25.

(g) ***Physical Fitness and Overseas/Operational Suitability Situations Are Not in-and-of Themselves Sufficient Reasons to Forward a Case to the PEB.*** The inability to meet screening criteria for a specific assignment or administrative requirement (i.e., deployment, overseas or sea duty assignment, or participation in PRT/PFT/PFA cycle) does not alone justify referral to the PEB. Referral to the PEB is appropriate only in cases where the condition appears to be permanent in nature or of such a degree as to render the member unable to return to naval service within a reasonable period. MANMED, chapter 15 and BUMEDINST 1300.2 series provide amplifying information on fitness criteria.

(h) ***Members Being Processed for Separation or Retirement for Reasons other than Physical Disability.*** Do not refer a member for disability evaluation who is being processed for separation or retirement for reasons other than physical disability, unless the member previously was found unfit but retained on active duty in a permanent limited duty (PLD) status, or the member's physical condition reasonably prompts doubt that he or she is fit to continue to perform the duties of office, grade, rank or rating/MOS.

(i) ***Cases in Which Members Have Upcoming Surgical Procedures for Diagnosis(es) Relevant to the MEBR Being Considered by the PEB.*** These cases are discussed in more detail at MANMED article 18-25. As a general protocol, patients on whom an MEBR has been prepared and submitted to the PEB should not undergo surgery for any diagnosis unless that surgery is of an emergent nature. The PEB will be consulted immediately upon the MTF becoming aware of surgery planned for a patient for whom an MEBR has been submitted to the PEB.

(j) ***Cases of Members Previously Evaluated by the PEB as Fit for Continued Naval Service Warrant Close Scrutiny by the MTF CA Prior to Any Proposed Resubmittal to the PEB.*** The President, PEB may reject any case (medical information submitted as a new MEBR, or addendum to a previous board) in which the date of the newly dictated medical information is within 6 months of the date of the PEB's notification of decision if, upon review by a medical officer assigned to the informal PEB, the medical officer advises:

(1) The condition reported does not alter the subject member's previous findings.

(2) The condition reported is not a significant deterioration of the previously reported condition.

(3) The servicemember's treatment has not significantly changed.

(4) The servicemember has required no significant outpatient treatment other than that required for maintenance.

(9) The SECNAVINST 1850.4 current edition (as modified by PEB policy letters) is the definitive governing directive on cases being referred to the PEB. As such, in any situation where MANMED Chapter 18 and SECNAVINST 1850.4, DON Disability Evaluation Manual series appear in conflict concerning cases for the PEB, SECNAVINST 1850.4 will supersede MANMED chapter 18. CAs will ensure their personnel involved in any aspect of the disability evaluation process are thoroughly versed in the provisions of the DON Disability Evaluation Manual.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

# Section III
# PROCESSING MEDICAL EVALUATION BOARD REPORTS (MEBRs)

| Article | | Page |
|---|---|---|
| 18-12 | Format of the MEBR for Referral to the DON Physical Evaluation Board (DON PEB) | 18-41 |
| 18-13 | Format of the MEBR for Referral to the DON Physical Evaluation Board (DON PEB) Under Death Imminent Conditions | 18-51 |
| 18-14 | Format of the MEBR Prepared for Placement on Limited Duty or for Referral to Service to Service Headquarters Requesting Limited Duty (Departmental Review) | 18-51 |
| 18-15 | Non-Medical Assessment (NMA) | 18-53 |
| 18-16 | Line of Duty/Misconduct (LOD/M) Determination | 18-55 |
| 18-17 | The Abbreviated MEBR | 18-57 |
| 18-18 | Format of the MEBR for Temporary Disability Retired List (TDRL) Reevaluation | 18-59 |
| 18-19 | Definition of, and Processes for Complying With, Mandated Timeframes for Completion and Submission of MEBRs | 18-60 |
| 18-20 | Transmission Methods, HIPAA, and Privacy Maintenance | 18-62 |

## 18-12 Format of the MEBR for Referral to the DON PEB

(1) Once a determination is made that an MEB will be convened referring a patient's case to the PEB for disability evaluation, the MEBR becomes of critical importance in ensuring appropriate clinical and administrative management of the patient.

(2) When developing an appropriate MEBR, the following criteria defined in the DON Disability Evaluation Manual (SECNAVINST 1850.4 series) must be satisfied. CAs shall ensure that this information is conveyed to their physicians comprising MEBs. Among the CA responsibilities surrounding medical boards is that all members of any MEB, as well as all MEB's staff involved with processing and administrative overview of MEBRs, must be thoroughly familiar with this MANMED article and chapter 8 of the DON Disability Evaluation Manual. The following depict criteria provided by the PEB

for establishing a viable MEBR. A sample of an appropriate MEBR for submission to the PEB, developed in conjunction with the PEB, appears at the end of this article.

(3) ***MEBR Documentation***

(a) ***Required Information***

(1) Member's name, rank or rate, grade, and social security number.

(2) The specialty of the physicians comprising the MEB/signing off on the MEBR.

(3) The clinical department and/or service authoring or sponsoring the document.

(4) The MTF and its location.

(5) Date the MEB was conducted and date the MEBR was dictated.

(6) A legible, single-sided copy of the member's health record should accompany the MEBR. Any supplemental records should be submitted.

(7) Copies of all narrative summaries of hospitalizations and all procedure reports are to be submitted with the MEBR.

(8) Signatures of the MEB members on the NAVMED 6100/1 (Rev. 8-2004), cover sheet. Electronic signatures will not be accepted by the PEB as of this writing.

(b) ***On Each Page***

(1) Member's last name, social security number, and date typed or transcribed in bottom margin.

(2) Page number will be annotated at the bottom center of the page.

(3) Document is marked "For Official Use Only – Privacy Act Protected."

(c) ***Reason For Convening the MEB*** (e.g., physician-directed, command-directed)

(1) The mere presence of a diagnosis is not synonymous with disability. It must be established that the medical disease or condition underlying the diagnosis actually interferes significantly with the member's ability to carry out the duties of his or her rank or rate.

(2) When assessing the severity of symptoms, physicians must evaluate the subjective symptoms in light of objective findings and report discrepancies in addition to positive findings.

(d) ***Eligibility for MEB*** (i.e., duty status).

(e) ***Military Information***

(1) Date of first and most recent entry into service.

(2) Estimated termination of service (i.e., EAOS/EAS).

(3) Administrative actions ongoing, pending, or completed (e.g., LODI, courts-martial, selective early retirement, retirement, or separation dates).

(f) ***Chief Complaint.*** Preferably stated in servicemember's own words as contained in the health record.

(g) ***History of Present Illness.*** Exact details, including pertinent dates regarding illnesses or injuries, how injuries were incurred. Enclose and summarize any pertinent previous MEBRs. References to "interval history" are inappropriate as they assume that the PEB has access to the previous MEBRs which is not always the case. The author of the MEBR must give a complete history chronologically as well as simply event-based.

(h) ***Past Medical History***

(1) Past injuries and illnesses.

(2) Prior disability ratings (e.g., given by either the PEB or Department of Veterans Affairs).

(3) Past hospitalizations and relevant outpatient treatment, including documentation of diagnosis and therapy, pertinent dates, and location should be listed.

(4) Social information pertinent to the member's condition (e.g., activity level and sports activities engaged in would be pertinent to orthopedic evaluation; alcohol and drug usage rates must also be included in all cases) should be provided. (There is an inclusive list of applicable items under the specialty specific section for psychiatric disorders.)

(5) Illnesses, conditions, and prodromal symptoms, existing prior to service (referred to as EPTS or existed prior to enlistment (EPTE) conditions).

(i) ***Laboratory and Other Ancillary Studies.*** All studies that support and qualify the diagnosis(es) should be included as should any studies that conflict with the diagnosis(es).

(j) ***Present Condition/Review of Systems and Current Functional Status***

(1) Current clinical condition(s) should be noted including all current complaints and review of systems; required medications and any non-medication treatment regimens (e.g., physical therapy) in progress.

(2) Functional status

(a) The servicemember's functional status as to the ability to perform his or her required duty should be indicated.

(b) If possible, a summation of the member's ability to perform the civilian equivalent of their assigned duties should be indicated.

(3) A statement should be given regarding the prognosis for functional status after completion of treatment, if chronic treatment is not necessary.

(4) A statement should be given regarding the prognosis for functional status in cases requiring chronic treatment.

(5) The stability of the current clinical condition and functional status should be addressed.

(6) Statement of compliance with treatment recommendations and reasonableness of any refusal of recommended treatment procedures, including surgery. NAVMED 6100/4 (Rev. 8-2004) must be submitted as a portion of the MEBR when refusal of surgery or treatment is considered "unreasonable."

(7) Requirement for monitoring including frequency of indicated treatment and/or therapy visits and associated operational assignment limitations.

(k) ***Conclusions***

(1) An informed opinion should be stated as to the servicemember's ability to meet current retention standards.

(2) If a servicemember does not meet retention standards, the specific reasons why should be stated.

(3) Treatment recommendations including medications, procedures, and behavior and/or lifestyle modifications must be depicted. Include a statement concerning the member's compliance. If non-compliant, indicate whether the patient's non-compliance is reasonable.

(4) ***Under no circumstances is the narrative to indicate that the member is unfit, nor recommend a disability percentage rating.*** It is the PEB's responsibility to determine fitness and disability percentage ratings. The MEBR may state something to the effect, "the member is referred to the PEB because we are of the opinion that the member's condition may interfere with the performance of his or her duties because the member does not meet medical retention standards as described in..."

(l) ***Drug Therapy.*** There may be certain instances where a specific drug therapy may in and of itself preclude the full performance of duties. This must be stated specifically if it is the reason for the board.

(m) ***Limited Duty.*** The authoring physician should not only address previous periods of LIMDU (and what they were for) but also consider whether a member might obtain greater benefit by being referred to a LIMDU board for placement on LIMDU vice direct submission to the informal PEB. Reference to MANMED article 18-10 on LIMDU is recommended in such cases.

(n) ***Surrebuttal.*** When the member submits a rebuttal to a medical board or an addendum, the authoring physician must address the member's specific issues.

(o) ***Referral of Hospitalized Patients.*** Referral of such cases to PEB is appropriate only in the presence of significant extenuating circumstances. The MEBR will cite the reasons for continued retention in the hospital. For members who are hospitalized for an acute psychiatric emergency, the MEBR should include a mental status exam and statement of functional status within 30 days of submission of the MEBR to the PEB.

(p) ***Competency Statements.*** Competency statements are required on all psychiatric diagnoses (except where the psychiatric condition has resolved).

The statement of competency must be made by a psychiatrist, as the specific determination is to be made in accordance with the JAG Manual. Therefore, most cases that contain a psychiatric diagnosis should be referred to or evaluated by a psychiatrist.

(q) ***Trauma.*** (i.e., severe trauma and acute clinical, fulminant presentations.) In clinical situations where the level of impairment is likely to change significantly within or over the following 2 months, submission of the MEBR should be delayed until this period of time has elapsed.

*Note: MANMED article 18-19(2) addresses MTF timeliness for processing MEBRs; owing to the dynamic nature of trauma cases, MTFs should refrain from dictating and submitting MEBRs to the PEB if significant change in the patient's condition—which would have a material effect on the MEBR documentation—is anticipated within a 2-month period. Patients in this condition, however should be placed on a period of LIMDU (see article 18-10) pending the resolution of the case to a sufficient point that an appropriate MEBR dictation is possible.*

(1) It is important that the MEBR be dictated at the latest possible time prior to submission. This is particularly important when the MEBR is done and then months pass while waiting for completion of the LODI. If the MEBR has previously been dictated, an addendum should be included stating current condition. Statements such as "There has been no change since the previous medical board was dictated" are generally insufficient.

(2) Ensure that all of the member's complaints and conditions are addressed by the appropriate specialty in attached addenda. The authoring service, in conjunction with the MEBs department of the MTF, is responsible for ensuring that all required addenda and non-medical information are included in the original package.

(r) ***Submission of Photographs.*** Current photographs are essential in burn cases, and very useful in cases with significantly disfiguring scars. Photographs submitted should be certified, by the medical photography department, to have been taken within 1 month of the date of dictation of the MEBR.

(s) ***Organ Transplants.*** When the MTF has opted to retain the member to receive his or her transplant, the MTF will place the member on a LIMDU status pending the transplant. MEBR referral to the PEB should be delayed until the procedure has been done and the maximum therapeutic benefit of treatment has been achieved.

(t) ***TDRL Evaluations.*** Physicians performing TDRL evaluations are responsible for knowing the information contained in SECNAVINST 1850.4 series, part 6 of enclosure (3), that addresses TDRL reevaluations.

(u) ***Physical Examination (PE).*** A complete PE must be recorded in the MEBR and must have been conducted within 6 months of the date of the MEBR. For all conditions, hand dominance must be stated. Height and weight must be documented in all MEBRs (in the narrative).

(v) ***Selected Specialty-Related Considerations and Guidelines***

(1) ***Cardiology***

(a) Results of special studies to support and quantify the cardiac impairment should be noted, e.g., treadmill and thallium stress tests, angiography, and other special studies.

(b) The functional therapeutic classification of the cardiac condition must be included. Either the New York or Canadian classification system may be used (see SECNAVINST 1850.4 series, enclosure (9), attachment (b), table 3, for assessment criteria).

(c) ***General Information.*** Evaluation and reporting of cardiovascular function should be in terms of metabolic equivalents (METs) of energy expended to produce a certain level of symptoms.

1. Objective measurements of the level of physical activity, expressed as METs, at which cardiac symptoms develop is the main method of evaluating cardiovascular entities now.

2. Exercise capacity of skeletal muscle depends on the ability of the cardiovascular system to deliver oxygen to the muscle, and measuring exercise capacity can, therefore, also measure cardiovascular function. The most accurate measure of exercise capacity is the maximal oxygen uptake, which is the amount of oxygen, in liters per minute, transported from the lungs and skeletal muscle at peak effort. Because measurement of the maximal oxygen uptake is impractical, multiples of resting oxygen consumption (or METs) are used to calculate the energy cost of physical activity. One MET is the energy cost of standing quietly at rest and represents an oxygen uptake of 3.5 milliliters per kilogram of

body weight per minute. The calculation of work activities in multiples of METs is a useful measurement for assessing disability and standardizing the reporting of exercise workloads when different exercise protocols are used.

3. Alternative methods of evaluating function are provided for situations where treadmill stress testing is medically contraindicated: the examiner's estimation of the level of activity, expressed in METs and supported by examples of specific activities, such as slow stair climbing or shoveling snow that results in dyspnea, fatigue, angina, dizziness, or syncope is acceptable.

(2) ***Gastroenterology.*** Servicemembers with fecal incontinence should have recorded findings of rectal examination, e.g., digital exam, manometric studies as indicated, and radiographic studies. The degree and frequency of the incontinence should be noted as well as the incapacitation caused by the condition.

(3) ***Neurosurgery/Neurology***

(a) For vertebral disc problems, radicular findings on PE should be supported by laboratory studies such as computer-aided tomography (CT) scan, magnetic resonance imaging (MRI), electromyogram (EMG), or nerve conduction velocity (NCV). In cases where surgery has been performed, both pre- and post-operative deep-tendon reflexes should be documented.

(b) ***General***

1. ***Dementia and Head Trauma.*** Neuropsychiatric or neuropsychological assessment should be accomplished in all head injury cases. Results should be included. Neuropsychiatric or neuropsychological measurements should be performed as early as possible. Current tests (performed within 6 weeks of submission of the board) are also required.

2. ***Migraine Headaches.*** The number of incapacitating episodes (those that require the individual to stop the activity in which engaged and seek medical treatment) per week, month, or year should be noted and verified by a physician.

3. ***Seizure Disorder.*** The evaluation will be done by a neurologist. An electroencephalogram (EEG), MRI, or CT will be included in the initial examination. When subsequent seizure episodes occur while on medical therapy, blood levels of prescribed medication(s) will be determined.

4. ***Neuropathies.*** EMG and nerve conduction studies will be performed.

5. ***Multiple Sclerosis.*** Appropriate MRI(s) will be performed.

6. ***Industrial (and Industrially Related) Social Impairment.*** Estimate the degree of impairment that will be incurred by the servicemember.

7. ***Imaging Studies.*** For all neurological and neurosurgical conditions appropriate imaging studies should be obtained in concert with current standards of practice.

(4) ***Ophthalmology***

(a) If retention standards are not met for reasons related to vision, visual fields must be included in the PE and verified by an ophthalmologist. Specialist examination should include uncorrected and corrected central visual acuity. Snellen's test or its equivalent will be used and if indicated measurements of the Goldmann perimeter chart will be included.

(b) Visual field deficits must be documented on a Goldmann field chart using the III-4-e objective. Cases of diplopia must be documented using a Goldmann perimeter chart plotting the fields of diplopia.

(5) ***Orthopaedics***

(a) Range of motion (ROM) measurements must be documented for injuries to the extremities. The results of the measurement should be validated and the method of measurement and validation should be stated.

(b) In cases involving back pain, the use of Waddell's signs should be included in assessing the severity and character of the pain. (Refer to SECNAVINST 1850.4 series; also refer to Waddell G, McCulloch J.A., Kummel E, Venner R.M.. Nonorganic physical signs in low back pain. Spine. 1980; 5:117125. Waddell G. Somerville D., Henderson I., Newton M.. Objective clinical evaluation of physical impairment in chronic low back pain. Spine. 1992; 17:617-628.)

(c) For vertebral disc problems, radicular findings on PE should be supported by laboratory studies such as CT scan, MRI, EMG, or NCV. In cases where surgery has been performed, both pre- and post-operative deep-tendon reflexes should be documented.

(6) ***Otolaryngology.*** Audiograms must include speech discrimination scores. Current and entry level audiograms must also be included.

(7) ***Psychiatry***

(a) Particular attention should be paid to documenting all prior psychiatric care. Supportive data should be obtained for verification of the patient's verbal history.

(b) Psychiatric hospitalization is not *prima facie* evidence of an unfitting psychiatric disorder. It may, however, be evidence that the condition is administratively unsuiting.

(c) Psychometric assessment should be carried out if such assessment will help quantify the severity of certain conditions and allow a reference point for future evaluation.

(d) The Diagnostic and Statistical Manual of Mental Disorders (most recent edition) will be used for diagnostic terminology. The multiaxial system of assessment will be used to include axes I-V. The degree of industrial and industrially related social impairment must be individually determined and documented, for each axis I and axis II diagnosis, and correlated to the servicemember's clinical manifestations. Increased severity of symptoms due to transient stressors associated with the PEB and prospect of separation, retirement, relocation or re-employment will not be considered in determining the degree of impairment. The servicemember's total impairment for civilian industrial adaptability from all sources (axes I, II, III) should be determined and documented. The contribution of each condition to the total adaptability impairment should then be individually noted and correlated with the servicemember's clinical manifestations.

(e) Every effort must be made to distinguish symptoms and impairment resulting from personality disorder, or maladaptive traits, from impairments based on other psychiatric conditions. The MEBR must specifically address the issues of relative contribution of noncompensable conditions (e.g., personality disorders, adjustment disorder, impulse control disorder, substance abuse, etc.).

(f) Documentation shall be submitted addressing the following:

1. ***Living Arrangements*** (e.g., by oneself, with spouse and children, with parents and siblings).

2. ***Marital Status.*** Single, married, separated, divorced, and the type of relationship (harmony or strife).

3. ***Leisure Activity.*** Sports, hobbies, TV, or reading.

4. ***Acquaintances.*** Male, female, both sexes, many, few.

5. ***Substance Use or Abuse.*** Alcohol or drugs.

6. ***Police Encounters/Record.***

(8) ***Pulmonary.*** When the MEB is held for restrictive or obstructive pulmonary disease, rating is usually based upon pulmonary function tests measuring residual function. There must be a minimum of one set of PFTs.

(a) Studies should be performed both before and after medication.

1. Pre-bronchodilator PFTs. When the results are normal, post-bronchodilator studies are not required.

2. In all other cases, post-bronchodilator studies should be done unless contraindicated (because of allergy to medication, etc.) or if a patient was on bronchodilators before the test and had taken his or her medication within a few hours of the study.

a. A physician who determines that a post-bronchodilator study should not be done in a given case should provide an explanation.

b. The members of the informal PEB shall request either the explanation when not provided or a repeat of the studies.

c. The post-bronchodilator results will be used in applying the evaluation criteria in the rating schedule. There is a small group of patients (5 percent or less) in whom there may be a paradoxical reaction to bronchodilators; i.e., the post-bronchodilator results will be poorer than the pre-bronchodilator results. When there is a paradoxical response, the better (pre-bronchodilator) values will be used in the rating.

d. When there is disparity between the results of different tests (FEV-1, FVC, etc.) so that the level of evaluation would differ depending on which test result is used, the test with the better (higher) values (i.e., that would give the lower evaluation) will be used. This is because such tests are effort-dependent, and such a difference is ordinarily due to a difference in effort from test to test. However, if there is a substantial disparity in the results, the MEB physician may be asked for an explanation and/or request that the test be repeated if there is no clear reason.

e. When the FEV-1 is greater than 100 percent, an FEV-1/FVC ratio that is below normal should be considered a physiological variant rather than an abnormal value.

(b) Where warranted, the member should have a methacholine challenge, especially when the original set of PFTs are "normal."

(c) In cases of exercise-induced asthma, pulmonary function tests after exercise should be performed.

(9) ***Urology***

(a) Cases involving neurogenic bladder must include studies that document the condition.

(b) All cases involving incontinence must include studies that document the condition.

(c) Cases involving incontinence and/or neurogenic bladder should have documentation regarding severity as indicated by the number of times self catheterization is required, the number and type of pads required in a day, or the soilage frequency.

(4) ***Format of the Dictated MEBR.*** As detailed in the DON Disability Evaluation Manual, enclosure (8), the following is an example of a well-prepared MEBR. MTFs will ensure compliance with this template in the preparation and forwarding of MEBRs to the PEB.

***REMAINDER OF PAGE INTENTIONALLY LEFT BLANK***

## SAMPLE MEBR FOR REFERRING A CASE TO THE PEB

**FOR OFFICIAL USE ONLY**

**NAME AND SSN:**

**RATE:** (To include rank and rating, e.g., Yeoman First Class) OR MILITARY OCCUPATIONAL SPECIALTY (MOS) AS INDICATED BY BRANCH OF SERVICE:

**UNIT/COMMAND:**

**DATE:** (DD/MM/YYYY)

**MILITARY HISTORY:**

Petty Officer______________________________ entered into active duty on ____________________________. She attended Recruit Training Command in Orlando, Florida. She then attended Yeoman A School in Meridian, Mississippi. She has been stationed at various locations and received awards for her exemplary service. She was twice named sailor of the quarter and once sailor of the year for the ____________________ area. She has received three consecutive good conduct medals and two Navy and Marine Corps achievement medals.

**CHIEF COMPLAINT:** Back and Foot Pain

**HISTORY OF PRESENT ILLNESS:**

Petty Officer ____________________________ back pain began in 19______ after a motor vehicle accident. She developed worsening of her symptoms in __________ after a second motor vehicle accident. The back pain is constantly present with varying intensity. Exacerbating factors include walking or standing for greater than 2 minutes. Some palliation is noted with non-weight bearing rest. The symptoms have progressed insidiously to include plantar foot pain and arthralgias involving the hips, knees, and ankles. The plantar foot pain occurs daily and is exacerbated by any weight bearing activity. She has received a variety of health care evaluations with subsequent therapeutic recommendations. Unsuccessful treatments employed have included NSAIDS, muscle relaxants, tricyclic antidepressants to modify the pain threshold, orthotics, physical therapy, plantar and sacroiliac anesthetic injections, nighttime ankle splints, and local ultrasound treatment. A lumbosacral series revealed sacralization of the 5th lumbar vertebrae. She was evaluated by Physical Medicine and Rehabilitation at which time a bone scan was obtained that showed mild increased tracer uptake in both sacroiliac joints consistent with sacroiliitis. She was then referred to Rheumatology where she was initially evaluated in March 1997. Sacroiliac radiographs were suspicious for sacroiliac disease. An MRI subsequently revealed no evidence of sacroiliitis. Her symptoms have persisted despite maximal therapy and negatively impacted on her ability to perform her naval duties. She is therefore being referred to the Physical Evaluation Board for further review and disposition.

**ALLERGIES:** None

**MEDICATIONS:** Indomethacin SR 75mg bid, Norplant

**PAST MEDICAL HISTORY:** Spina bifida occulta, childhood asthma, duplicated left renal collecting system without reflux or obstruction (urology evaluation completed in 1997), perivaginal cyst, tinea versicolor

For official use only
Page ___ of ___ Pages

NavalHospital ___________________________________
Patient Last Name and Last Four ___________________
Date Dictated __________ Date Typed __________

**PAST SURGICAL HISTORY:** None.

**SOCIAL HISTORY:** No tobacco or alcohol.

**REVIEW OF SYSTEMS:**

**Musculoskeletal:** Arthralgias involving hips, knees, and ankles, occurs with resting or ambulation, occasionally resolves with rest or spontaneously, chronicity 11 years, episodes last days to weeks; back pain of 11 years duration with symp-toms worsening since 1992, pain is worse with activity, palliation with resting and laying supine, prevents restorative sleep; plantar foot pain with radiation into achilles tendon and gastrocnemius, pain is constantly present and worse with weight bearing and ambulation, refractory to shoe inserts and nighttime splints.

**Neurologic:** midline occipital headaches, occurs in the AM upon awakening, resolves with aspirin, chronicity 11 years; dizziness and fainting spells, episode duration approximately 2 minutes, chronicity 7 years, associated with gastro-intestinal symptoms, no known loss of consciousness.

**Gastrointestinal:** "knot-like" sensation with pain in the epigastrium, associated nausea and increased bowel motility, associated salivary regurgitation without acid brash, no diarrhea or bloating, onset is spontaneous and without identifiable provocative factors, chronicity 7 years.

**PHYSICAL EXAMINATION:**

**BP** 123/77 P 75 T 98.9F Wt 123lbs
**HEENT** - extraocular movements intact, Fundi normal, no oral ulcers, tympanic membranes clear
**NECK** - normal range of motion, nontender, no lymphadenopathy, no thyroid enlargement or nodules
**LUNGS** - clear
**HEART** - regular rhythm, no murmurs or gallops
**ABDOMEN** - no hepatosplenomegaly, nontender, bowel sounds present
**PELVIC** - (Ob-Gyn) normal

**MUSCULOSKELETAL:**

**Feet:** plantar pain bilaterally at the calcaneus and metatarsal heads, callus formation overlying #1, 2, 5 bilaterally at the metatarsal heads.
**Back:** focal area of palpable low pain overlying sacrum and lumbosacral junction, presacral fat pad, Schober's test reveals 2.5 cm lumbar distraction with back flexion, straight leg raise test negative, hyperextension hips without pain provocation, flattening appearance to lumbar spine, FABERE negative, no leg length discrepancy.
Joints: no synovitis

**NEUROLOGIC** - strength normal, deep tendon reflexes present and equal bilaterally, babinski absent, no sensory deficits elicited, muscle tone normal

**DERMATOLOGIC** - scar at dorsum of left wrist, acneiform lesions on back.

**LABORATORY:**

**Urinalysis** - SG 1.026, trace protein, 1-2 RBC/HPF, 5-9 EPI/HPF
**Chemistries** - normal
**complete blood count** - normal
**erythrocyte sedimentation rate** - 9 - <0.1
**HLA** - B27 negative

**ELECTROCARDIOGRAM:** sinus bradycardia.

For official use only
Page ___ of ___ Pages

NavalHospital ____________________
Patient Last Name and Last Four ____________
Date Dictated __________ Date Typed _________

**RADIOLOGY:**

| | |
|---|---|
| (23 May 97) | chest x-ray - normal |
| (4 April 97) | MRI pelvis - normal |
| (21 Mar 97) | ferguson pelvis - normal |
| (6 Mar 97) | bone scan - increased uptake in the spinous processes of L4, 5; mild increased uptake in both sacroiliac joints |
| (27 Feb 97) | lumber spine series - sacralization of L5 vertebrae |

**FINAL DIAGNOSES:**

(1) Plantar Fasciitis
(2) Mechanical low back pain
(3) Duplicated collecting system of left kidney without evidence of reflux or obstruction

**PRESENT CONDITION:**

Petty Officer _________________ is currently unable to successfully perform her military duties as reflected by the member and her direct supervisors. Her condition has placed an undue burden on coworkers in her office attempting to support those duties which Petty Officer _________________ is unable to perform. Her current medical problems have also significantly impacted her personal life by limiting her hobbies, interrupting normal sleep patterns, and making activities of daily living difficult.

**PROGNOSIS:**

Petty Officer _________________ is likely to require ongoing therapy and medical follow-up by clinicians interested in musculoskeletal ailments.

**RECOMMENDATIONS:**

1. Petty Officer_______________ medical condition at this time precludes her from continuation on active duty. She is therefore being referred to the Physical Evaluation Board for further evaluation and disposition.

2. Continued use of proper shoe inserts and nighttime splints on a regular basis.

3. Daily stretching exercises targeting the plantar fascia and low back.

4. Daily strengthening exercises targeting the abdominal muscles and intrinsic muscles of the feet.

5. Regular use of NSAIDS at analgesic doses.

6. Periodic formal physical therapy evaluations to document proper self-directed rehabilitation routines and to monitor progress.

7. Evaluation every 3-4 months by a physician interested in the diagnosis and treatment of musculoskeletal problems.

________________________________
Signature and typed Name and Status
(to include specialty) of MEB Member

________________________________
Signature and typed Name and Status
(to include specialty) of MEB Member

For official use only
Page ___ of ___ Pages

Naval Hospital ___________________________________
Patient Last Name and Last Four ____________________
Date Dictated __________ Date Typed __________

## 18-13 Format of the MEBR for Referral to the DON PEB under Death Imminent Conditions

(1) Prior to December 2003, the Navy Disability Evaluation Manual allowed that in cases in which "competent medical authority determines that a service member's death is expected within 72 hours and it is determined to be in the best interests of his or her estate, the member may be referred expeditiously into the DES. To protect the interests of the Government and the service member, disposition shall be placement on the TDRL provided all requirements under statute, legal opinions, and regulation are met."

(2) On 23 December 2003, the Principal Deputy to the Undersecretary of Defense for Personnel and Readiness rescinded the authority for the services to perform such "death imminent" PEB cases, predicated on Survivor Benefit Program (SBP) changes incorporated in the National Defense Authorization Act (NDAA) of 2004.

(3) Accordingly, effective 30 December 2003, the DON PEB issued guidance that from that date forward there are no longer "death imminent" PEB procedures for the DON.

## 18-14 Format of the MEBR Prepared for Placement on Limited Duty or for Referral to Service Headquarters Requesting Limited Duty (Departmental Review)

(1) As discussed in MANMED article 18-10 regarding LIMDU, some LIMDU cases must be referred by MTFs to Navy or Marine Corps headquarters for approval.

(2) As developed in article 18-3(1) through 18-3(4), only CAs can effect an MEB, and an MEB must be convened for LIMDU cases. Commands must ensure that their providers and patients realize that a recommended period of LIMDU must be forwarded to service headquarters for adjudication does not commence until it has been approved by NAVPERSCOM or HQMC, as appropriate. Branch medical clinics and providers attached to ships and operational units do not—by definition—hold CA. Strict compliance with the criteria established in articles 18-3 and 18-10 regarding CA and LIMDU is mandatory for all MTFs and units with assigned medical personnel so that the most efficacious clinical and administrative case management activities are provided to our patients.

(3) Appropriate clinical and administrative case management of patients in a LIMDU status is vital. This includes ensuring that cases requiring service headquarters approval for continuation on LIMDU are forwarded in ample time to enable the service headquarters to render timely decisions on either ordering LIMDU continuation or referral of cases to the DON PEB. MTFs must ensure close liaison with the LIMDU coordinators of the commands they serve to foster this timely referral of cases. MANMED article 18-10(11) addresses the reevaluation of patients in a LIMDU status.

(4) Once a determination is made that an MEB will be convened to recommend a member to service headquarters for LIMDU, the MEBR becomes of critical importance in appropriate clinical and administrative management of the patient.

(5) All MTFs will ensure compliance with the template (on the next page) in the preparation and forwarding of MEBRs to service headquarters for consideration of periods of LIMDU.

(6) Procedures for returning members to "fit for duty" status from a period of LIMDU are contained in article 18-10(11).

**SAMPLE MEBR FOR SUBMITTING A CASE TO SERVICE HEADQUARTERS FOR LIMITED DUTY CONSIDERATION**

**FOR OFFICIAL USE ONLY**

**NAME AND SSN:**

**RATE:** (To include rank and rating, e.g., Yeoman First Class) OR MILITARY OCCUPATIONAL SPECIALTY (MOS) AS INDICATED BY BRANCH OF SERVICE:

**UNIT/COMMAND:**

**DATE:** (DD/MM/YYYY)

**MILITARY HISTORY:**

Petty Officer ____________________________ entered into active duty on ____________________________________________. She attended Recruit Training Command in Orlando, Florida. She then attended Yeoman A School in Meridian, Mississippi. She has been stationed at various locations and received awards for her exemplary service. She was twice named sailor of the quarter and once sailor of the year for the____________________ area. She has received three consecutive good conduct medals and two Navy and Marine Corps achievement medals.

**CHIEF COMPLAINT:**

**HISTORY OF PRESENT ILLNESS:**

**PAST SIGNIFICANT MEDICAL HISTORY:**

**PAST SURGICAL HISTORY:**

**DATES OF AND DIAGNOSES CAUSING PAST LIMITED DUTY PERIODS:**

**FINAL DIAGNOSES (LIST ALL PERTINENT DIAGNOSES):**
(1)
(2)

**PRESENT CONDITION:**

Petty Officer ___________________ is currently unable to successfully perform her military duties as reflected by the member and her direct supervisors. Her condition has placed an undue burden on coworkers in her office attempting to support those duties which Petty Officer __________________ is unable to perform. Her current medical problems have also significantly impacted her personal life by limiting her hobbies, interrupting normal sleep patterns, and making activities of daily living difficult.

**PROGNOSIS, TO INCLUDE ESTIMATED PERIOD OF LIMITED DUTY:**

Petty Officer ___________________ is likely to require ongoing therapy and medical follow-up by clinicians interested in musculoskeletal ailments.

**PERIOD OF LIMITED DUTY RECOMMENDED BY THIS BOARD:**

**COURSE OF CARE—INCLUDING SURGICAL PROCEDURES AND TIMEFRAMES—ANTICPATED DURING THIS RECOMMENDED PERIOD OF LIMITED DUTY:**

**DISCUSSION OF LIKELIHOOD THAT PATIENT WILL RETURN TO MEDICALLY UNRESTRICTED DUTY DURING OR AT THE END OF THE RECOMMENDED PERIOD OF LIMITED DUTY:**

**LIMITATIONS ON SERVICE DURING THE RECOMMENDED PERIOD OF LIMITED DUTY:**

**ADDITIONAL FINDINGS AND/OR RECOMMENDATIONS:**

________________________________
Signature and typed Name and Status
(to include specialty) of MEB Member

________________________________
Signature and typed Name and Status
(to include specialty) of MEB Member

For official use only
Page ___ of ___ Pages

Naval Hospital ________________________________
Patient Last Name and Last Four __________________
Date Dictated __________ Date Typed __________

## 18-15 Non-Medical Assessment (NMA)

(1) Since December 1998, the PEB has required that each MEBR referring an ADSM into the DES in accordance with SECNAVINST 1850.4 series will contain an NMA. This tool, a CO's assessment of a service member's performance of duty relative to MEB considerations, has proven invaluable as an input to the deliberations of the PEB.

(2) HQMC (MMSR-4) and NAVPERSCOM (PERS-4821) have also mandated an NMA will be included with selected MEBR sent by an MTF for "departmental review" to service headquarters relative to LIMDU requests (see articles 18-5 and 18-14).

(3) The NMA is to be completed by the service-member's parent command, and to the maximum extent practicable be signed by the patient's CO. MTFs must request an NMA from a member's parent command immediately at the commencement of any MEB likely to refer a patient to the PEB for disability evaluation or to service headquarters for LIMDU consideration. MTFs should not presume that parent command's have ready access to the NMA format developed in SECNAVINST 1850.4 series, and should in their requests for NMA ensure that parent commands are provided reference locations where they can readily obtain the NMA format. These are to include:

(a) Navy Directives online at http://neds.daps.dla.mil where the entire SECNAVINST 1850.4 series is available.

(b) The Web site of the PEB at http://www.hq.navy.mil/ncpb, where a downloadable version of the NMA is available for parent comment use.

(c) NMA templates embedded in messages from MTFs to parent commands advising of LIMDU recommendations and requirements for parent command NMA submittal. MTF requests for NMA should cite all these reference sources. MTFs should additionally ensure that their respective Web sites offer links to the PEB site, and should make this information available to parent commands as part of the NMA request documentation.

(4) SECNAVINST 1850.4 series mandates that "commanders will ensure that NMAs are submitted to the requesting facility within 15 calendar days from the date of receipt of such request." For patients having transferred PCS from the previous parent command or having been sent TEMDU from the previous parent command to an MTF for treatment, the MTF is still obligated to obtain the NMA from the previous parent command. MTFs experiencing difficulty receiving NMAs from parent commands within the 15 calendar day timeframe are to judiciously direct requests for further assistance as deemed necessary to NAVPERSCOM (PERS-4821) or HQMC (MMSR-4). Obtaining NMAs often presents as one of the most time-consuming endeavors facing the MTFs in preparing complete MEBRs; MTF commanders shall ensure their respective MEBs staffs are diligent in pursuing NMAs to facilitate compliance with the "30-day window" for completing MEBRs as defined in article 18-19. To foster compliance with processing timeframes, parent commands should be encouraged to provide the NMA via naval message traffic or, as an alternative, to fax NMAs on their command letterhead to MTFs.

(5) SECNAVINST 1850.4, enclosure (11), provides additional information on, and the format template for, the NMA, and pertinent sections thereof are reproduced here: (See sample command letter on next page.)

***REMAINDER OF PAGE INTENTIONALLY LEFT BLANK***

**COMMAND LETTERHEAD**

Date:

From: Commanding Officer
To: Medical Treatment Facility

Subj: NON-MEDICAL ASSESSMENT (NMA); CASE OF _______________________(name, SSN)

1. Questionnaire. The following assessment is submitted to assist the PEB in their determination of Fitness/Unfitness and/or service headquarters in determining appropriate limited duty:

a. Service member's Rating/NEC/MOS/Specialty ___________ (Numerical designator and description; e.g., 031 I/Rifleman, A03/Aviation Ordnanceman).

b. Is the member currently working out of his/her specialty because of the medical condition?

c. Last date the member took PRT/PFT.

d. Last date the member passed the PRT/PFT.

e. Member's height and weight (inches/lbs) _______________.

f. Is the member within weight and body fat standards?

g. To your knowledge, is the member fully complying with the prescribed appointments and treatment for the therapy?

h. How much time has the member's condition required him/her to be away from duties for treatment/evaluation/recuperation?

i. Estimate the average number of hours per week the member is absent from command duties.

j. How has this impacted member's performance?

k. Is member pending disciplinary action or involuntary administrative separation for misconduct? If so, for what?

l. Does the member have good potential for continued service in his/her present physical and mental condition?

m. Is member motivated for continued active duty?

n. Is this member's performance worthy to remain on active duty in a Permanent Limited Duty status if found Unfit?

2. Commanding officer's comments: This paragraph is crucial to summarize member's situation in the perspective of the commanding officer. In a concise and succinct paragraph, statements are needed to assist in determining the fit/unfit potential of the member. Highlight the Sailor or Marine's ability to execute duties as required of his/her rating and the reality of their contribution. Discuss how their performance has been impacted. Discuss how the patient is attempting to work through his/her medical problem and meet daily goals to support the command's mission. The following guidelines should be followed in completing this paragraph:

a. The NMA narrative summary is to be completed by the commanding officer. It captures his/her observations and those of other senior command personnel as to how the service member's medical impairments have or have not impacted upon the member's ability to function within the command. The NMA should describe how well the member performs military duties; i.e., MOS/rating duties, field duties or exercises, participation in the PRT/PFT, etc. Comment on what the member can or cannot do. Equally important is a description of the member's off-duty social and athletic activities. How have these activities been affected by the member's medical impairments?

b. Commanding officers perform a vital role in assisting the PEB to make the proper Fit or Unfit determination. The commanding officer and senior command personnel are in the unique position to provide valuable information as to how the service member's physical and/or mental condition(s), as reported in the MEBR, affect the member's ability to function on a daily basis. The purpose of the NMA is to provide the PEB with those insights.

c. The medical evaluation board has the responsibility to document the medical status of Sailors and Marines by describing the nature and severity of their medical conditions in the MEBR. The PEB function is to determine the servicemember's fitness to continue naval service. In the case of an unfitting condition, the PEB determines the required disability rating. Performance plays a large part in these decisions.

d. For service members assigned to temporary holding units (TPUs), medical holding companies, or medical centers, commanding officers will complete those questions that pertain to the period of observation. If the TPU/medical center commanding officer has had sufficient observation of the member, then he or she will complete the questionnaire. If not, coordination with the previous command will be required to assist in answering questions covering the member's period of assignment to that command.

3. POC at this command is _________________ (name/rank/position) at Commercial _______________, DSN _______________, or e-mail ________________________________.

__________________________________
Commanding Officer

# 18-16 Line of Duty/Misconduct (LOD/M) Determination

(1) Under the laws (Title 10 USC, sections 1201-1204, 1206, and 1207) and regulations (SECNAVINST 1850.4 series) governing the Navy DES, members entitled to basic pay who incur or aggravate medical conditions which make them unfit to perform their military duties may be eligible to receive disability retirement or separation benefits. Members' eligibility to these benefits may be overcome however, if the physical disability resulted from the member's own intentional misconduct or willful neglect, was incurred while not in the LOD, or was incurred while the member was in an unauthorized absence status.

(2) The SECNAVINST 1850.4 series details the LOD/M determination process, and critical attention should be paid to that section by MTFs determining whether to request LOD/M determination from parent commands. There is a legal presumption that any disease or injury discovered after a member enters active military service, with the exception of congenital and hereditary conditions, is presumed to have been incurred "in the line of duty" and "not the result of misconduct." While SECNAVINST 1850.4 series delineates several examples not considered in the line of duty, to include conditions incurred:

(a) As a result of the member's own misconduct.

(b) While avoiding duty by deserting the service.

(c) During a period of unauthorized absence.

(d) While confined under sentence of a court-martial which included an unmerited dishonorable discharge.

(e) While confined under sentence of a civil court following conviction for an offense which is defined as a felony by the law of the jurisdiction where convicted.

(f) While on appellate leave.

The legal standard of "clear and convincing evidence," not the less-demanding evidentiary standard of "beyond a reasonable doubt," is required to overcome the presumption of "in the line of duty" and "not the result of misconduct."

(3) Intentional misconduct or willful neglect. Misconduct is wrongful conduct. However, simple or ordinary negligence or carelessness, standing alone, does not constitute misconduct. To support an opinion of misconduct, it must be established by clear and convincing evidence that the injury or disease either was intentionally incurred or the proximate result of such gross negligence as to demonstrate a reckless disregard of the consequences. If a resulting injury or disease is such that it could have been reasonably foreseen from the course of conduct, it is said to be a "proximate result." The fact that the conduct violates a law, regulation, or order, or the fact that the conduct is engaged in while the individual is intoxicated, does not, of itself, constitute a basis for a determination of misconduct. Such circumstances will however be considered along with all other facts and circumstances by the PEB in determining whether the conduct of the individual was grossly negligent, and whether the incurrence of injury or disease was reasonably foreseeable as a probable result of such conduct.

(4) JAGINST 5800.7C (JAGMAN), chapter II, outlines policies and procedures for making LOD/M determinations. If a member incurs a disease or injury that may result in a permanent disability or that results in the member's physical inability to perform duty for a period exceeding 24 hours (as distinguished from a period of hospitalization for evaluation or observation) then determination of whether the disease or injury was incurred in LOD or as a result of misconduct is required. At a minimum, in accordance with JAGMAN 0220d, a command must convene an investigation and make findings concerning misconduct and LOD when:

(a) The injury was incurred under circumstances which suggest a finding of "misconduct" might result (for example, but not limited to, cases involving illegal drug use, intoxication, or bona fide suicide attempts).

(b) The injury was incurred under circumstances that suggest a finding of "not in the line of duty" might result.

(c) There is a reasonable chance of permanent disability and the CO considers the convening of an investigation essential to ensure an adequate record is made concerning the circumstances surrounding the incident.

(d) The injured member is in the Naval or Marine Corps Reserve and the CO considers an investigation essential to an adequate official record made concerning the circumstances surrounding the incident.

(5) JAGMAN section 0221details that each injury or disease requiring an LOD/M determination must be the subject of a preliminary inquiry. If, per JAGMAN 0221c, the preliminary inquiry shows in the opinion of the medical officer and with concurrence of the member's CO, that the injury or disease was incurred "in the line of duty" and "not as a result of the member's own misconduct" and appropriate medical record entries are made, no investigation need be convened.

(6) JAGMAN sections 0230 and 0231 prescribe that commands record LOD/M determinations in the member's health or dental record. When a command investigation or written preliminary inquiry (as discussed in the preceding paragraph) has been prepared per JAGMAN, chapter II, commands will provide a copy of the inquiry or investigation with the General Court-Martial Convening Authority (GCMCA) endorsement, to the MEB convening authority for inclusion in the official records of the case which are forwarded with the MEBR for PEB consideration. The MEB will ensure the attending physician has made appropriate medical record entries concerning the preliminary inquiry, as detailed in the preceding paragraph.

(7) As detailed in SECNAVINST 1850.4, section 3410, normally the PEB will accept the command LOD/M determination as binding. However, there may be cases in which the Informal Board, Formal Board, or Legal Advisor considers an LOD/M determination to be contrary to the evidence of record, contrary to additional evidence obtained during the PEB review and hearing process, or predicated upon an investigation that may be deficient. In these cases, the President, PEB shall forward the LOD/M determination to DIRSECNAVCORB for review and decision prior to the signing either of a preliminary findings letter or a findings letter. For this reason, and as explained in article 18-11(5), MTFs shall not unilaterally decline to process and forward to the PEB MEBRs in which parent command LODD indicate a member's condition was incurred outside the LOD and due to the member's misconduct, as this decision rests definitively with the PEB and the DIRSECNAVCORBs.

(8) Responsibilities of the MTF commander/CA in obtaining LOD/M determinations are conveyed in SECNAVINST 1850.4. Before referring a case for PEB review, the MEB CA shall review case records to ensure they contain required LOD/M determinations from the responsible field commander. The MEB CA shall process a case which fails to contain a required LOD/M determination according to the following principles:

(a) If the date of the injury giving rise to the requirement for an LOD/M determination was more than 2 years prior to the date of the MEB, the MEB CA shall continue to process the member's case, including forwarding the case to the PEB, without further effort to obtain the LOD/M determination or information normally required for making the determination. Consistent with the JAGMAN, the MEB will presume a finding of "in the line of duty and not due to the member's own misconduct" in processing such cases.

(b) If the date of the injury giving rise to the requirement for an LOD/M determination is less than 2 years from the date of the MEB, the MEB CA will contact the responsible field commander and request that steps be taken to properly investigate the facts surrounding the injury and to document and record appropriate findings. The MEB CA only shall forward the MEBR to the PEB for processing if:

(1) MEB CA obtains a copy of the LOD/M investigation and includes it as part of the MEBR.

(2) MEB CA obtains a copy of the health/dental record entry recording the LOD/M determination, and includes it as part of the MEBR package.

(3) MEB CA obtains a statement from the cognizant GCMCA stating that an LOD/M determination was not required (JAGMAN article 0221) or was not able to be obtained (i.e., that diligent efforts to complete the investigation were not productive due to witness unavailability).

(c) MTFs debating whether to request LOD/M from parent commands should err on the side of requesting the LOD/M. Whether decisions on convening MEBs for PEB referral have yet to be made, or PEB referral will occur at some indeterminate point in the future, an LOD/M contemporary to the time of the incurrence of illness or injury will facilitate appropriate medical record entries, and as obtaining LOD/M is often one of the most time-consuming steps in an MTFs preparation of MEBRs, early requests for LOD/M to parent commands will assist MTFs in complying with the "30-day window" for preparing MEBRs developed in article 18-19. Questions on obtaining LOD/M should be referred to the PEB to ensure cases are not unnecessarily delayed.

## 18-17 The Abbreviated MEBR

(1) As discussed in article 18-10, to facilitate appropriate clinical and administrative case management while curtailing overly burdensome paperwork requirements, MTFs can rely on NAVMED 6100/5 (Rev. 8-2004), Abbreviated Medical Evaluation Board Report for the following LIMDU actions:

(a) 1st periods of LIMDU in the career of enlisted Sailors or Marines that are < 6 months (no referral to service headquarters necessary).

(b) 2nd LIMDU periods for enlisted Sailors and Marines that are < 6 months (no referral to service headquarters necessary). Note that the first and second TLD periods cannot exceed 12 months cumulatively from the date of the first TLD period.

(c) 1st and 2nd LIMDU periods for Navy and Marine Corps officers (for referral to service headquarters for "departmental review").

(d) 3rd or subsequent LIMDU periods on Navy and Marine ADSM involving distinctly different condition than that responsible for the first and/or second TLD periods (for referral to service headquarters for "departmental review").

(e) Placement on LIMDU, if the patient is not already in a LIMDU status, at the same time the patient's case is referred to the PEB for adjudication.

*Note: Any other LIMDU requires a dictated MEBR to be sent to respective service headquarters. Use of any edition before NAVMED 6100/5 (Rev. 8-2004) is immediately prohibited. MTFs using the "Abbreviated MEBR" for LIMDU are reminded that the MTFs LIMDU recommendation is not deemed final until the CA of the MTF has signed the MEBR.* ***(Not more than 5 working days will elapse between the time the MEB reports out a LIMDU (NAVMED 6100/5 (Rev. 8-2004) and the CA signs the form approving the LIMDU.)*** *MTFs must be mindful that, given the nature of LIMDU as both a medical and personnel function, specificity of information necessary for the appropriate clinical and administrative case management of patients entered into LIMDU status is vital. Patients placed on LIMDU via the abbreviated MEBR must be entered into the MedBOLTT or systems that replace it; see article 18-27.*

(2) The format of the NAVMED 6100/5 (Rev. 8-2004) appears at the end of this article. Previous editions of this form are obsolete and effective immediately are not to be used.

(3) The use of the abbreviated LIMDU MEBR does not change any of the requirements for a LIMDU placement expressed in article 18-10, particularly regarding that the MTFs LIMDU recommendation described in any NAVMED 6100/5 (Rev. 8-2004) writeup is not effective until approved by the MTF CA. (Refer to article 18-3 for CA definitions and responsibilities.)

(4) Procedures for returning members to "fit for duty" status, including mandatory medical record entries and completion of the NAVMED 6100/6 (Rev. 8-2004), from a period of LIMDU are contained in article 18-10(11).

***REMAINDER OF PAGE INTENTIONALLY LEFT BLANK***

# ABBREVIATED MEDICAL EVALUATION BOARD REPORT

**SECTION 1: CLINICAL INFORMATION (TO BE COMPLETED BY MEDICAL OFFICERS)**

Date: ____________ Patient Name: ______________________________ Patient SSN: ____________

Proposed start date for limited duty: ____________ Proposed end date (< 6 months): ____________

This period of limited duty is for: (Select one)

☐ 1st LIMDU (< 6 months) Enlisted ADSM (no referral to service headquarters necessary).

☐ 2nd LIMDU (< 6 months) Enlisted ADSM (no referral to service headquarters necessary). Note that the first and second TLD periods cannot exceed 12 months cumulatively from the date of the first TLD period.

☐ 1st LIMDU (< 6 months) Officer ADSM (referral to service headquarters necessary).

☐ 2nd LIMDU (< 6 months) Officer ADSM (referral to service headquarters necessary).

☐ 3rd or subsequent LIMDU periods on Navy and Marine ADSM involving a distinctly different condition than that responsible for the first and second TLD periods (for referral to service headquarters for "departmental review").

☐ Placement on LIMDU - if the patient is not already in a LIMDU status - at the same time the patient's case is referred to the physical evaluation board for adjudication.

Diagnosis: (1) ______________________________ ICD-9 CM Code ____________

(2) ______________________________ ICD-9 CM Code ____________

(3) ______________________________ ICD-9 CM Code ____________

Circumstances of injury/illness:

Treatment plan:

Limitations from full duty (including whether transfer/TEMDU for treatment is indicated, and any PRT limitations):

| Printed MEB Member Name and Signature/Date | Printed MEB Member Name and Signature/Date | Printed CA Name and Signature/Date |
|---|---|---|

**SECTION 2: PATIENT INFORMATION, TO BE COMPLETED BY PATIENT**

I have received full information on the proposed Limited Duty period from my provider. I understand that this period of limited duty is not effective until approved by the MTF Convening Authority, and that the MTF will report this LIMDU action to my parent command. I understand I may be returned to duty prior to the date appearing above as my clinical condition warrants and upon action by my attending provider.

Patient Signature/Date

**SECTION 3: TO BE COMPLETED BY PATIENT ADMINISTRATION OFFICER/MEDICAL BOARDS OFFICER**

The following actions have been completed:

☐ Completion of Patient Information Sheet

☐ Notification to PSD/Personnel Office

☐ LODD Requested from Parent Command (if LODD required)

☐ Entry into MedBOLTT

☐ Briefing to Patient on Limited Duty/MEBs

☐ Notification to MTF LIMDU Coordinator

☐ Notification to Parent Command

Patient Administration Officer/Medical Boards Official Printed Name, Signature, and Date

ROUTING: Original to Patient Health Record; copies to Patient, Parent Command, PSD, MEBR Case File, and PERS-4821 or MMSR-4

NAVMED 6100/5 (Rev. 08-2004)
PREVIOUS EDITIONS OBSOLETE

# 18-18 Format of the MEBR for TDRL Reevaluation

(1) In addition to their responsibilities to ADSM, the PEB and Navy and Marine service headquarters maintain responsibility for those former members rated by the PEB as disabled at greater than a 30 percent level of disability and subsequently placed on the TDRL. While the placement and accounting for members on the TDRL are not MTF responsibilities, the proper clinical reevaluation of TDRL members, and presentation of this information to the PEB, is an MTF responsibility, as delineated in the BUMEDINST 6320.79 series. All TDRL evaluation episodes will be entered into the MedBOLTT or any system that replaces it.

(2) Members on the TDRL receive, from their respective service headquarters, orders to report to an MTF for TDRL reevaluation. These reevaluations occur at intervals not to exceed 18 months while a retiree is on the TDRL. (The maximum period, by statute, that a retiree is allowed to remain on the TDRL prior to case finalization is 5 years.) A copy of the orders sent to the member requiring TDRL evaluation is also sent to the MTF responsible for conducting the reevaluation. The MTF is to schedule the appointment as rapidly as possible to satisfy the timeframe stipulated in the orders for the reevaluation to occur, and is to convey this information to the retiree promptly. In scheduling reevaluation appointments and conducting reevaluations, MTFs must be mindful of expediency; it is entirely possible that MTF actions that do not satisfy stipulated timeframes, particularly regarding the 5-year limit on TDRL placement, can result in the suspension of the retirees' disability benefits. Moreover, this 5-year maximum is mandated by statute (Title 10 USC) and cannot be extended unilaterally by service headquarters. Any problems encountered must be rapidly and effectively conveyed to both the appropriate service headquarters and the patient for resolution.

(3) DON Disability Evaluation Manual, part 6 of enclosure (3), is dedicated to processing TDRL cases; MTF providers and medical boards staff involved with TDRL reevaluations must be thoroughly familiar with its contents.

(4) As developed in the DON Disability Evaluation Manual, sections 3614–3617, the report submitted by an MTF pursuant to TDRL reevaluation:

(a) May be prepared in the format of either an MEBR (following MANMED article 18-12), a letter, or a narrative summary.

(b) Shall address or contain:

(1) The member's current address and telephone number.

(2) An interval history since the last examination, with particular reference to the member's employment and time lost there due to the disability for which retired.

(3) A comprehensive PE, reporting all physical impairments, including any impairment from which the member has recovered, and new ones acquired while on the TDRL. Advice of consultants should be obtained if the examining physician is in doubt as to an actual physical condition or diagnosis.

(4) All clinical evaluations and laboratory studies necessary to document the member's physical condition.

(5) Information regarding the member's current condition and prognosis, including current stability of the condition and the likelihood of significant change within the remaining statutory time the member might remain on the TDRL, and a comparative estimate of the changes relative to the member's present condition.

(6) Statement as to the current degree of impairment of industrial and social adaptability for all cases involving psychiatric disabilities.

(7) Statement as to whether disclosure to the member of information relative to his or her physical or mental condition, or a personal appearance before the PEB would be detrimental to the member's physical or mental health.

(8) For members who served in the Southwest Asia Theater of Operations (SWATO) Comprehensive Clinical Evaluation Program (CCEP) evaluation (or waiver) if the medical diagnosis(es) included in the MEBR are assessed to be related to illnesses that are directly or causally related to service in this theater. If this was not done before the original MEBR, it must be included with the periodic examination.

(9) An estimate of changes since the previous examination.

(10) All medical impairments diagnosed since the member was placed on the TDRL, to include: whether the new diagnosis was caused either by the condition for which the member was placed on the TDRL or the treatment received for such a condition; whether, if not caused by the TDRL condition, the member's medical records document incurrence or aggravation of the condition while the member was in a military status; whether the condition is unstable, and a suggested period within 18 months when the next examination should occur.

(11) A detailed occupational history, indication of pertinent social and recreational activities, and activities of daily living.

(12) A competency board, if the member has a functional or organic disorder which makes questionable the member's ability to handle personal affairs and to understand and cooperate in MEB and PEB proceedings. Additionally, all TDRL cases with a previously rated psychiatric diagnosis must have a statement of competency (as shown in article 18-6).

## 18-19 Definition of, and Processes for Complying With, Mandated Timeframes for Completion and Submission of MEBRs

(1) MTFs have a significant responsibility to expedite all actions involving patients on LIMDU and patients being referred to the PEB for disability evaluation.

(2) For MEBRs being submitted for fitness for continued service determination to the PEB, MTFs must have the board report completed, sent to, ***and accepted by*** the PEB within 30 days of the date of dictation of the MEBR by the attending physician. This requirement replaces the previous standard (appearing in previous editions of both this chapter of MANMED and the SECNAVINST 1850.4 series) of "day of the decision of the attending physician that a referral to the CPEB is clinically indicated" as it more concisely and contemporarily links a physician's determination that a patient requires referral to an MEB and the actions of that MEB. This "30 days from the date of dictation" rule will sponsor a more accurate measuring of compliance by MTFs in timely preparation of MEBRs, and shall be the standard upon which MTF compliance is audited by the Enlisted Personnel Management Center (EPMAC) TMU. Immediately upon being advised that an MEB for referring a case to the PEB will be convened, MTF medical boards staff should concurrently, not consecutively, launch action on, and track completion of, the requirements which comprise the appropriate MEBR package submitted to the PEB.

(a) Immediate requests of parent commands for NMAs, and for LOD/M determinations where appropriate, are vital as these items often present significant obstacles to timely MEBR package completion. SECNAVINST 1850.4 series requires that COs will complete and forward NMAs within 15 days of receiving requests from MTFs. (See MANMED articles 18-15 and 18-16 for additional information on, respectively, NMAs and LOD determinations.)

(b) PEs should be scheduled immediately, and medical boards staffs must take proactive action in this regard, rather than merely instructing patients to schedule their own examinations. While not prescribed by this chapter of MANMED, it is recommended that MTF commanders establish mechanisms where MEB staffs are granted scheduling authority for obtaining rapid PEs for patients being evaluated by MEBs for referral to the PEB. MTFs should also determine their respective best business practices regarding which providers will conduct the PEs (i.e., the provider ordering a patient to an MEB, or a "physical examinations" section, or other appropriate provider). Patient administration and MEBs staffs must, as well, receive PE reports expeditiously from the providers performing the examinations. Regardless of how PEs are scheduled for MEB patients, MTF commanders must ensure that there is in place within their respective commands a method by which PEs performed on all members undergoing an MEB will be received by the MTF patient administration and MEBs staff from the department or branch clinic performing the examination on the day the examination is completed.

(c) Scheduling for indicated diagnostic procedures, particularly those with long lead-times must occur immediately.

(d) Consultations with indicated specialists to provide addenda to the MEBR must also occur immediately and MTF commanders will ensure that patients undergoing MEBs are ensured appropriate priority in seeing required consultant specialists.

(e) MTFs must include in their "30-day window" appropriate time periods for MEBR dictation, review, and signature by the MEBR members, and final review and signature by the CA. For MEBRs being dictated by other commands and providers, MTF commanders will ensure appropriate liaison with those institutions to ensure compliance with the "30-day window." The MEBR package being prepared for forwarding to the PEB will not be presented to the patient until it has been reviewed and signed by the MEB members and by the CA. The MEBR package presented to the patient for signature must be complete, and will contain all information, including NMA, LOD/M, addenda, and other documentation the MTF intends to submit to the PEB (for disability cases) or to service headquarters (for LIMDU cases) as part of the MEBR.

(f) MTFs must account in their "30-day window" the opportunity for patients to rebut their MEBR. From the day they receive their written MEBRs, patients (or for patients declared mentally incompetent or for whom the CA feels presentation of the MEBR information would be deleterious, their next of kin or duly appointed legal agent) have 5 working days to accept the MEBR by signing the NAVMED 6100/2 (Rev. 8-2004), Medical Board Statement of Patient, or to provide the CA with a written rebuttal. In cases in which the patient at the end of this 5-day period has provided neither a signature nor a rebuttal, the patient's acceptance of the MEBR will be presumed, and the MEBR will be forwarded. (Requests for extensions to this 5-day period will be adjudicated on a case-by-case basis by the CA.) If a patient elects to rebut, the patient will prepare a written statement and include any additional relevant information. The MEB members will review the rebuttal and make any appropriate change to the MEBR and forward the MEBR to the CA for review. The MEBR will then be represented to the patient. If changes have been made to the MEBR that result in the member wishing to withdraw his or her rebuttal, the MEBR will be forwarded without surrebuttal. If the patient elects to have the MEBR package contain his or her rebuttal as it is forwarded, the MEBR must contain a written surrebuttal. In all cases where an MEBR is forwarded from the MTF with a member's rebuttal, a surrebuttal must be included. The surrebuttal must specifically address any new information or issues raised by the patient in the rebuttal. A statement such as "I have reviewed the member's rebuttal and the opinions and recommendations made by the MEB still stand" is not sufficient when previously unaddressed information is presented by the patient in the rebuttal. Rebuttals and surrebuttals will become part of the MEBR package. Patients are not provided an additional rebuttal option or additional rebuttal time when presented with the surrebuttal.

(g) MTFs must account in their "30-day window" for periods of travel outside the area of the MTF, such as convalescent leave recommended for their patients, regular annual leave their patients may request, or requests to return temporarily to the parent command for members who were MEDEVAC'd or transferred for care unexpectedly and need to return to take care of their personal affairs. MTFs should carefully monitor the location of patients they have referred to MEBs to ensure that MEBR processing is not delayed due to an inability to contact the patient. Where practicable, regular annual leave out of the area of the MTF should be deferred until the MEBR has been submitted to the PEB. If travel out of the area of the MTF is entertained, there should be a provision for two-way transmission of information relative to the MEBR so as not to unduly delay MEBR processing, and mechanisms for providing appropriate counseling to the patient must also be defined. For patients for whom convalescent leave is recommended, the MTF should evaluate whether the decision to refer the patient to an MEB is most appropriate after the clinical evaluation to be made by the MTF at the conclusion of the patient's convalescent leave.

(h) All actions relative to an MEB case must be entered into MedBOLTT (or systems that replace it).

(3) For dictated MEBRs being submitted to service headquarters for "departmental review" requesting LIMDU, MTFs must submit the request such that the service headquarters receives the request as soon as possible after the decision to refer the case to service headquarters, but in any event within 20 days,

which allows for the MTF to obtain, as required by service headquarters (i.e., MMSR-4 for USMC and PERS-4821 for Navy) the NMA from the parent command, as well as providing time for the MTF to complete the MEBR. The MEBR package will not be presented to the patient until it has been reviewed and signed by the MEB members and by the CA. The MEBR package presented to the patient for signature must be complete, and will contain all information, including NMA, and other documentation the MTF intends to submit to service headquarters. From the day they receive their written MEBRs, patients (or--for patients declared mentally incompetent or for whom the CA feels presentation of the MEBR information would be deleterious--their next of kin or duly appointed legal agent) have 5 working days to accept the MEBR by signing a NAVMED 6100/2 (Rev 8-2004), Medical Board Statement of Patient, or to provide the CA with a written rebuttal. In cases in which the patient at the end of this 5-day period has provided neither a signature nor a rebuttal, the patient's acceptance of the MEBR will be presumed, and the MEBR will be forwarded to the respective service headquarters. MTF providers and MEB staffs must remain aware that in these cases the LIMDU period is not officially commenced or continued until ratified by service headquarters; appropriate liaison must occur with parent commands to ensure that members' medical conditions that necessitated MEB evaluation are not exacerbated pending authorization from service headquarters for LIMDU and that patients already on LIMDU are referred to service headquarters in ample time to provide for uninterrupted LIMDU or rapid referral to the PEB.

(4) For Abbreviated MEBRs being prepared to place an enlisted Sailor or Marine on LIMDU, not more than 5 working days will elapse between the time the MEB reports out a NAVMED 6100/5 (Rev. 8-2004) and the CA signs the form approving the LIMDU. The MTF will notify the member's parent command by Naval message traffic within 5 working days of the MEBR being initiated. (Refer to article 18-17 for information relative to the abbreviated LIMDU MEBR.)

(5) For reevaluation cases for TDRL patients, MTFs will ensure that all reevaluation cases have been accepted by the PEB as soon as possible following the patient's evaluation but in all events within 30 days of the patient's appointment at the MTF. Article 18-18 discusses in detail MTF responsibilities in TDRL reevaluation cases.

(6) All actions relative to an MEB case must be entered into MedBOLTT (or systems that replace it).

## 18-20 Transmission Methods, HIPAA, and Privacy Maintenance

(1) MTFs must ensure that all information relative to MEBRs is handled and conveyed to ensure the utmost in securing patient privacy and respecting the sensitive nature of the information conveyed by MEBRs. All MEBR information is covered by the Privacy Act. Additionally, as the provisions of the Health Insurance Portability and Accountability Act (HIPAA) of 1996 enact, all MEBR transmissions must comport to the requirements of this Federal legislation which influences the transmission of any data that allow for the identification of any individual patient. Detailed information on ensuring the privacy and confidentiality of all aspects of health care information appears in MANMED chapter 16 and supporting documentation. MTF commanders must ensure that their staff members involved in the production and routing of MEBRs are thoroughly trained in, and remain compliant with, all aspects of ensuring and protecting the privacy and confidentiality of information contained in MEBRs.

(2) Where written documentation is essential, and it is possible to convey this information concisely, naval message traffic is the preferred method of transmitting sensitive information between MTFs, parent commands, service headquarters, and the PEB. Strong consideration should be given by MTFs to sending this message traffic as "Personal For" traffic to the patient's parent commands, to further protect the privacy of sensitive medical information. This reliance on naval message traffic is obviously, however, inappropriate for the transmission of the large volume of documents that appropriately comprises each MEBR being submitted to the PEB, as well as many of those MEBRs submitted to service

headquarters petitioning for periods of temporary LIMDU. Emerging sophisticated technologies are allowing increased reliance on transmitting information electronically. MTFs and parent commands relying on electronic transmission via e-mails, intranets, etc., are responsible for maintaining the privacy of the information so conveyed.

(3) In cases where naval message traffic is impractical, the transmission of information between MTFs, service headquarters, and the PEB by use of telephonic facsimile (fax) equipment may be practical. In all cases where fax transmission is used, MTFs will ensure they are in full compliance with all contemporary applicable DON fax transmission policy. MTFs will also ensure that an appropriate warning statement, citing the Privacy Act and instructing fax recipients receiving any fax in error of specific, appropriate corrective actions required of them, appears prominently on at least the cover sheet of any fax transmittal package.

(4) Where naval message traffic and fax transmission are clearly inappropriate based on the volume of information to be transmitted and/or logistics, MTFs will rely on either the United States Postal Service or commercial carriers to convey information to service headquarters and the PEB. MTF commanders will ensure their staffs are directed to the maximum extent practicable to rely on "overnight" service for package delivery to the PEB, to optimize the time allowed MTFs under the "30-day window" (see article 18-16 to prepare appropriate MEBRs). MTFs should also rely on the "return receipt" or internet-based and other tracking modes made available by these delivery firms, to afford both enhanced tracking of packages in transit and enhanced audit trails to document compliance with the "30-day window." MTF medical board staffs should carefully monitor their respective routing of packages to the PEB such that resources are not wasted in sending packages "one at a time" but neither is rapid delivery thwarted by well-intentioned but inefficient stockpiling of MEBRs to "ship in bulk" to the PEB or to service headquarters.

(5) Electronic mail (e-mail) is not expressly prohibited as a method of transmission of patient information among "internal users" with a need to know. An opinion by BUMED JAG on the matter finds that "we may, when the mission requires, place personal information in an e-mail" but cautions that "we should only transmit such information by e-mail when absolutely required to frame an issue, and alternative methods of transmission would be inadequate." E-mail transmission of private information "should be the exception, not the rule." Accordingly, use of e-mail for conveying MEBR information, whether in the main body of e-mail messages or as attachments thereto, must be strictly evaluated to ensure compliance with Privacy Act, HIPAA, and information security requirements.

(6) An important correlated aspect of the information defined previously in this article is those cases in which an MTF needs to obtain information on ADSMs from a civilian institution. Under the HIPAA enacting legislation, 45 CFR 164.512(k)(1)(i): it is explicit that under the "Uses and disclosures for specialized government functions" provision "a covered entity may use and disclose the protected health information of individuals who are Armed Forces personnel for activities deemed necessary by appropriate military command authorities to assure the proper execution of the military mission, if the appropriate military authority has published by notice in the FEDERAL REGISTER the following information: (A) Appropriate military command authorities; and (B) The purposes for which the protected health information may be used or disclosed." Moreover, pursuant to the Federal Register publication of April 9, 2003, volume 68, number 68, page 17357, "Supplementary Information: In accordance with 45 CFR 164.512 (K)(1)(i), the Department of Defense has established in DoD 6025.18–R, paragraph C7.11.1, the following provisions: 1. General Rule. A covered entity (including a covered entity not part of or affiliated with the Department of Defense) may use and disclose the protected health information of individuals who are Armed Forces personnel for activities deemed necessary by appropriate military command authorities to assure the proper execution of the military mission."…it is obvious that MTF personnel are entitled by law to obtain from civilian facilities that information necessary to adjudicate appropriately continued fitness for duty issues.

# Section IV
# SPECIAL CONSIDERATIONS


| Article | | Page |
|---|---|---|
| 18-21 | Recruits: Removal from "Full Duty" Status; MEBs on Recruits and Members Within First 180 Days of Service | 18-64 |
| 18-22 | Students and Midshipmen | 18-68 |
| 18-23 | Reservists: Physical Disqualification and Referral to the PEB | 18-68 |
| 18-24 | Flag, General, and Medical Corps Officers: PEB Requirements | 18-69 |
| 18-25 | Care at the End of Active Duty, Medical Care Subsequent to Submission of a Case to the PEB, and Fitness to Separate | 18-70 |
| 18-26 | Checklist Elements for MEBR Being Submitted to the PEB | 18-72 |
| 18-27 | The Medical Board OnLine Triservice Tracking (MedBOLTT) System | 18-73 |
| 18-28 | Rejection, Suspension, or Termination of Cases at PEB | 18-74 |
| 18-29 | Training for MTF Staff, Patient Counseling, and the Role of the PEBLOs | 18-75 |
| 18-30 | Reference Listing | 18-77 |


## 18-21 Recruits: Removal from "Full Duty" Status; MEBs on Recruits and Members Within First 180 Days of Service

(1) The appropriate initial training of recruits as they enter the Navy and Marine Corps is inextricably linked to the protection and maintenance of their health. MTF commanders supporting Naval Training Center, Great Lakes and Marine Corps Recruit Depots, San Diego and Parris Island, as well as the various Navy and Marine Corps officer candidate schools, will construct and maintain appropriate liaison with the training commands to facilitate the vital sequencing of required training regimens while concomitantly ensuring the health of the recruits undergoing that training. Agreement on the proper referral of recruits to Navy Medicine facilities for accession screening, preventive, and restorative care is essential. MTF commanders must ensure collaboration with the training commands regarding interruptions in training due to medical conditions, including "medical holds," convalescent leave, repeating basic training cycles, and medical separations as warranted.

(2) Minor physical conditions or defects need not be reason for separation when they are considered not to interfere with training and they are not expected to interfere with the recruit's ability to perform medically unrestricted duties. Physical conditions or defects discovered during training should be evaluated regarding the recruit's ability to adjust to military service and to perform and function effectively when transferred at the conclusion of training. Recruits found to have physical conditions or defects which, had they been known at the time of entry would have been considered disqualifying for enlistment, are subject to referral for administrative separation by reason of defective enlistment.

(3) Recruits found to have physical conditions or defects which, had they been known at the time of entry would have been considered disqualifying for enlistment, are subject to referral for administrative separation by reason of defective enlistment. Commands with recruits on whom such diagnoses are made can elect to pursue retaining these recruits rather than separating them. In such cases, the command should forward all pertinent medical information to the Physical Qualifications and Review Division (BUMED-M3F1) for a retention recommendation. BUMED will provide this recommendation to the members' command, which has final authority on the decision to administratively separate or retain these recruits.

(4) MTF commanders supporting the Marine Corps recruit depots and the Naval Training Center, Great Lakes will establish recruit evaluation units (REUs) as a branch of their mental health services. The REU is a professional, advisory, and consultant unit to which recruits with possible mental health conditions will be referred for appropriate mental health consultation. The MTF commander must effect appropriate provider and support staff and appropriate physical plant spaces to allow for the clinical and administrative management of patients evaluated by the REU, and must ensure that appropriate inpatient facilities are available for patients requiring admission for observation and/or treatment. When practicable, REU psychiatrists, clinical psychologists, or other appropriate staff should briefly examine each recruit as part of the arrival medical in-processing, making indicated referral appointments at that time. Moreover, the MTF commanders must effect the development of cogent criteria agreed upon by the MTF and the recruit training command, and ensure the enforcement of those criteria, for referral of recruits as indicated to the REU (or, as warranted, to the MTFs mental health and/or emergency departments) and for REU provider examinations of recruits as necessary.

(5) MTF commanders responsible for evaluating recruits for medical separation are, in addition to serving as the Navy and Marine Corp's advocate, the patient's primary advocate in ensuring that the legally appropriate manner of discharge is effected. Accordingly, MTF commanders shall implement processes, and ensure staff members are trained appropriately in these processes, by which decisions are made as to whether medical separation under entry level medical separation (ELMS) conditions or convening of an MEB for possible referral to the PEB for disability evaluation is appropriate.

(6) ***Administrative Separations (ADSEP).*** Article 18-5, multiple articles in the DON Disability Evaluation Manual, and service directives (e.g., MILPERSMAN 1910 series and the MARCORSEPMAN) discuss in detail the administrative separations process. Five key criteria emerge that must be evaluated relative to determining whether medically-based administrative separation or referral to the PEB is appropriate for recruits:

(a) Whether the medical impairment is identified prior to or within 180 days of entry onto active duty.

(b) Whether the condition was the subject of a medical waiver for the member to enter the military.

(c) Whether the condition EPTS as established in DOD Instruction 1332.38 (E3.P4.5.2) and articles 3804m-3804p of the DON Disability Evaluation Manual:

(1) Except for medical defects and physical disabilities noted and recorded at the time of entrance, any injury or disease discovered after a service member enters active duty, with the exception of congenital and hereditary conditions, is presumed to have been incurred in the line of duty.

(2) Hereditary and genetic conditions shall be presumed to have been incurred prior to entry into active duty. They will be presumed service aggravated unless evidence clearly establishes that the condition is solely the time result of the condition's natural progression.

(3) Generally recognized risks associated with treating pre-existing conditions shall not be considered service aggravation.

(4) Signs or symptoms of chronic disease identified so soon after the day of entry on military service (usually within 180 days) that the disease could not have originated in that short a period will be accepted as proof that the disease manifested prior to entrance into active Military service (DOD Instruction 1332.38 (E3.P4.5.4)).

(5) Signs or symptoms of communicable disease within less than the medically recognized minimum incubation period after entry on active service will be accepted as evidence that the disease EPTS (DOD Instruction 1332.38 (E3.P4.5.4)).

(6) Per service headquarters directives (e.g., MILPERSMAN article 1910-130), any case which cannot be conclusively determined at the MTF level as to whether the condition actually EPTS or whether the condition was aggravated at any time after the member was enlisted or inducted will result in the convening of an MEB for referring the case to the PEB for final determination.

(7) Per SECNAVINST 1850.4E, articles 1001d, 2027, and enclosure (10), "service members found unfit for continued naval service with conditions that have not been incurred or been permanently aggravated by military service," i.e., Unfit-EPTS, "are not eligible for disability severance pay or disability retirement if they have less than 8 years cumulative active service." Further details on this "8-year rule" are found at enclosure (10) of the DON Disability Evaluation Manual.

(d) Whether the condition was service aggravated.

(1) DON Disability Evaluation Manual, article 3804m, conveys that "A medical condition manifesting itself or existing prior to entry into military service will be considered "permanently service aggravated" when military service lastingly worsens that medical condition beyond its natural progression. Use generally accepted medical principles to determine "natural progression." "

(2) Generally recognized risks associated with treating pre-existing conditions shall not be considered service aggravated.

(e) Whether the condition is one that merits referral to the PEB. As conveyed in article 18-5, the mere presence of a diagnosis does not automatically confer either "disability" or the requirement for PEB evaluation of a case. Examples of these conditions appear at article 18-5.

(7) ***Referral of Recruit Cases to the PEB***

(a) ***Members with medical waivers.*** For recruits with medical entry waivers granted by appropriate authority upon recommendation by BUMED-M3F1, per article 3308a of the DON Disability Evaluation Manual: "Provided no aggravation has occurred, servicemembers who enter the military with a medical waiver may be separated without physical disability evaluation when the responsible medical authority designated by service regulations determines within 180 days of the member's entry into active service that the waivered condition represents a risk to the member or prejudices the best interests of the Government. Once 180 days have elapsed, or the condition is one that causes referral into the DES, refer the member for physical disability evaluation, if otherwise qualified."

(b) ***Members Without Medical Waivers.*** Per article 3308b of the DON Disability Evaluation Manual: "Members undergoing initial active duty for training who incur an injury or condition which was not waived for the purpose of entry into military service, who will not be returned to training in a reasonable period of time, will be referred to the PEB for disability evaluation."

(8) ***Removal of Recruits from Full Duty Status Upon Diagnosis of a Medical Condition/LIMDU for Recruits.*** Program authorization for all LIMDU, as detailed in article 18-10, rests with service headquarters. While service headquarters directives do not expressly prohibit LIMDU periods for recruits, it is vital that MTFs supporting the recruit training centers realize that the unique, precisely scheduled prerequisites for successful recruit training do not comport to extended periods of LIMDU. Rather than LIMDU, recruits with medical conditions precluding their full participation in recruit training activities are placed in "recruit convalescence units" or in a "medical/administrative hold" status until they are either medically cleared to continue their training, or are referred for medical administrative separation

or to an MEB at the MTF. MTF commanders supporting the recruit training commands must ensure that the MTF and the training command have agreed upon clinical referral criteria that allow for appropriate clinical and administrative management of those patients whose condition renders them less-than-fully physically or mentally capable of participating fully in recruit training activities.

(9) ***Summary Overview.*** The following presents a flow-diagram of the process in determining whether applicable cases are handled through the administrative separation process or necessitate the MTF convening an MEB for potential referral to the PEB for disability evaluation.

**Summary: ADSEP Eligibility *vs* PEB Referral**



## 18-22 Students and Midshipmen

(1) ***Midshipmen.*** A prerequisite for eligibility for referral to the Physical Evaluation Board for disability evaluation is that the disease or injury resulting in referral to the PEB must be "incurred while entitled to receive basic pay." This factor had historically precluded midshipmen and cadets at the service academies from PEB referral, as delineated in SECNAVINST 1850.4 series, "Injury or disease which was incurred by a member while not entitled to basic pay specifically is excluded from disability benefits, unless service aggravated (10 USC 1217)." Effective with the enactment in the first quarter of FY 05 of the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005 (NDAA 05), 10 USC 1217 was amended such that "Monthly cadet pay and monthly midshipman pay under section 203(c) of title 37 shall be considered to be basic pay for purposes of this chapter and the computation of retired pay and severance and separation pay to which entitlement is established under this chapter." This 10 USC 1217 revision then confers PEB eligibility for those "cadets at the United States Military Academy, the United States Air Force Academy, and the United States Coast Guard Academy, and midshipmen of the United States Naval Academy, but only with respect to physical disabilities incurred after the date of the enactment of the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005." Additional implementing guidance on processing PEBs for service academy cadets and midshipmen is available from the DON PEB. Members of ROTC, by definition, are not entitled to basic pay, and are therefore ineligible for disability benefits adjudicated by the PEB. Questions on the disposition of these members in connection with determinations of "physically qualified/not physically qualified" (PQ/NPQ) should be referred to the Patient Administration/Medical Evaluation Boards officer at the MTF, with additional referral to BUMED (Physical Qualifications and Review Division), who renders the PQ/NPQ decision in these cases.

(2) ***Students in Recruiting Command Programs Entitled to Basic Pay.*** There are officer recruitment programs operated by Commander, Navy Recruiting Command (CNRC) and Marine Corps Recruiting Command (MCRC) in which students enrolled in academic programs leading to a commission are, during their college coursework, entitled to receipt of basic pay. Accordingly, these individuals are entitled to DES determinations, just as any other ADSM, in accordance with SECNAVINST 1850.4 guidance. Students in these categories (e.g., the Nuclear Power Commissioning (NUPOC) Program and certain enlisted commissioning programs (ECP)) will be evaluated by BUMED Physical Qualifications and Review Division (BUMED-M3F1) for "PQ/NPQ" determination for retention in the program or for commissioning determination. BUMED-M3F1 will advise whether or not these cases meet the criteria for referral into the DES. For cases meriting referral to the PEB, CNRC, and MCRC staff will contact the Military Medical Support Office (MMSO) in Great Lakes, IL as necessary for assistance in identifying which Navy MTF will be tasked with convening an MEB in these cases. MTF staff are to provide every assistance necessary to CNRC, MCRC, and MMSO in this regard, recognizing the special constraints (e.g., academic responsibilities and sometimes significant geographic separation from an MTF) inherent in the academic settings in which these patients are located. The MTF identified to convene the MEB will follow the case through to completion, ensuring liaison with MMSO, CNRC, or MCRC as appropriate to facilitate the PEB receiving the case for adjudication.

## 18-23 Reservists: Physical Disqualification and Referral to the PEB

(1) ***Reserve Component (RC) Members are Required to Meet Physical Qualifications as set forth in MANMED.*** Every reservist is responsible for notifying his or her CO immediately of any physical problem that may delay or preclude his or her mobilization. Additionally, if a unit or activity CO receives information from the annual screening or, for other reason, believes a reservist is NPQ for active duty or retention, he or she shall ensure the member is examined by a medical officer as soon as possible. If the medical officer discovers a potentially disqualifying

defect as noted in this chapter, the reserve activity CO will forward the result of the examination to BUMED-M3F1, Physical Qualifications and Review Division, via the echelon 4 command for determination for fitness for continued service. BUMED will review available information, advise service headquarters of the member's medical condition, and recommend disposition (i.e., whether the member should be retained in the RC or separated as being NPQ for retention). Service headquarters will notify the member of this finding and, for NPQ findings, will offer three options, including: retirement, if eligible; administrative separation; or request for adjudication of the case by the PEB. If the PEB determines the member is PQ, he or she may be reassigned in a drilling status.

(2) ***Referral of RC Member Cases to the PEB.*** If an RC member elects a PEB following review by BUMED, the members MEBR will be compiled following the procedures for active component members conveyed throughout this chapter, and forwarded to the PEB. As with all Navy and Marine Corps members, a case referred to the DON PEB must be referred from one of the MTFs whose commander holds CA for MEBs (as delineated in article 18-3). If the physical distance from a Reserve unit to one of these MTFs precludes the patient actually being evaluated at the Navy MTF, all consultant services should be obtained from another appropriate DOD, DVA, or TRICARE facility and reports thereof forwarded to a Navy MTF whose commander holds CA. Per SECNAVINST 1770.3 series, the service headquarters will review the member's eligibility for disability benefits and, when appropriate, issue a notice of eligibility (NOE) or line of duty (LOD) certification. In some cases, it will be clinically mandatory that the member present in person at a Navy MTF to allow for appropriate preparation of the MEBR; the member's CO in these cases should be prepared to ensure appropriate funding and logistic support, and should ensure that unit representatives are in contact with the MTF's patient administration and/or Operational Forces liaison offices to facilitate appropriate clinical and administrative case management. Additionally, some cases may require that the Reservist provide medical documentation of care received from providers not involved with the MHS. Directives (refer to SECNAVINST 1770.3 series) and legal interpretation exist for DON to obtain this clinical information; additional guidance in these cases should be obtained from BUMED JAG and/or the JAG officers serving respective RC units.

(3) As with all MEB actions, there are clinical as well as personnel components inherent in processing RC members' MEBRs. For questions not addressed herein, RC members and their parent commands should refer to the SECNAVINST 1770.3 series and COMNAVRESFORINST 1001.5 series for additional guidance, and should contact their respective service headquarters for more definitive information. Particularly in cases involving an RC member's desire to remain on active duty pending PEB adjudication (as provided under National Defense Authorization Act 2000) or, conversely, to release from an active duty for special work period pending PEB findings without compromising potential benefits (see DOD Instruction 1332.38, section E3.P2.7.2.1) additional guidance should be sought by the member and his or her parent command from elements of their RC chain of command.

(4) ***Temporary Disqualifications.*** Inactive Reservists are not routinely eligible for LIMDU (as developed in previous sections of this chapter). A medical officer may classify a member as temporarily NPQ (TNPQ) when the member has a physical disqualification of a minor or temporary nature that would not preclude the member from attending drill. The prognosis for recovery must be greater than 1 month, but less than 6 months for TNPQ status to be possible. Members may remain TNPQ for a maximum of 6 months. If it appears the disqualifying factor is of a more permanent nature, the procedures for determining PQ/NPQ status as defined above will be initiated by the medical officer and the Reserve activity.

## 18-24 Flag, General, and Medical Corps Officers: PEB Requirements

(1) Cases involving Marine Corps Generals, Navy Admirals, and Navy Medical Corps (210X) officers (irrespective of rank) that are being referred to the

PEB have additional requirements levied on them as compared to other PEB cases, as it is mandatory they be treated as "special interest" cases following SECNAVINST 1850.4 series.

(2) For Flag and General officer cases, the originating MTFs are advised to refer to the appropriate articles of the DON Disability Evaluation Manual for specific information relative to case processing.

(3) For Medical Corps (210X) cases, MTFs must convene a Peer Review Board and must comport to all particulars of the credentialing and privileging directives; MTF staff preparing Medical Corps officer cases are directed to refer to the appropriate articles of the DON Disability Evaluation Manual for specific information relative to case processing.

## 18-25 Care at the End of Active Duty, Medical Care Subsequent to Submission of a Case to the PEB, and Fitness to Separate

(1) **Care at the end of active duty** Marine and Navy members in the waning aspects of their service facing non-punitive separation, whether due to voluntary longevity retirement, or voluntary separation at end of active obligated service (e.g., EAS or EAOS), or involuntary separation (e.g., high year tenure or an ongoing case being adjudicated via the DES), often encounter situations requiring a difficult resolution of whether a health problem should force their being retained on active duty beyond the previously established date of separation. These cases are increasingly difficult given that separation from active duty decisions are personnel actions that must be effected in compliance with the Federal laws regulating eligibility for care within the DOD MHS. Accordingly, when a separation or retirement date has been established, every effort must be made to effect the servicemember's discharge on that date. Only the respective service headquarters can alter a servicemember's date of discharge. MTFs caring for patients who have an impending separation date who present with or incur conditions for which care is neither deferrable nor elective, and for which the course of care cannot be completed prior to the scheduled separation date, must ensure that respective service headquarters are made aware of such situations immediately. For patients whose care is deferrable and/or elective, it is not appropriate for MTFs caring for patients with an impending separation date who present with conditions for which care is deferrable and elective to attempt to forestall the established separation or retirement date. MTF staffs shall be attentive in these situations to not launching an elective course of care which cannot be expected to be completed prior to the scheduled separation date.

(a) In cases where patients present or are diagnosed with a condition for which competent MTF authorities determine the care is not elective, the MTF should immediately notify the parent command and the respective service headquarters of the member's condition and anticipated course of care. Actions for retaining the member on active duty until a definitive resolution (i.e., either curative care or referral to the DES) is effected are appropriate. (Provided this is the patient's intent: Provisions in MILPERSMAN articles 1160-040 and 1160-050), the Marine Corps Separation and Retirement Manual (MARCORSEPMAN), and the SECNAVINST 1850.4 series allow servicemembers to waive care and/or referral to the PEB so they may release from active duty at the scheduled release date, so consultation with the patient is paramount.

*Cases of this nature involving members for whom a retirement date has been set, will be evaluated under a standard of presumed fit (P-FIT). Such cases must be received by the PEB 60 days prior to the originally scheduled date of retirement or EAOS to allow for adequate processing time. President, PEB will verify dates with the appropriate service headquarters. MEBs received within the 60-day window will be screened by a medical officer of the informal PEB to ensure serious conditions potentially overcoming P-FIT are not overlooked. Cases not accepted after medical review will be rejected and returned to the MTF. Service headquarters will be notified of case rejection to allow continued processing of the member for retirement. Acceptance of cases within this window does not necessarily mean that members will overcome the "presumption of fitness" criteria.*

(b) Cases in which the course of care is determined to be "elective" may lead to debate over whether to render that care, particularly if it cannot be accomplished within the member's remaining period of service. DOD 6015.1-M, the Glossary for Healthcare Terminology, defines the following:

(1) ***Deferred Non-Emergency Care.*** "Medical or dental care (such as eye refraction, immunizations, dental prophylaxis, and so on) that can be delayed without risk to the patient."

(2) ***Elective Care.*** "Medical, surgical, or dental care that, in the opinion of professional authority, could be performed at another time or place without jeopardizing the patient's life, limb, health, or well-being." Obviously however, the decision of what constitutes "elective" care is a clinical call that must be determined on a case-by-case basis. Disputes that may emerge among clinicians as to whether a projected course of care is "elective" must also be decided from a clinical perspective with involvement of the appropriate chain of command of the MTF. Predicated on respective command's policies, the senior medical officer, the chief of the clinical staff and/or the CA for medical boards (i.e., the CO) should be consulted as the final arbiter of whether a case involves "elective care."

(c) In cases involving would-be retirees and "elective" care, the requirement to maintain the member on active duty is not compelling in many cases, as retirees still have Federally-mandated access to care within the direct care infrastructure of the MHS. Only in those cases where the would-be retiree can assert an impact on any potential disability determination status should consideration of retention on active duty be entertained.

(d) For personnel being discharged shy of the number of years required to establish an ongoing entitlement to care in the MHS, the decisions on whether to commence "elective" courses of care near the time of an already-determined separation date become more acute, as there is no entitlement to care following the date of discharge (outside the provisions of any Transition Assistance Management Program (TAMP) that may be in effect at the time). For those cases in which it cannot be asserted that a patient's condition represents a potential disability that mandates referral to the DON PEB, the provider must conscientiously determine whether all care can appropriately be rendered prior to the member's projected date of discharge. As it is unlikely that service headquarters would extend a servicemember's period of active duty to receive "elective" care, providers must be exactingly cautious not to commence a course of care that will not be concluded prior to the expiration of the patient's eligibility for care. In these cases, clinically appropriate deferral of care to appropriate civilian providers (or the DVA as applicable) as indicated by the patient should be pursued. As always, extenuating circumstances, unusual cases or any requests for clarifying information should be forwarded to the patient administration officer.

(2) Those cases in which a patient is considered for or undergoes substantive surgical intervention or medical care after his or her case has already been submitted to the PEB merit special attention. It is imperative that the health record of any patient being referred to an MEB contain prominent notation of this so that any provider who engages in a course of care with the patient subsequent to the patient being referred to an MEB is readily aware of this fact. The PEB and the patient's respective service headquarters must be notified immediately of any surgical or significant medical intervention that occurs subsequent to the patient's case being submitted to the PEB, as this may bear a significant impact in the deliberations of the PEB. Elective and deferrable surgeries should not be undertaken following the submission of the MEBR to the PEB, and in consonance with appropriate clinical management, any non-elective surgeries should be completed prior to the submission of the MEBR to the PEB to facilitate comprehensive case adjudication by the PEB members. The role of the provider in communicating with the MTF patient administration or MEBs service cannot be over-emphasized in these cases. The provider and the patient administration officer must ensure that the patient, his or her parent command, the PEB, and the respective service headquarters remain constantly apprised of the patient's status, particularly regarding any attempt to retain the patient on active duty beyond the previously enacted separation or retirement date.

(3) ***Fitness to Separate.*** A substantive number of cases involving potential retention beyond an already established separation or retirement date emerge from findings noted during the member's separation PE (as otherwise, the LIMDU and PEB processes should have led to documentation of significant illness or injury throughout the member's period of service). MTFs must ensure the timeliness and accuracy of separation physicals, including ensuring that all required and indicated follow-on studies and consultations are completed prior to the physical being signed off and the member being separated. These separation physicals are predicated on criteria for retention,

not accession. As such, they are documenting that servicemembers are fit for "continuing" service (e.g., Reserve affiliations following release from active duty, etc.). They are not intended to document that the patient is a "perfect specimen;" neither are they intended as a road map to be followed in returning the patient to the "perfect specimen" condition conveyed by accession standards. The origin of and logic behind the "separation physical" as conveyed in MANMED article 15-29, indicate that the separation physical serves chiefly in:

(a) Documenting the member's suitability for continuing service, (i.e., Reserve affiliation or potential return to active duty) as the measurement of fitness to separate.

(b) Establishing the presence (and, equally important, the absence) of any service-connected disability condition that must be referred to the Navy's PEB following the SECNAVINST 1850.4 series. Routine service, and the years inherent therein, induce wear and tear, and it is likely that after significant service many patients will present with diagnoses that may well have been "disqualifying" on an entrance physical had the diagnoses manifested then. From that perspective it is critical to remember that the mere presence of a "check in the block" on the separation physical paperwork neither prima facie indicates a condition barring on-time release from active duty, nor translates into automatic referral to the PEB. "Fit to separate" status at the time of retirement or separation does not indicate that a departing servicemember is devoid of medical conditions or diagnoses, but rather indicates:

(1) The absence of a service-connected disability condition meriting referral to the PEB (except for, obviously, those cases where the PEB has found a member unfit).

(2) The satisfaction of retention standards allowing a servicemember to satisfy Reserve affiliation obligations and/or be considered for re-entering active service.

(4) ***Cases Involving Punitive Discharge.*** Personnel regulations do not afford members undergoing punitive discharge the same alternatives available to those separating under non-punitive conditions in dealing with medical situations emerging at the time of the separation physical. Retention on active duty to deal with situations emerging on separation physicals in these cases is not permitted. MTFs caring for patients in these situations must be mindful of the overriding legal ramifications; referral to MILPERSMAN article 1900-808 for Navy personnel is required, and conference with appropriate legal and PSD officials is encouraged; referral to MARCORSEPMAN for Marine Corps personnel.

## 18-26 Checklist Elements for MEBR Being Submitted to the PEB

(1) Article 18-12 provides a comprehensive example of the complete MEBR format to be used in cases being submitted to the PEB for adjudication of fitness for continued naval service. Excerpted here are items, and the order in which they should appear to enhance processing, of those cases referred by MTFs to the PEB:

(a) NAVMED 6100/1 Information (cover) sheet (as defined in MANMED article 18-9, depicting member's identifying information name, rank, grade, and social security number; specialty of the signatory physicians; clinical department and/or service authoring or sponsoring the document; MTF and its location; dates MEBR was conducted and dictated; and signatures of the members of the MEB).

(b) The dictated MEBR, bearing identifying information and signatures as appropriate of the MEB members and the patient. Under no circumstances will the narrative prepared by the MTF state that the member is unfit, or provide recommendation for a disability percentage rating. (See MANMED article 18-12(3)k for information on specific permissible wording in this regard.)

(c) NAVMED 6100/2, Medical Board Statement of Patient.

(d) Specialty related considerations and addenda.

(e) Rebuttal to the MEBR (if prepared by the patient) and surrebuttal. When the member submits a rebuttal to a medical board or an addendum, the

physician authoring the MEBR must address the member's specific issues. (MANMED article 18-19 details handling of rebuttals and surrebuttals.)

(f) A complete PE conducted within 6 months of the date of the MEBR. In all cases, hand dominance must be stated. Height and weight must be documented in all MEBRs.

(g) The NMA from the member's CO (see MANMED article 18-15 for discussion of NMAs).

(h) A copy of the member's health record, single sided. Any supplemental records should be submitted. If the member's medical record is for any reason not included with the MEBR, this fact should be pointed out concisely to the PEB at the time the MEBR package is forwarded to PEB. Cases in which the patients health record is unavailable should be discussed with the PEB prior to forwarding the case.

(i) Copies of all narrative summaries of hospitalizations and all procedure reports.

(j) ***Laboratory and Ancillary Studies.*** All studies that support and quantify the diagnosis(es) should be included as should any studies that conflict with the diagnosis(es). All results maintained in CHCS will be printed and included in the health record to ensure the PEB receives complete information.

(k) ***Photographs.*** Current photographs are essential in burn cases and very useful in cases with significantly disfiguring scars. Photographs submitted should be certified by the medical photography department to have been taken within 1 month of the date of dictation of the MEBR.

(l) ***Competency Statements.*** Competency statements are required on all psychiatric diagnoses (except where the psychiatric condition has resolved). Where a member's competency is in question, an incapacitation board must be held and the report of the incapacitation board must be submitted to the PEB. The statement of competency must be made by a psychiatrist following the criteria established by the JAG Manual.

(m) LODD, where required (See MANMED article 18-16).

(n) Notice of eligibility (NOE) or line of duty (LOD) certification as required in processing cases for RC Personnel (see MANMED article 18-23).

(2) MTFs are encouraged to develop locally-optimized checklists predicated on the above items, to ensure comprehensive and timely compliance with MEBR requirements. In addition to the above elements, these checklists may also include items that do not appear in an MEBR prepared for the PEB, such as: attendance of the patient at Disabled Transition Assistance Programs (DTAPs); acquisition of TEMDU orders (as indicated) from the patient's parent command; provision for family members relocation and/or other needs if the member undergoing an MEB has been transferred from his or her previous command; collaboration between the MTF and the servicing PSD for any patient-specific personnel actions; assignment of caseworker (if the patient administration/MEBs office is using a case management system); evidence of any required interaction between the patient administration or MEBs office and the MTF operational forces medical liaison service; evidence of communications between the MTF and the patient's parent command; confirmation of appropriate briefings to the patient on MEB processes; and other items that the MTF deems appropriate.

## 18-27 The Medical Board OnLine Triservice Tracking (MedBOLTT) System

(1) The MedBOLTT is a Web-based system accessible to those MTFs with CA to perform MEBs. MedBOLTT is operated by contract under the aegis of NMIMC. Questions on MedBOLTT policy will be directed to the BUMED Patient Administration and TRICARE Operations Branch; questions on technical aspects of MedBOLTT operation will be referred to the MedBOLTT project officer at NMIMC and/or the help desk provided by the MedBOLTT contractor, as determined by NMIMC. It is imperative that MTF commanders possessing CA for MEBs (MANMED article 18-3) ensure they have

adequate numbers of staff appropriately trained in MedBOLTT applica-tions to guarantee all activity involving MEBs is entered promptly and correctly into MedBOLTT. As developed in MANMED article 18-1, the proper exe-cution of MEB and MEBR actions is a significant readiness issue and a force multiplier; MedBOLTT is the method by which Navy Medicine reports its efficacy in executing this vital mission.

(2) MedBOLTT captures and shares data globally, allowing all MTFs with CA to research, for any patient referred to an MEB, both the contemporary board activity as well as historical referrals to any MEB. These historical checks are vital to assisting service headquarters and parent commands with ensuring appropriate personnel community management across the Navy and Marine Corps, and proper routing of MEBRs, given that:

(a) Service headquarters must approve certain LIMDU periods.

(b) Total LIMDU must be tracked to ensure appropriately timed referral to the PEB should the patient's condition(s) not completely resolve while on LIMDU.

(c) Stipulated time intervals must be satisfied before a case previously adjudicated by the PEB can be referred anew by an MTF to the PEB for additional action.

(3) It is imperative that all aspects of MEB and MEBR activity be entered into MedBOLTT. These MedBOLTT entries must include final findings for cases adjudicated by the PEB (whether entered by PEBLOs or by Patient Administration/MEBs staff) as well as cases where members are returned to duty following LIMDU.

(4) MTFs shall take all appropriate steps to protect the privacy of patients by securing the integrity of the sensitive information contained in MedBOLTT.

## 18-28 Rejection, Suspension, or Termination of Cases at PEB

(1) The PEB can reject cases submitted to it by the MTFs, or elect to suspend or terminate cases, for a variety of reasons at anytime prior to releasing "en bloc" findings. In the overwhelming majority of such cases, the PEB requires additional clinical information from the MTF submitting the MEBR. In the case of PEB suspension or termination of cases, the PEB will communicate directly and immediately upon rendering a cancellation or suspension determination with the MTF MEB staff to delineate cause for suspension or cancellation and remedial actions to be undertaken by the MTF. Cases terminated by the PEB that are resubmitted by an MTF must contain a completely new MEBR and NMA, and must contain no other information older than 6 months old by the time the case is received at the PEB (i.e., patient administration or medical boards staffs must ensure that only contemporary information is submitted in any case forwarded for adjudication to the PEB).

(2) ***An MTF that has submitted an MEBR to the PEB cannot unilaterally cancel that MEBR.*** If a patient who has been submitted to the PEB has experienced, in the opinion of the CA who referred the patient to the PEB, a significant enough change in condition that the PEB referral may no longer be optimal, the MTF shall communicate this information to the OIC of the recorders at the PEB via reliable, confirmable communication methods, (including naval message traffic or fax) as a request to cancel the MEBR. The PEB will confirm receipt of this MTF request immediately, and will convey information indicating when a decision on the cancellation request will be rendered. Both the MTF and the PEB shall ensure that the patient and the patient's parent command are apprised in real time of developments with the PEB referral and it's possible cancellation in such cases.

## 18-29 Training for MTF Staff, Patient Counseling, and the Role of the PEBLOs

(1) The arena of "MEBs" is unfamiliar to many, and Navy Medicine must eliminate this unfamiliarity by practicing empathy and by ensuring appropriate training exists for providers, MEB staffs, and patients (and their commands) involved with the MEB system. MTFs, in concert with parent commands and service headquarters must assiduously track and manage those patients in the MEB system both to reduce each respective patient's period of medically unrestricted duty, and to optimize the fighting forces of the Navy and Marine Corps. To that end, we must ensure appropriate communications with our patients and their commands to eliminate confusion and facilitate rapid returns to healthy service or, where indicated, expeditious referral to the DON Disability Evaluation Manual.

(2) The Physical Evaluation Board Liaison Officers (PEBLOs) provide a critical, congressionally mandated function of vital importance in the operation of the MTF MEB role. The PEBLOs are guided by SECNAVINST 1850.4 series in their role of counseling Navy and Marine Corps members who have been entered into the DON Disability Evaluation Manual. The DIRSECNAVCORB assigns PEBLOs to eight MTFs whose volume of DES cases warrants a full-time counselor to serve patients at and near those MTFs. (Those MTFs are Bethesda, San Diego, Portsmouth, Jacksonville, Camp Lejeune, Great Lakes, Camp Pendleton, and Pearl Harbor.) At those Navy MTFs where permanently DIRSECNAVCORB-assigned PEBLO counselors are not available, the MTF commander shall designate a staff member to provide disability counseling to patients entered into the DES. PEBLOs and those MTF members assigned collateral duties for counseling DES patients should, wherever practical, be senior enlisted members or equivalent civilian employees. Initial, quarterly, and annual training is provided to all PEBLOs, including the collateral duty PEBLOs or counselors, in a comprehensive training program proffered by the PEB staff; additional information is offered via the PEBs Web site (see article 18-30). MTF commanders are encouraged to define and actuate, via interaction with the PEBs OIC of PEBLOs, that pattern of PEBLO involvement that optimizes their respective MTF's performance. MTF COs are required to maximize the funding for training opportunities for their PEBLOs, and at a minimum will ensure they fund their PEBLOs attendance at the annual PEB Conference, historically held in the spring of each calendar year. (Funding for this conference for DIRSECNAVCORB-appointed PEBLOs will be provided by DIRSECNAVCORB.)

(3) Article 18-3 delineates MTF commander training responsibilities relative to MEBs operation. Other areas of this chapter of MANMED talk to the importance of having MTF-specific written guidance on the proper execution of MEBs. The following are offered as broad-based areas of consideration in developing cogent, effective MEB, and patient administration or MEBs staff training offerings.

(4) For MEBs Staff and PEBLOs the following are integral training points:

(a) Who counsels patients? On what? What is interplay between providers and MEBs staff regarding patient counseling? Who counsels regarding benefits, particularly when the next of kin (NOK) is geographically removed from the MTF? Does the MTF have appropriate practices in place, including for those patients who are hospitalized in non-DOD facilities?

(b) Are procedures for working with clinical staff, including setting consult and PE appointments, clearly delineated?

(c) Does the staff understand the role of EPMACs TMU?

(d) Does the staff understand what comprises a complete MEBR package, whether the final disposition is the PEB or service headquarters (for LIMDU determination)?

(e) Does the staff understand the relationship of their operations to the medical holding company and to the Operational Forces liaison office?

(f) Does the staff know who the MTFs LIMDU coordinator is?

(g) Does the staff realize the importance of, and the mechanisms for, communicating with parent commands and the line activities whose Sailors and Marines are in the MEB process?

(h) Does the staff have ready access to all pertinent directives?

(i) Does the staff understand the MTF's MEBR dictation system?

(j) Does the appropriate staff have access to MedBOLTT and any system that succeeds it?

(5) For providers the following are integral training points:

(a) Are all appropriate providers trained and certified in writing by the CA to sit on MEBs?

(b) Do providers have ready access to all SECNAV, BUMED, and MTF-specific directives on MEBs and MEBRs?

(c) Do providers understand their difficult role as advocates for both their patients and the DON in MEB cases, and have avenues of redress for conflict been appropriately explained?

(d) Do providers understand the PE standards conveyed in MANMED chapter 15, and understand that a complete PE is required pursuant to every MEB? Is there agreement across the MTF on who performs PEs for cases being referred to the PEB, and are appointments readily available and results immediately provided to the MEB office?

(e) Are providers given appropriate guidance in the execution of TDRL reevaluation appointments?

(f) Is there a comprehensive training program in place for providers? Is this mandated at the command level, or delegated to clinical department heads, and if so how is this delegation conveyed?

(g) Are providers required to attend the site visit briefs conducted by the PEB staff?

(h) At institutions with teaching/residency programs, are MEB and/or PEB staff provided lecture time with newly-arriving providers?

(i) Do providers understand the relationship of their practice to the medical holding company, operational forces office, and operational units (e.g., why returning a member in a full leg cast to a ship is contraindicated).

(6) For patients, the following are integral training and counseling points:

(a) Do patients receive comprehensive counseling on the significance of the actions proposed and the related rights, entitlements, and benefits accruing to them under the DES (see DOD Directive 1332.18).

(b) Can patients readily access all pertinent directives? Has the MTF prepared a concise handout and/or Web site information for patients involved in the MEB arena?

(c) Are Transition Assistance Program and Disabled Transition Assistance Program (TAP/DTAP) courses available and appropriate (i.e., timely and informative) for cases being referred to the PEB? Are DVA and other representatives made available to patients in the MEB system?

(d) Are appropriate external agency liaisons available for patients undergoing MEBs?

(e) Have MTF staff explained to the patient who will provide counseling on the MEB process?

(f) Upon receipt of findings do PEBLOs counsel patients receiving findings of unfit for continued naval service on options for "home awaiting orders" status (MILPERSMAN article 1910-900 and MARCORSEPMAN pertains) as well as options for pursuing PLD status? PLD regulations changed with the publication of the SECNAVINST 1850.4E such that the President, PEB, is no longer considering "conditional" acceptances of PEB findings involving granting any PLD. All PLD actions accordingly are regulated by service headquarters, and patients receiving PEB findings of unfit for continued naval service who wish to pursue PLD must submit this request pursuant to receiving their PEB findings. Additional information on this topic is available from the PEBLOs and in SECNAVINST 1850.4 series.

***REMAINDER OF PAGE INTENTIONALLY LEFT BLANK***

# 18-30 Reference Listing

| Directive Number | Directive Title | Available Electronically at |
|---|---|---|
| DOD Directive 1332.18 | Separation or Retirement for Physical Disability | http://www.dtic.mil/whs/directives |
| DOD Directive 6130.3 | Physical Standards for Appointment, Enlistment or Induction | http://www.dtic.mil/whs/directives |
| DOD Instruction 1332.38 | Physical Disability Evaluation | http://www.dtic.mil/whs/directives |
| DOD Instruction 1332.39 | Application of the Veterans Administration Schedule for Rating Disabilities (VASRD) | http://www.dtic.mil/whs/directives |
| DOD Instruction 6025.15 | Implementation of Department of Defense Participation in the National Practitioner Data Bank | http://www.dtic.mil/whs/directives |
| DOD Instruction 6130.4 | Criteria and Procedure Requirements for Physical Standards for Appointment, Enlistment or Induction in the Armed Forces | http://www.dtic.mil/whs/directives |
| SECNAVINST 1850.4 series | Department of the Navy Disability Evaluation Manual | http://neds.daps.dla.mil/ |
| SECNAVINST 1770.3 series | Management and Disposition of Incapacitation and Incapacitation Benefits for Members of Navy and Marine Corps Reserve Components | http://www.bupers.navy.mil/ |
| No Directive Number | PEB Guidebook for Physicians(Authored by Captain Wurzbacher) | http://neds.daps.dla.mil/ |
| No Directive Number | PEBLO Guidebook | Not online, available through PEB |
| SECNAVINST 6320.24 series | Mental Health Evaluations of Members of the Armed Forces | http://neds.daps.dla.mil/ |
| OPNAVINST 6000.1 series | Management of Pregnant Servicewomen | http://www.bupers.navy.mil/ |
| BUMEDINST 1300.2 series | Medical, Dental, and Educational Suitability Screening and Exceptional Family Member Program Enrollment | http://navymedicine.med.navy.mil/ |
| BUMEDINST 6300.8 series | Donations, Transplants, and Disposition of Organs and Tissue | http://navymedicine.med.navy.mil/ |
| BUMEDINST 6320.79 series | Medical Examinations for Members on the Temporary Disability Retired List | http://navymedicine.med.navy.mil/ |
| NAVMEDCOMINST 6320.72 series | Non-Naval Health Care | http://navymedicine.med.navy.mil/ |
| BUMEDINST 6440.8 series | Operational Forces Medical Liaison Services | http://navymedicine.med.navy.mil/ |
| BUMEDNOTE 6300 of 26 Jul 2001 | Implementation of the DD Form 2807-1, DD Form 2807-2, and DD Form 2808 | http://navymedicine.med.navy.mil/ |
| MCO P1900.16 series | Marine Corps Separation and Retirement Manual | http://www.defenselink.mil |
| MILPERSMAN 1300 series | Limited Duty | http://www.bupers.navy.mil/ |
| MILPERSMAN 1900 series | Administrative Separations | http://www.bupers.navy.mil/ |
| BUPERSINST 1001.39 series | Administrative Procedures for Reservists on Inactive Duty | http://www.bupers.navy.mil/ |
| BUPERS/BUMEDINST 1306.72 series | Policy and Procedures concerning Medical Holding Companies | http://www.bupers.navy.mil/ |
| EPMACINST 5000.3 series COMNAVRESFORINST 1001.5 series | Transient Personnel Administration Manual (TPAMAN) | Not available on line. |
| JAGINST 5800.7 series | JAG Manual | http://neds.daps.dla.mil/jag/5800_7c.pdf |
| Air Force Instruction 44-157 | Medical Evaluation Boards and Continued Military Service | http://afpubs.hq.af.mil |
| Air Force Instruction 48-123 | Medical Examinations and Standards | http://afpubs.hq.af.mil |
| Air Force Instruction 41-210 | Patient Administration Functions | http://afpubs.hq.af.mil |
| Army Regulation 635-40 | Physical Evaluation for Retention, Retirement, or Separation | http://www.usapa.army.mil |
| Army Regulation 40-501 | Standards of Medical Fitness | http://www.usapa.army.mil |
| Army Regulation 40-400 | Patient Administration | http://www.usapa.army.mil |
| Coast Guard DOMDTINST M6000.1B CH-18 | Medical Manual | http://www.uscg.mil/ccs/cit/cim/directives/CN/CN_6000_2004_6_15.pdf |
| | **VARIOUS WEB SITES** | |
| BUMED Web Sites | Navy Medicine Online<br>BUMED Patient Administration | https://navymedicine.med.navy.mil/<br>https://navymedicine.med.navy.mil/ (Under “Hosted Sites”) |
| DON PEB Web Site | | http://www.hq.navy.mil/ncpb/ |
| MedBOLTT Web Site | | http://medboltt.med.navy.mil |
| Navy & Marine Corps Appellate Leave Activity Web Site | | http://hqinet001.hqmc.usmc.mil/namala/ |
| Transient Monitoring Unit (TMU) Web Site | Transient Personnel Administration Manual (TPAMAN) | http://www.epmac.nola.navy.mil/tmu/ |