# In the United States Court of Federal Claims

No. 05-533 C
(Filed Under Seal: July 30, 2008)
(Reissued: August 20, 2008)[1]

| | |
|---|---|
| JEFFREY G. WALLS, Plaintiff, | * |
| v. | * |
| THE UNITED STATES, Defendant. | * |

## OPINION AND ORDER

Presently before the court is Defendant's Motion to Dismiss, or, in the Alternative, for Judgment on the Administrative Record. Plaintiff generally alleges that the United States Department of the Navy ("Navy") improperly transferred him to the Fleet Reserve despite his disqualifying medical condition and that the Navy did not pay him for the duty he performed after his transfer to the Fleet Reserve. For the reasons set forth below, the court finds that plaintiff's allegation that he was improperly transferred to the Fleet Reserve must be dismissed for failure to state a claim and that the Board for Correction of Naval Records ("BCNR") did not err in denying plaintiff's application for back pay.

## I. BACKGROUND[2]

Plaintiff Jeffrey G. Walls served on active duty in the Navy for more than twenty years. See AR 115-24 ("Application for Enlistment"), 172 ("Certificate of Release or Discharge From

[1] The court originally filed this opinion under seal due to its detailed description of plaintiff's medical history. If either party believed that this opinion contained protected material that should be redacted prior to the opinion being made available to the public, the party was to file, by August 15, 2008, a motion requesting redaction. Neither party filed such a motion.

[2] The court has derived the facts in this section from plaintiff's pro se complaint–styled as a "Memorandum Opinion" ("Compl."), plaintiff's First Amended Complaint ("Am. Compl."), and the Administrative Record ("AR"). The factual allegations in the First Amended Complaint were derived from plaintiff's August 8, 2007 sworn declaration, attached as an exhibit to the First Amended Complaint.

Active Duty"). Central to plaintiff's claims are the injuries he allegedly sustained and the medical treatment he received while on active duty. However, the administrative record provided by defendant lacks any service medical records from October 1980 through April 1998–the vast majority of time during which plaintiff served on active duty. Thus, for this period of time, the court has only plaintiff's allegations–as presented in his First Amended Complaint and as recounted to the physicians who examined him within the last ten years–about what injuries he sustained and what treatment he received. The court notes the gaps in the administrative record throughout its factual recitation.

**A. Active Duty From September 1980 Through March 1998**

Plaintiff enlisted in the Navy in December 1979 and began active duty on September 2, 1980. Id. at 115-24. Upon applying for enlistment, plaintiff underwent a medical examination. Id. at 73-74. The physician conducting the examination found plaintiff qualified to enlist. Id. at 74; see also id. at 183-84 (containing a Report of Medical History dated December 20, 1979, that finds a "[n]egative medical history"). Thus, plaintiff attended basic training in Orlando, Florida, id. at 134, 207, after which he reported to the Naval Training Center in San Diego, California, id. at 90, 134, 108, 193, 207. In either March or May 1981, plaintiff reported for duty on the USS Whipple. See id. at 92 (March), 207 (May).

Plaintiff alleges that during the summer of 1984, he was injured while "assisting in the launch and recovery of aircraft."[3] Am. Compl. ¶ 28. Specifically, plaintiff contends that while he and three other men were "storing an electrical cable used during . . . flight operations, the launch operator ordered the launch of an F-18 Fighter Jet" and that "[t]he force of the F-18's take-off blew [plaintiff] and the other men across the flight deck, causing them severe injuries." Id. Plaintiff alleges that he "suffered severe injuries to his left knee and lower back," and as a result, he was "sent to the Philippines for 20 days to begin his recovery." Id. ¶ 29. Plaintiff then contends that upon "returning to his ship to complete his tour of duty, . . . [he] continued to receive palliative care and was told that his pain was merely stiffness in the injured areas." Id.

Plaintiff was discharged from duty on the USS Whipple on August 30, 1984. AR 163, 207. The record does not indicate where plaintiff was stationed for the following three months.

---

[3] The record before the court lacks a definitive date for this incident. According the Navy's records, plaintiff served on the USS Whipple until August 30, 1984. See AR 163, 207. According to the Navy's Naval Vessel Register, the USS Whipple was a frigate. See WHIPPLE, http://www.nvr.navy.mil/nvrships/details/FF1062.htm (last updated July 14, 2005). However, plaintiff's description of the incident suggests that it occurred on an aircraft carrier. Thus, it does not appear that plaintiff was injured prior to August 30, 1984. The incident may have occurred in September 1984, but because the record contains no indication of where plaintiff served between August 31, 1984 and December 6, 1984, the court cannot definitively reach this conclusion. However, it may be that the incident occurred in one of the next two years because, as noted below, plaintiff served on an aircraft carrier from December 7, 1984, to November 17, 1986.

However, on December 7, 1984, plaintiff reported for duty on the USS Midway,[4] id. at 62, 209, on which he served until November 17, 1986, id. at 77.

The records from plaintiff's service on the USS Whipple and USS Midway do not include a contemporaneous account of the launch incident, plaintiff's resulting injuries, or plaintiff's medical treatment, in the Philippines or elsewhere.[5] In particular, the records from plaintiff's service on the USS Whipple consist of notations concerning plaintiff's advancement from March 1981 to January 1983, id. at 212; two Enlisted Performance Records covering the periods from May 12, 1981, to September 1, 1983, and February 1, 1983, to August 30, 1984, id. at 134, 163; documentation of training courses completed in July, September, and October 1981, January, February, and June 1983, and June 1984, id. at 148, 212; a form indicating plaintiff's receipt of awards in December 1981 and July 1982, id. at 212; documentation of completed qualifications from April 1982 to March 1984, id. at 213; records concerning nonjudicial punishment and service school attendance from May 1982, id. at 161, 168-69; a form indicating plaintiff's receipt of commendations in July 1982 and May 1984, id. at 162; documents from November 1982, December 1983, January 1984, and June 1984 concerning plaintiff's rating, id. at 66, 87, 155, 175; a record indicating that plaintiff completed thirty days of mess cooking in June 1983, id. at 145; and documents concerning his reenlistment dated August 1984, id. at 70, 75-76.[6] The

---

[4] The USS Midway was an aircraft carrier. MIDWAY, http://www.nvr.navy.mil/nvrships/details/CV41.htm (last updated Jan. 13, 2004).

[5] In fact, the earliest reference to the incident in the record is in medical examination notes taken on March 18, 1999. See AR 294 ("He had a [left] knee injury in 1985 causing swelling [and] pain which improved [with] physical therapy."). The incident is also referred to in medical examination notes taken on May 20, 1999, see id. at 295 ("[Patient] states in 1985 he was blown off flight deck and injured [left] knee [with] pain and edema."); on June 2, 2000, see id. at 142 ("Left knee sometimes locks in place. This was caused by an accident aboard ship."); on February 7, 2001, see id. at 330 ("[H]e relates [his ten-year history of lower back pain] to being 'blown off the flight deck' by an airplane while in the military. He states he was rendered unconscious and landed on a cat-walk area."); on November 21, 2002, see id. at 273 ("He states that in 1984 he was blown off an aircraft carrier deck."); and on December 13, 2004, see id. at 228 ("In 1984 patient was in an accident and sustained a torn cartilage and ligament. He had arthroscopic surgery in 1985 to debride the knee."). In addition, there is only one record that mentions the location of plaintiff's medical treatment. On January 15, 2002, the United States Department of Veterans Affairs ("VA") requested plaintiff's medical records, specifically noting that plaintiff received treatment for lower back and left knee injuries in Yokosuka, Japan in March 1985. See id. at 322.

[6] There is one additional record that refers to plaintiff's service on the USS Whipple–a DD-214 Certificate of Release or Discharge From Active Duty. AR 174. However, the bottom half of the document in the administrative record is nearly indecipherable and thus the court cannot ascertain its significance.

records from plaintiff's service on the USS Midway consist solely of two Enlisted Performance Evaluation Reports covering the period from March 1, 1985, to November 17, 1986, id. at 62-63, 209-10; an Enlisted Performance Record covering the same time period, id. at 77; a document concerning plaintiff's rating dated December 1985, id. at 214; a life insurance election form from February 1986, id. at 69; and a form indicating that plaintiff earned a good conduct award in May 1986, completed a training course in June 1986, and attended a service school in July 1986, id. at 161-62. There are no medical records from plaintiff's time on the USS Whipple and USS Midway. Moreover, none of these records mentions or otherwise refers to the launch incident.

Plaintiff's next tour of duty began in January 1987 when he reported to the Navy's recruiting district in Detroit, Michigan. Id. at 67, 100, 128, 136, 156, 176. Plaintiff alleges that "[a]fter a short time on this assignment, the pain he experienced worsened." Am. Compl. ¶ 30. Plaintiff continues:

> Because of the distance of [his] assignment from a Naval medical facility, he was sent to a civilian doctor at the University of Michigan. The civilian doctor, contrary to the military doctors he had seen, informed him that he had a serious medical problem that required further evaluation by Navy medical personnel. The Navy never provided [him] with the further evaluation recommended by this civilian physician.
>
> Because of the pain he experienced while on assignment in Michigan, [he] periodically would see a Naval doctor stationed with him in Michigan. The Naval doctor provided him with over-the-counter pain relievers, but no other medical care.

Id. ¶¶ 30-31. Despite these allegations, the records from plaintiff's service in Michigan do not include any indication that the Navy referred him to a civilian doctor or that a Navy doctor provided treatment. In particular, the records from plaintiff's service in Michigan consist solely of four Enlisted Performance Evaluation Reports covering the periods from November 18, 1986, to March 31, 1989, and January 3, 1990, to August 20, 1990, AR 100-01, 136-37, 156-57, 176-77; an insurance application from January 1987, id. at 201-02; two Enlisted Performance Records covering the period from April 1, 1987, to August 20, 1990, id. at 77, 150; miscellaneous acknowledgment forms signed by plaintiff in April 1987 and March 1990, id. at 131, 170, 208; printouts containing emergency data from October 1987 and April 1990, id. at 109-11, 164-67; two forms indicating plaintiff's receipt of awards in August 1988, January 1989, January 1990, and May 1990, id. at 162, 180; and a form indicating his July 17, 1990 reenlistment, id. at 179. There are no medical records from plaintiff's time at the Detroit, Michigan recruiting district. Moreover, plaintiff has not provided the court with medical records from a civilian doctor, at the University of Michigan or elsewhere.

Plaintiff was discharged from the recruiting assignment on August 20, 1990. Id. at 128, 150. Subsequently, on September 16, 1990, plaintiff reported for duty on the USS Estocin. Id. at

71, 88, 112, 128, 150. Plaintiff alleges that, in 1991, while serving on the USS Estocin, he "repeated his medical complaints to a Hospital Corpsman"; but that "he was permitted to see a military physician about these complaints only after six months had elapsed." Am. Compl. ¶ 9. The military physician informed plaintiff that "his back and knee pain was not related to his initial back and knee injury." Id. Despite these allegations, the records from plaintiff's service on the USS Estocin do not include any indication that plaintiff was examined by a Hospital Corpsman or a military physician. In particular, the records from plaintiff's service on the USS Estocin consist of five Enlisted Performance Evaluation Reports covering the period from August 21, 1990, to September 8, 1995, AR 71-72, 88-89, 105-06, 129-30, 158-59; two Enlisted Performance Records covering the period from August 21, 1990, to September 8, 1995, id. at 64, 150; a form indicating plaintiff's completion of training courses in February 1991, July 1992, and August 1992, completion of an advancement requirement in June 1991, and receipt of an award in September 1992, id. at 180; documentation of completed qualifications from October 1990 to April 1995, id. at 181, 189; a list of awards received by plaintiff from March 1991 through September 1995, id. at 188; a form indicating plaintiff's receipt of a medal in April 1992, id. at 203; documents related to plaintiff's June 9, 1994 reenlistment, id. at 147, 171, 182; an acknowledgment form indicating plaintiff's attendance at an educational seminar in July 1994, id. at 192; a form listing training courses completed by plaintiff from September 1994 to October 1995, id. at 205; a miscellaneous acknowledgment form signed by plaintiff in January 1995, id. at 178; an undated citation letter for service between March and September 1995, id. at 65; and a form indicating plaintiff's qualification for duty on a newly constructed ship from March 1995, which indicated that plaintiff had "no history of instability or serious health problems," id. at 95. There are no medical records from plaintiff's time on the USS Estocin.

Plaintiff subsequently reported for duty on the USS Cole on September 8, 1995. Id. at 78, 98, 143. Plaintiff alleges that he again "spoke with the Hospital Corpsman about his medical problems." Am. Compl. ¶ 34. However, plaintiff was "[a]gain . . . refused proper medical care" because, "he was told, . . . it would have required sending him to shore for proper treatment." Id. Despite these allegations, the records from plaintiff's service on the USS Cole do not include any indication that plaintiff was examined by a Hospital Corpsman. In particular, the records from plaintiff's service on the USS Cole consist of an Enlisted Performance Evaluation Report covering the period from September 9, 1995, to November 30, 1995, AR 143-44; a History of Assignments form covering the period from September 8, 1995, to November 19, 1996, id. at 182; an Enlisted Performance Record covering the period from September 9, 1995, to November 30, 1995, id. at 64; a form indicating that plaintiff completed training courses in November 1995 and August 1996, id. at 146; three Evaluation Reports & Counseling Records for the period from December 1, 1995, to March 7, 1998, id. at 78-79, 98-99, 125-26; documentation of completed qualifications from January 1996 to August 1996, id. at 199; a miscellaneous acknowledgment form signed by plaintiff in February 1996, id. at 127; documents related to plaintiff's December 20, 1996 reenlistment, id. at 152, 204; and an insurance application from January 1997, id. at 103-04. Just as with all of his prior service, there are no medical records from plaintiff's time on the USS Cole.

**B. Active Duty From April 1998 Through September 2000**

Plaintiff's next duty assignment began on April 2, 1998, when he reported to the Navy and Marine Corps Reserve Center ("NMCRC") in Washington, DC.[7] Id. at 93, 132, 152. Plaintiff alleges that while he was serving at the NMCRC, "he began to have serious problems with his knee and back. After he collapsed while on duty, he was evaluated at the [National Naval Medical Center] . . . ." Am. Compl. ¶ 35.

The first medical record concerning plaintiff's knee and back pain is dated March 18, 1999. See AR 294. Plaintiff was examined at the National Naval Medical Center by physician Karin C. Wells, LT, MC, USN, who noted that plaintiff had a

> 10 year [history of] progressively worsening [left] knee pain. Pain occurs on waking in the mornings and goes away [with] activity. He also has [left] knee stiffness in the mornings. Much improved [with] jogging/biking. He had [left] knee injury in 1985 causing swelling [and] pain which improved [with] physical therapy. He has had a couple episodes of locking over the years. Occ[asional] mild swelling.

Id. Dr. Wells ordered an x-ray of plaintiff's left knee. Id. Plaintiff returned to the National Naval Medical Center on May 20, 1999, where he was examined by Joseph Jordan.[8] Id. at 295. Mr. Jordan noted that plaintiff had a "[history] of chronic [left] knee pain," and "present[ed] [with] persistent [left] knee and locking x 7 months." Id. Mr. Jordan also noted:

> [Patient] states in 1985 he was blown off flight deck and injured [left] knee [with] pain and edema. [Patient] has had intermittent pain since accident, but pain and [limited range of motion] have persisted continuously since 10/98. [Patient] states that it has given way several times since then and has had 2 episodes of locking. [Patient] denies weakness, numbness, tingling, or other injury. Pain is worse on waking and improves [with] daily activities.

Id. Mr. Jordan ordered physical therapy for plaintiff. Id. Plaintiff next visited National Naval Medical Center on June 8, 1999, where he was examined by Kevin R. Poole, a physician assistant.[9] Id. at 296. Mr. Poole noted that plaintiff "present[ed with] 2 week lower back pain."

---

[7] Plaintiff took leave and was in transit to his new assignment between March 9, 1998, and April 1, 1998. AR 93.

[8] The record does not reveal whether Mr. Jordan was a physician, a physician assistant, a nurse, or other professional.

[9] The administrative record reflects an additional evaluation by Mr. Poole. See AR 293. This record is undated. However, the records from both of Mr. Poole's evaluations indicate that

Id. Further, "[patient] reports pain usually comes [and] goes. Worse while driving/sitting. Today however pain is not present. Pain stopped on 05 Jun 99 prior to [appointment.] However [patient] wishes chiropractic eval[uation]. [Patient] denies bowel/bladder/erectile dysfun[ction]." Id. Thus, Mr. Poole referred plaintiff to a chiropractor. Id.

Plaintiff was seen by the chiropractor–William E. Morgan, D.C.–on June 15, 1999. Id. at 300. Plaintiff informed Dr. Morgan that he had been experiencing lower back pain since 1991 that was "worse over [the] last year [and] especially bad x 1 [week/month]."[10] Id. Dr. Morgan noted that a spine x-ray was indicated, id., which plaintiff had that same day, id. at 297, 299. The x-ray revealed both "significant S-shaped lumbar scoliosis . . . [that] may be due to transitional L4-5 vertebra" and "[p]robable SI joint erosions . . . ." Id. In a follow-up visit on June 24, 1999, Dr. Morgan formally diagnosed plaintiff with scoliosis. Id. at 302.

Some time after his x-ray but before August 12, 1999, plaintiff had an appointment with physician Kelly L. McCoy, LT, MC, USNR for a "document review" for his job application for the Maryland State Police. Id. at 303. Dr. McCoy noted plaintiff's pain and x-ray results, and that plaintiff was scheduled to receive a computed tomography ("CT" or "CAT") scan on August 12, 1999.[11] Id. However, Dr. McCoy also noted that plaintiff had "scored outstanding on all prior [physical readiness tests]," including the one on April 30, 1999. Id. Thus, Dr. McCoy concluded that plaintiff was "capable of performing all required elements of [the] MD State Police fitness test." Id.

If plaintiff sought the care of a military health care professional over the next ten to eleven months, there are no records of those visits.[12] Instead, the record reflects that plaintiff next sought medical care on June 2, 2000, at the Naval Branch Medical Center at Washington Navy Yard, where he underwent a physical examination in anticipation of retirement. Id. at 141-42, 190-91. Prior to the examination, plaintiff filled out a Report of Medical History form, on which he checked the boxes indicating that he either had or was currently experiencing "swollen or painful joints," "bone, joint or other deformity," "recurrent back pain," and a "'trick' or locked knee." Id. at 141; see also id. at 191 (noting that plaintiff indicated a history of "[left] knee and

---

plaintiff was thirty-six years old. Id. at 293, 296. Further, in the undated record, plaintiff was complaining of a three-week history of left knee pain, id. at 293, which appears to be consistent with the other medical records from this time period. Thus, the court infers that the undated evaluation occurred around the same time as the June 8, 1999 evaluation.

[10] Dr. Morgan's handwriting made it difficult to discern whether he wrote "week" or "month."

[11] A later medical record indicates that plaintiff did not have the CT scan. See AR 313.

[12] There is one record that may be from this time period, given the age listed for plaintiff. See AR 304. However, the record is undated.

[lower pack pain]"). Plaintiff also checked the box indicating that he had been hospitalized in the past.[13] Id. at 142. Plaintiff was examined by Harold Yu, a physician assistant. Id. at 142, 191. According to Mr. Yu's notes, plaintiff indicated: "Left knee sometimes locks in place. This was caused by an accident aboard ship. [Illegible] and stiffness in the morning. Doesn't affect motor skills. Some pain in the morning before waking up." Id. Mr. Yu's assessment was that plaintiff experienced "morning stiffness [with] improvement throughout [the] day [in the left] knee [with] no [history] of [fracture]" and that "scoliosis [was] found on x-ray" but that plaintiff had "[n]o significant back pain." Id. Mr. Yu concluded that plaintiff was "qualified for separation." Id. at 191. Plaintiff now alleges that Mr. Yu reached this conclusion only after encouraging plaintiff "to downplay the severity of his injuries" because if plaintiff "complain[ed] about his physical infirmities, [he] could jeopardize his ability to obtain post-retirement work with the Maryland State Police," with whom plaintiff had a pending job application. Am. Compl. ¶ 36. For obvious reasons, this allegation is not reflected in Mr. Yu's report.

Plaintiff returned to the National Naval Medical Center on August 9, 2000, where he was seen by physician Susan C. Cullom, CAPT. AR 312-13. Dr. Cullom noted that plaintiff had a "[history] 6 [weeks] ago of [left]-sided knee [and] low back pain." Id. at 313. In addition, Dr. Cullom noted:

> Seen at Andrews AFB x2 in ER - had injections - did have x-rays of back/knee - [negative]. Moving 15 [pound]-equipment 6 [weeks] ago - no major lifting. Long [history left] knee pain x past 10+ [years]. See prior entries - LS spine [with] scoliosis, SI [joint] erosion. Did not have CT scan. Transit[iona]l L4-5 vert[ebra] as well. Retiring [September] 2000, joining MD state police - passed [physical examination]. On Motrin and Darvocet.

Id. Dr. Cullom ordered a magnetic resonance imaging ("MRI") scan of plaintiff's spine and a pain management consultation. Id. at 312. The MRI, which plaintiff had on August 31, 2000, revealed "[c]entral canal and neural foraminal stenosis secondary to spondyloarthropathy at multiple levels" and "S-shaped scoliosis of the lumbosacral spine." Id. at 291-92.

Dr. Cullom discussed the MRI scan findings with plaintiff some time in the following three weeks.[14] Id. at 56. The record from this appointment indicates that plaintiff was "[d]ue to retire" on September 30, 2000, and that Dr. Cullom scheduled plaintiff for a neurosurgery consultation. Id. The record also contains the following notation, in handwriting distinct from

---

[13] The hospitalization must have occurred during plaintiff's military service. Plaintiff completed a facially identical Report of Medical History form on December 20, 1979, prior to entering the Navy, on which he indicated that he had never been hospitalized. AR 184.

[14] The record is undated, but it must have occurred after the MRI scan on August 31, 2000, but before a pain management appointment that Dr. Cullom noted was scheduled for September 19, 2000. AR 56.

the handwriting of Dr. Cullom: "To request member be placed on medical hold status [illegible] the problem can be corrected. Requ[illegible] an appt. not to exceed [illegible] until [illegible]." Id. Plaintiff alleges that "Dr. Cullom told him that he was not fit to retire due to his injuries" and that she would recommend to Mr. Yu that "he be placed on 'medical hold,' which would keep him on active duty past his scheduled retirement date so that he could be adequately treated for his medical problems before his retirement." Am. Compl. ¶ 39. Plaintiff also alleges that Dr. Cullom "indicated that [Mr. Yu] would send [his Medical Evaluation Board ("MEB")] Report to the [Physical Evaluation Board ("PEB")], which [was] responsible for evaluating a member's fitness for continued service." Id. Plaintiff further alleges that Dr. Cullom advised him to speak with Frank A. Walker, Jr., the Assistant Manager of the Medical Boards Service at the National Naval Medical Center, "to schedule a convening of a PEB to review his MEB Report." Id. ¶ 40. According to plaintiff, he "spoke with Mr. Walker, who told him that [he] needed to obtain additional medical paperwork from Dr. Cullom." Id. ¶ 41. Plaintiff alleges that he obtained a medical evaluation from Dr. Cullom that contained a "notation requesting that 'member be placed on medical hold status'" that he then provided to Mr. Walker. Id.

Plaintiff saw the neurosurgeon–Robert Helm, M.D.–on September 22, 2000. AR 314. Dr. Helm noted: "8-9 [year history] intermittent [lower back pain]. Originates [left] hip [with] radiation to [lower left extremity] ([left] knee). [No] radiation below knee. . . . Improves [with] exercise. [Positive] improvement [with] chiropractic care." Id. Upon examination, Dr. Helm determined that plaintiff did not require surgery but that he might get some relief at the pain management clinic or from chiropractic care. Id. After this appointment, plaintiff had one additional follow-up appointment with Dr. Cullom on September 27, 2000, at which she prescribed a new medication for plaintiff's back pain. Id. at 306.

For the period of time during which plaintiff served at NMCRC–April 2, 1998, to September 30, 2000–the administrative record does not contain much more than medical records.[11] The only other significant records are two Evaluation Reports & Counseling Records covering the period from March 8, 1998, to November 15, 1999. Id. at 93-94, 132-33. Neither evaluation report mentions any medical issues that plaintiff may have been experiencing at the time.

### C. Release From Active Duty Through May 2001

According to the Certificate of Release or Discharge From Active Duty bearing his signature, plaintiff was released from active duty and transferred to the Fleet Reserve on September 30, 2000, after twenty years and twenty-nine days of active service. Id. at 172. At the time of his release and transfer, plaintiff's pay grade was E6. Id. On October 1, 2000, plaintiff's

[11] In the First Amended Complaint, plaintiff contends that in the spring of 2000, he "was assigned for temporary duty to the Defense Intelligence Agency," which in turn "seconded him to the State Department." Am. Compl. ¶ 37. This may explain the lack of records.

records were transferred to the Naval Reserve Personnel Center in New Orleans, Louisiana. Id. at 152, 172.

According to plaintiff, it was around this time–in October 2000–that he "received a call from Ms. Hall, a Navy employee, who directed [him] to report to the [National Naval Medical Center] where he would be hospitalized and treated for his medical condition."[12] Am. Compl. ¶¶ 42-43. Plaintiff alleges that he "[i]mmediately" reported to the National Naval Medical Center upon receiving the telephone call. Id. ¶ 43. Plaintiff states that he first "went to Mr. Walker's office, where he was directed to the barracks building . . . . At the barracks building, he was told to report to Lieutenant Wiley," who informed plaintiff that "he would be provided both with medical care and living accommodations while at the [National Naval Medical Center]." Id. "Lieutenant Wiley also provided [plaintiff] with details about the duties he was to perform . . . when his medical condition permitted." Id. Plaintiff contends that at all times while he was "stationed" at the National Naval Medical Center, he was required to live in the barracks, sign in and sign out of the barracks, abide by a curfew, wear his uniform, and make his room available for inspection. Id. ¶¶ 44-48.

Plaintiff further alleges that from October 2000 to January 2001, he was unable to work. Id. ¶ 50. Instead, plaintiff indicates that "[h]e met with doctors and other medical personnel five days per week" at the National Naval Medical Center, including at the Pain Management Clinic. Id. Upon his arrival at the National Naval Medical Center, plaintiff avers that he "was confined to a wheelchair." Id. Plaintiff states that eventually he was able to walk with the assistance of a walker, and subsequently he required only a cane. Id. As his condition improved in January 2001, plaintiff indicates that "he was able to perform some limited duty," including "administrative duties in the Chaplain's office, in the library, and in the mailroom." Id. ¶¶ 51-52. Specifically, he "reported for duty each day" but "when, on certain days, his health did not permit him to work, he was required to inform the officer [who] assigned him work that he was unable to work." Id. ¶ 51. The improvement of plaintiff's condition also led to the reduction of his medical treatment, according to plaintiff, to two visits per week. Id. ¶ 53. Plaintiff states that "[l]ater in the winter of 2001, he moved out of the [National Naval Medical Center] barracks." Id. Plaintiff does not indicate where he moved, but he does contend that he continued to receive medical treatment twice per week and report for work detail every day until mid-May 2001, when he was discharged from National Naval Medical Center. Id. ¶¶ 54-55. According to plaintiff, he "did not receive his basic pay, housing allowance, or subsistence allowance from October 1, 2000 until his discharge from the [National Naval Medical Center] in mid-May 2001." Id. ¶ 56.

Plaintiff's allegations for the events between October 2000 and May 2001 are much more detailed than what is shown in the administrative record. First, the record contains only two medical records from the National Naval Medical Center: (1) a record of a visit to the Pain Management Clinic on October 13, 2000, indicating that plaintiff, who was "recently retired,"

---

[12] Specifically, plaintiff alleged that he received the telephone call from Ms. Hall "[a] few weeks after he brought his medical evaluation to Mr. Walker." Am. Compl. ¶ 42.

should be scheduled for a lumbar epidural steroid injection, AR 315; and (2) a record of a second lumbar epidural steroid injection administered at the Pain Management Clinic on December 22, 2000,[13] id. at 308-10. There are no additional records–medical or service-related–from the National Naval Medical Center. The only other records from this time period reflect plaintiff's first attempt to seek redress from the BCNR and benefits from the VA.

Plaintiff applied to the BCNR for the correction of his military records on November 17, 2000, alleging that he "was release[d] from the military with an injury that should have been corrected." Id. at 32. In the letter supporting his application, plaintiff contended:

> On August 10, 2000, I had a recurring injury that had plagued me for the past 10 years of my military career. The pain to my lower back started mild at first[,] the[n] later increased. The pain formed in the lower part of my back, then extended to my left knee.
>
> The pain I am referring to first started in the morning after I rested, and my body had become stiff. However, the pain I suffered on August 10, 2000 increased as the day continued, and became so intense that I could not walk. This pain had continued to the present, and now I find it hard just to do simple movement. I checked into the hospital at Andrews [Air Force] Base, and received temporary treatment. I later received a CAT Scan on August 31, 2000.[14] The CAT Scan noticed a problem and I was advised to see several other physician[s]. I was also to attend pain management for treatment.
>
> The problems I am faced with [are] hard to explain. I was retired from the military before my treatment was complete. I was release[d] by the Navy without a Medical Board and now because of my pain I los[t] a position I had applied for. I was also scheduled to attend the police academy in January for the [Maryland] State Police, which I was canceled from the program.
>
> I was informed by your department that a[n] explanation must be sent along with my Form 149. Also [illegible] to apply for disability. As it stands right now, I have no income other than my retirement pay. This pay is insufficient to live on. I didn't find a need to be placed on disability until now. I am [pleading] with you to given be your undivided attention. I truly need your assistance in this matter.

---

[13] The administrative record does not contain a report from plaintiff's first lumbar epidural steroid injection or any follow-up care.

[14] The administrative record reflects that on August 31, 2000, an MRI scan, and not a CAT scan, was performed. See AR 291-92.

Id. at 33-34 (footnote added). Notably, plaintiff does not mention in his letter that he was, at that time, hospitalized, as he alleges in the First Amended Complaint. After receiving plaintiff's application, the BCNR requested a copy of the PEB proceedings from the PEB on November 27, 2000, id. at 31, and an advisory opinion from the Navy Personnel Command on May 15, 2001, concerning whether plaintiff was receiving retainer pay or active duty pay, id. at 30. The Navy Personnel Command in turn requested a recommendation regarding plaintiff's case from the Medical Retirements Branch on May 31, 2001. Id. at 29.

In the meantime, plaintiff sought disability benefits from the VA. The record does not contain plaintiff's initial application for benefits, but other documents in the record refer to the application. See, e.g., id. at 284 (noting, in an October 10, 2002 rating decision, that in reaching its conclusion, the VA considered a statement from plaintiff in support of his claim dated December 5, 2000), 288 (reporting a claim date of December 5, 2000), 326 (same). Upon receipt of plaintiff's claim, the VA sent a request for plaintiff's service medical record to the VA's Records Management Center ("RMC"). Id. at 288, 325-26. When the RMC indicated that it did not have plaintiff's service medical record, the VA requested the record from the Bureau of Naval Personnel ("BUPERS") in April 2001. Id. It appears that neither entity–BUPERS or the RMC–was able to produce any medical records relating to plaintiff. See id. at 325 (noting that plaintiff's "[s]ervice medical records [were] not located [at] RMC" and that BUPERS did not include any enclosures when returning the records request to the VA); cf. id. at 337 (indicating that neither the Navy Personnel Command nor the Naval Reserve Personnel Center could locate plaintiff's service medical record). The VA also requested records directly from the National Naval Medical Center on January 29, 2001, id. at 334-35, a request that appears to have been unsuccessful, see id. at 284 (indicating, in its October 10, 2002 rating decision, that one piece of evidence that the VA considered was a "Notice of no records available, Bethesda Naval Medical Center, dated January 29, 2001"), 318 (indicating, in a June 7, 2002 letter from the VA to plaintiff, that the VA "received a 'no information on you for treatment'" response from the National Naval Medical Center). But see id. at 337 (indicating that the VA obtained "some outpatient retiree records" from the National Naval Medical Center).

While the VA was searching for plaintiff's medical records, plaintiff underwent a medical examination by the VA on February 7, 2001. Id. at 330-32. Plaintiff provided the following history to the examining physician:

> [H]e states he has a 10-year history of low back pain. He relates this to being 'blown off the flight deck' by an airplane while in the military. He states he was rendered unconscious and landed on a cat-walk area. He states that in August of last year, he noted an increase in the low back pain. Low back pain is now constant. He has a diagnosis of chronic low back strain. He states he had an MRI done at the Bethesda Naval Hospital in September of last year but he does not know the results.

Id. at 330. The physician diagnosed "[p]ersistent and increasing low back pain after trauma" and "chronic low back strain." Id. at 331. However, the VA did not render a decision on plaintiff's disability claim during this time period.

In sum, the entire universe of records for the period spanning October 2000 through May 2001 consists of two records from the National Naval Medical Center, plaintiff's application to the BCNR and two related letters, and a medical examination report and three records requests from the VA. None of the records from this time period indicates that plaintiff had been admitted to National Naval Medical Center for treatment.[15]

**D. BCNR and VA Proceedings From June 2001 Through January 2005**

Both the BCNR and the VA continued to act on plaintiff's applications after plaintiff's purported discharge from National Naval Medical Center. On June 12, 2001, the Navy Personnel Command provided the BCNR with its advisory opinion, which contained the following relevant findings:

> 1. . . . [T]his office does not support [plaintiff's] request to be placed on active duty in a medical hold status.
>
> 2. [Plaintiff] requested to be transferred to the Fleet Reserve effective 30 September 2000 which was subsequently granted.[16] Personnel are required to undergo a physical examination to identify disqualifying medical conditions prior to transfer to the Fleet Reserve. [Plaintiff] was transferred to the Fleet Reserve effective 30 September 2000 as requested.
>
> 3. The Physical Evaluation Board has never received a medical board for adjudication through the Disability Evaluation System in the case of [plaintiff].

Id. at 27 (footnote added). The BCNR forwarded the advisory opinion to plaintiff for comment, noting that plaintiff was entitled to provide "further statement or additional documentary material in support of [his] application." Id. at 26. Plaintiff provided a further statement in a letter dated July 7, 2001:

---

[15] One piece of information that might support plaintiff's contention that he was admitted to the National Naval Medical Center is his mailing address. However, plaintiff's address was redacted in all of the records from this time period.

[16] The administrative record does not contain plaintiff's request for transfer to the Fleet Reserve.

> For the past year I have been in the most pain I had ever faced in my life. I have exhausted my entire saving[s] and what was awarded me following my mother['s] death. For the past year I have been waiting on the result of your so-called investigation and I received it a few days ago.
>
> For the past 20 years I had performed my military duty in a professional manner, and find it hard to believe this is the thank[s] I get. All the material I presented speaks for itself. I don't have anymore information to submit. For 12 years while performing my duties, I suffered with this pain, yet I continued with my duties. This [w]as when the expert said that [there] w[as] nothing wrong with me for half my career. Now they are saying there was a problem I had since birth. I never had pain like this when I was growing up as a child. I never experience[d] any problems when I performed sports in high school. Your expert wanted to treat me for this condition. However, they w[ere] the one[s] that wanted me to go beyond my retirement date. Knowing that I would be release[d] before I could be treated they decided to place me on a medical hold status. This condition became serious 2 years before my retirement and I didn't request to be transfer[red] to the Fleet Reserve nor did I sign[] papers stating that fact, all of this was said to ha[ve] taken place automatic[ally].
>
> Now I am faced with this condition that prevent[s] me f[rom] performing any work and it needs to be corrected. The same pertains with my pay. I should not have been release[d] from military service and if I need to seek legal assistance then that may be a step I may need to take. How can you release me from the military in this condition? [I am] unable to work, this is wrong, and should not [have] happened. Yes, I am angry and upset. I can't work. All my saving[s are] being used to support my daily life. I can't believe this is the way the Medical Board operates. If it is, it is wrong and I will take any actions to make sure I can be treated fairly.

Id. at 24-25.

The BCNR issued a decision on plaintiff's November 17, 2000 application on August 20, 2001. Id. at 21-22. The BCNR concluded:

> Your allegations of error and injustice were reviewed in accordance with administrative regulations and procedures applicable to the proceedings of this Board. Documentary material considered by the Board consisted of your application, together with all material submitted in support thereof, your naval record and applicable statutes, regulations and policies. In addition, the Board considered the advisory opinion furnished by the Commander, Navy Personnel Command, dated 21 June 2001, a copy of which is attached, and your rebuttal thereto.

> After careful and conscientious consideration of the entire record, the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice. In this connection, the Board substantially concurred with the comments contained in the advisory opinion. Accordingly, your application has been denied. . . .
>
> It is regretted that the circumstances of your case are such that favorable action cannot be taken. You are entitled to have the Board reconsider its decision upon submission of new and material evidence or other matter not previously considered by the Board.

Id. at 21. Plaintiff sought reconsideration of the BCNR's decision in a letter dated September 13, 2001, which added the following details to his application:

> I was able to locate some information concerning my [care/case], and I would like to bring this to your attention. I was scheduled to be [released] from the military on Sept. 31, 2001.[17] I had my physical in Jun[.] 2001 and the physical revealed a concern with my lower back. A[n] MRI was requested and it showed a serious problem. Also, during the same time I showed sign[s] of pain developing in my lower back. This was the same pain I have been suffering for at least 10 years. On Aug. 10, 2001, the pain was so intense that I couldn't move. And on Sept. 14, 2001, Dr. Cullom requested I be placed on medical hold. On Sept. 22, all records w[ere] submitted to [the Washington Navy Yard Branch Health Clinic] and I began treatment at Bethesda Naval Medical Center on Sept. 26, 2001. I have been in their program ever since with an active duty status as 20 [sic] when I started. I am not sure how this problem developed or how it can be resolved. All I know is that I truly believed I should have not been released from the military for the condition I was in.
>
> I believe that my paper work was not submitted from the Navy Yard and forwarded to the Medical Board, and therefore it was not processed [illegible]. If this is true then it should be corrected and I should not be at fault. All I ask is that this can be resolved and I can continue with my life. Once again, I don't believe[] it was the military['s] intention to have me released in a condition that would cause me problems once I was released.

---

[17] Plaintiff wrote "2001" here and throughout the remainder of the paragraph. However, based on the relevant portions of the administrative record, plaintiff is unquestionably referring to events that occurred in 2000. Further, because there are only thirty days in September, plaintiff was likely referring to September 30.

Id. at 39-41 (footnote added). The BCNR denied plaintiff's request for reconsideration on November 19, 2001, stating: "You previously petitioned the Board and were advised in our letter of August 20, 2001, that your request had been denied. Accordingly, reconsideration is not appropriate at this time." Id. at 37.

Plaintiff was not deterred by the BCNR's response. Instead, he further investigated his case, and wrote the following in a letter to the BCNR on May 7, 2002:

> I spoke with a representative of yours on April 2002 [sic]. During our conversation, I informed her of my conversation with BUPERS. That I spoke with Mr. Smallwood at BUPERS and that according to his system, I had been placed on medical hold for a period of 6 months. That I should [have] been released from military service on April 31, 2001, not September 31, 2002.[18] All records state[] that there should be a discharge date of April.
>
> If you could contact Mr. Smallwood perhaps he could explain to you as he explained the facts to me.

Id. at 47. Plaintiff then renewed his request for reconsideration of his application for correction of his naval records in a letter bearing a facsimile date stamp of August 21, 2002, explaining how he came to contact Mr. Smallwood:

> The reason for this letter is that I have been working on this problem concerning an issue [where] I was placed on medical hold from September 2000 to April 2001. . . . I spoke with Dr. [Cullom] and she gave me a point of contact at the Bureau of Naval Personnel. The person at the Bureau of Naval Personnel is Chief Smallwood, and he confirmed the fact that I had been placed on a medical hold status.
>
> I believe a mistake of some kind had been made [and] that all is needed to correct this problem is for [someone] to contact Mr. Smallwood at BUPERS. The fact that I had been [laid] up with a medical condition for 6 months with this illness and that the Navy [k]new about my condition for 10 years before my retirement is truly an upset to me. This problem should have been corrected years ago.
>
> I am sending a copy of a medical card I received [in] September of 2001. This will show that I was still in the system and had been on active duty. Also, if

---

[18] Again, the administrative record clearly indicates that plaintiff's use of "2001" and "2002" here is incorrect. In addition, neither April nor September have thirty-one days. Thus, it is apparent that plaintiff meant to write "April 30, 2001" and "September 30, 2000."

> you could contact Mr. Smallwood at [telephone number redacted] or Lt. Wiley at the same number.[19]

Id. at 44-46 (footnote added). The BCNR eventually responded to plaintiff's letter on December 27, 2002, with the following statement:

> Your letter has been carefully examined. Although at least some of the material you have submitted is new, it is not material. In other words, even if this material was presented to the Board, the decision would inevitably be the same. Accordingly, reconsideration is not appropriate at this time.

Id. at 43.

While plaintiff was engaged in the BCNR process, the VA continued to act on plaintiff's claim for benefits. On June 5, 2001, the VA deferred action on plaintiff's application because it had been unable to obtain plaintiff's service medical record. Id. at 324. The VA requested plaintiff's records on three other occasions, first on July 3, 2001, then on January 15, 2002, and finally on June 17, 2002. See id. at 288, 322-23. But see id. at 288 (indicating that the first renewed record request occurred on July 31, 2001).

The VA resolved part of plaintiff's December 5, 2000 application on October 10, 2002. Id. at 283-86. Among the evidence considered by the VA in its rating decision was "Incomplete Photocopies of Service Medical Records from February 11, 1999 through September 27, 2002";[20] "Military Medical Facility from October 13, 2000 through August 21, 2001";[21] two statements by plaintiff in support of his claim dated December 5, 2000, and March 18, 2002;[22] a "VA

[19] The telephone number was redacted in the administrative record.

[20] These records likely included a report from a medical examination in August 2001. See AR 290. However, the report does not clearly indicate where the examination occurred or the purpose of the examination.

[21] The title of this document (or group of documents) suggests that it may be relevant to the instant proceedings. However, nothing with this title was included in the record. On the other hand, the court notes that another document considered by the VA was a "Notice of no records available, Bethesda Naval Medical Center, dated January 29, 2001," see AR 284, which may negate any relevance of the former document.

[22] The March 18, 2002 statement appears to be an October 21, 2001 letter plaintiff sent to the group Disabled American Veterans to seek its assistance, of which the VA received a copy on March 18, 2002. See AR 217-18.

Examination . . . dated February 7, 2002";[23] and various correspondence from the VA to plaintiff. Id. at 284. The VA found that plaintiff had a service-connected lower back strain leading to a twenty percent disability rating, but deferred any decision on plaintiff's left knee. Id. at 283-86; see also id. at 276-79 (containing an undated letter from the VA to plaintiff that appears to describe the October 10, 2002 rating decision).

Subsequently, the VA requested that plaintiff undergo a medical examination of his left knee. Id. at 275. The examination was conducted on November 21, 2002. Id. at 273. Plaintiff provided the following history to the examining physician:

> He states that in 1984 he was blown off an aircraft carrier deck. Starting around 1985 he noted onset of pain and swelling in the left knee. He was given a diagnosis of ligament damage. Initially improved but then seems to recur[]. Presently he has stiffness or pain that seems improved today. He has no swelling at the present time. He also states that the knee will "lock and pop out of place." No weakness, fatigability[,] decreased endurance[,] incoordination[,] or flare-ups claimed.

Id. The physician diagnosed "[r]ecurrent left knee pain and associated symptoms" and "ligament injury." Id.

The VA then resolved the remaining portion of plaintiff's December 5, 2000 application on December 11, 2002. Id. at 269-72. Along with the evidence considered in its first rating decision, the VA considered plaintiff's November 21, 2002 medical examination. Id. at 270. The VA found that plaintiff had a service-connected left knee ligament injury leading to a ten percent disability rating. Id. at 269-72; see also id. at 265-68 (containing a letter hand-dated December 20, 2002, from the VA to plaintiff that addresses the December 11, 2002 rating decision); cf. id. at 264 (containing a Retired Pay Waiver form from the Defense Finance and Accounting Service describing the VA benefits to which plaintiff was entitled).

On April 22, 2003, plaintiff made one final appeal to the BCNR for reconsideration of its November 19, 2001 decision. Id. at 57-59. Plaintiff again expressed his frustration that the BCNR refused to amend the date he was released from active duty and award him back pay. Id. Plaintiff also stated that he had sought legal assistance. Id. at 57-58. The record does not include the BCNR's response, if any.

Plaintiff began seeing VA physicians for his medical problems in May 2004, and the record contains information about plaintiff's various appointments at the VA through December 2004. Id. at 236-54. In the meantime, as a result of his October 7, 2004 claim for increased

---

[23] The administrative record does not include any medical records dated February 7, 2002. The court finds it likely that this is a typographical error, and refers instead to the medical examination that occurred on February 7, 2001. See AR 330-32.

benefits, id. at 235, 255-63, plaintiff underwent a medical examination at the VA on December 13, 2004, id. at 227-32. In its January 19, 2005 rating decision, the VA continued plaintiff's disability ratings of twenty percent for chronic lower back strain and ten percent for left knee ligament injury, but denied plaintiff's application for benefits related to stomach and digestive problems and headaches. Id. at 222-26; see also id. at 219-21 (containing a January 25, 2005 letter from the VA to plaintiff that addresses the January 19, 2005 rating decision).

**E. Proceedings Before the United States Court of Federal Claims**

Not having obtained the relief he sought from the BCNR, plaintiff filed a pro se complaint in the United States Court of Federal Claims ("Court of Federal Claims") on May 10, 2005. Id. at 20. Plaintiff requested back pay for the time period spanning September 30, 2000, to March 30, 2001; reimbursement of $2,500 for a "do-it-yourself" move in January 2001; reimbursement of $13,520 for sixty days of lost leave; and $5,650 to cover processing fees, counseling fees, and court costs. Compl. ¶ 14. The case was initially assigned to the Honorable Marian Blank Horn, who remanded the case to the BCNR on August 31, 2005, requesting that the BCNR "address the claims in the plaintiff's complaint, and create a record of its review and of its decision on the plaintiff's claims." Order, Aug. 31, 2005. Counsel for the Navy informed the BCNR of the remand order on October 11, 2005, requesting that the BCNR "address the voluntariness of [plaintiff's] transfer to the Fleet Reserve, the circumstances surrounding [plaintiff's] medical care before and after retirement, and the status of any physical evaluation board or medical board that may or may not have been properly processed." AR 19. Accordingly, the BCNR initiated proceedings. Id. at 215.

On October 17, 2005, the BCNR sent a letter to the VA requesting copies of the VA's rating decisions, the return of plaintiff's original service record, and "[p]hotographs of all VA medical/compensation examinations, hospital summaries, other medical evaluation reports, VA statements of case, and []VA decisions." Id. at 365. The BCNR then sent a letter to plaintiff on October 25, 2005, seeking copies of plaintiff's Leave and Earnings Statements; a copy of "the report of examination conducted during July or August 2000 in connection with [plaintiff's] application for employment as a member of the Maryland State Police"; indication of plaintiff's "unit of assignment and the military duties [] performed" from July 1, 2000, to March 31, 2001; and information concerning plaintiff's "do-it-yourself move" upon his transfer to the Fleet Reserve. Id. at 18. The BCNR also requested that plaintiff indicate whether it was his contention that he did not undergo a preretirement physical and that he did not receive active duty, retired, or retainer pay from October 1, 2000, to March 31, 2001. Id. There is no evidence in the record that plaintiff responded to the BCNR's letter. See also id. at 2 (indicating that the BCNR did not receive any response from plaintiff).

Next, the BCNR obtained advisory opinions from the Office of the Chief of Naval Operations on November 9, 2005, id. at 9; the Navy Personnel Command on December 23, 2005, id. at 8; and the Navy Bureau of Medicine and Surgery on March 10, 2006, id. at 7. The Chief of Naval Operations recommended "disapproval of the petitioner's request to sell back 60 days of

leave." Id. at 9. The Navy Personnel Command "recommended that the mandatory transfer to the Fleet Reserve be upheld . . . and that no undue benefits be awarded to [plaintiff]." Id. at 8. The Navy Personnel Command specifically noted:

> [Plaintiff] was a mandatory retirement based on High Year Tenure policy and would have been separated without benefits at his Expiration of Active Obligated Service (EAOS) had no request for transfer to the fleet reserve been received. A review of records reveal that there was no request received by COMNAVPERSCOM to continue [plaintiff] on active duty to receive treatment. Of note, members that are mandatory transfers to the fleet reserve are not retained on active duty to receive medical treatment in accordance with SECNAVINST 1850.4 unless they overcome the presumption of fitness. To overcome the presumption of fitness, at that time, required the member to be evaluated and rated by the Central Physical Evaluation Board at 60% or greater. [Plaintiff] was, based on the information on hand, properly transferred to the Fleet Reserve on his mandatory date. As a member of the fleet reserve, [plaintiff] was, and still is, entitled to follow up treatment through Veterans Administration.

Id. Finally, the Navy Bureau of Medicine and Surgery concluded that plaintiff "was appropriately retired from active duty service" and that "[f]urther processing by the Physical Evaluation Board [was] NOT recommended." Id. at 7. After it received each advisory opinion, the BCNR forwarded the opinion to plaintiff for comment. See id. at 10, 13, 17. There is no evidence in the record that plaintiff responded to the BCNR's letters. See also id. at 2 (indicating that the BCNR did not receive any responses from plaintiff).

The BCNR issued its remand decision on May 17, 2006, taking into account plaintiff's pro se complaint, plaintiff's naval record, applicable statutes, regulations, and policies, and the three advisory opinions. Id. at 2-5. The BCNR made the following findings:

> After careful and conscientious consideration of the entire record, the Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice. In this regard, the Board substantially concurred with the comments contained in the advisory opinions. Additional specific findings of the Board are below.
>
> Your contention that you did not undergo a pre-retirement physical examination is false. You underwent such an examination on 2 June 2000 at the Naval Branch Medical Clinic, Washington Navy Yard. You advised the physician's assistant who conducted the examination that you did not have significant back pain at that time, and you did not report any conditions you felt required further evaluation, or rendered you unfit for duty. You completed a Report of Medical History on 2 June 2000 in which you indicated that your health was good and that you were not taking any medications. Upon completion of the

examination, you were found fit for separation. As indicated above, as you had reached your high-year tenure, you had the option of being transferred to the Fleet Reserve, or being completely severed from the Navy. As you know, you elected to transfer to the Fleet Reserve.

You have not demonstrated that officials or agents of the Department of the Navy harmed you as you alleged in Memorandum paragraph 3d,[24] or that you suffered from a significant spinal disorder that was undiagnosed from 1985 to 2001. Although you were treated for a number of minor illnesses and medical conditions during your career, none of them rendered you unfit to reasonably perform the duties of your office, grade, rank or rating. There is no basis for concluding that medical malpractice occurred in your case.

It is very common for service members facing mandatory release from active duty and transfer to the Fleet Reserve to attempt to remain on active duty for an additional period of time by making a last minute claim that they suffer from an unfitting medical condition or disorder that requires urgent medical care prior to the member's release. As you pointed out in Memorandum, paragraph 3A,[25] members pending mandatory transfer to the Fleet Reserve will be retained on active duty only in those cases where the member is hospitalized or a medical board has been referred to the Physical Evaluation Board. As you were not hospitalized on 30 September 2000, and as [a] medical board had not been initiated, any action taken to retain you on active duty beyond 30 September 2000 was invalid. You did not lose your entitlement to medical care at government expense, as members of the Fleet Reserve remain entitled to such care.

As there was no objective evidence of significant spinal pathology in your case, or credible evidence of your inability to perform military duty, there was no basis for initiating a medical board. Had a medical board been completed and referred to the PEB, however, you would have been presumed fit for duty in accordance with the provisions of DOD Instruction 1332.38, part 3, paragraph E.2.d., as you were an enlisted member within twelve months of your high year tenure. It is unlikely that you could have successfully rebutted that presumption, as there is no credible evidence that your back condition was severe enough to have met the criteria listed in paragraphs E.3.a.-c. of the DOD instruction, Overcoming the Presumption (of Fitness).

---

[24] The BCNR's use of the term "Memorandum" is a reference to plaintiff's pro se complaint. See AR 2; supra note 2. However, there is no "paragraph 3d" in the pro se complaint.

[25] There is no "paragraph 3A" in plaintiff's pro se complaint.

Your contention that you were "unable to perform any daily active [sic]", Memorandum paragraph 9, is unsubstantiated, and not considered credible.

Your reference to an allotment for "payment of his mother [sic] house",[26] Memorandum, paragraph 10[,] p. 7, is not credible.

The available records do not show that you performed any military duties during the 1 October 2000–1 April 2001 period. You are not entitled to any additional "treatment, service, and reimbursement" for that period. There is no evidence that officials of the Department of the Navy acted in bad faith toward you, or that applicable policies were disregarded or violated.

Your complaints about the actions of the staff of the Board are without merit. After your initial application was denied, you repeatedly contacted the staff of the Board and falsely claimed that you had not been released from active duty, and that you were not receiving any payments from the Department of the Navy. As it was obvious that no useful purpose would be served by speaking with you, you were advised that all further contact with the staff of the Board would have to be in writing. You submitted several requests for reconsideration of your application, each of which was denied.

In view of the foregoing, your application has been denied.

Id. at 2-4 (footnotes added).

Subsequent to the BCNR's remand decision, plaintiff retained counsel to represent him before the Court of Federal Claims.[27] Plaintiff then filed a First Amended Complaint on August 20, 2007, seeking back pay in the amount of basic pay and allowances for the time period between October 2000 and mid-May 2001 pursuant to 37 U.S.C. §§ 204(a), 402-403, along with the associated correction of his military records, based on three theories of recovery. Am. Compl. ¶¶ 71, 82, 99-100. First, plaintiff alleges that he should be awarded back pay because he "was on active duty as described by MILPERSMAN 1830-30 and 1830-40 until mid-May 2001." Id. ¶ 69 (footnote omitted). Second, plaintiff alleges that he should be awarded back pay because he "participated in full-time duty while stationed at the [National Naval Medical Center]" pursuant to 37 U.S.C. § 204(a). Id. ¶¶ 75-76. Third, plaintiff alleges that he should be awarded back pay because the Navy violated various sections of Secretary of the Navy Instruction ("SECNAVINST") 1850.4D. Id. ¶¶ 86-98. Defendant filed the instant motion on October 1, 2007, and the parties completed briefing on March 28, 2008. The court deems oral argument unnecessary.

---

[26] The actual quotation is "payment of his mother['s] home." Compl. ¶ 10.

[27] By this time, the case had been reassigned to the undersigned. See Order, Jan. 9, 2006.

## II. STANDARDS OF REVIEW

### A. Motion to Dismiss for Failure to State a Claim

Defendant filed a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). A motion to dismiss tests the sufficiency of a complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor. Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). The United States Supreme Court ("Supreme Court") recently clarified the degree of specificity with which a plaintiff must plead facts sufficient to survive such a motion in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), stating that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," id. at 1964-65 (citation omitted). The Supreme Court explained that although a complaint need not contain "detailed factual allegations," id. at 1964, the "factual allegations must be enough to raise a right to relief above the speculative level," id. at 1965. "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."[28] Id. at 1969. Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

### B. Motion for Judgment on the Administrative Record and the Correction of Military Records

Defendant also filed a motion for judgment on the administrative record pursuant to RCFC 52.1, seeking to uphold the BCNR's May 17, 2006 decision declining to correct plaintiff's military record. The BCNR's decision was authorized by 10 U.S.C. § 1552 (2000 & Supp. II 2003), which allows for the correction of military records "to correct an error or remove an injustice." The court "'will not disturb the decision of [a] corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" Barnes v. United States, 473 F.3d 1356, 1361 (Fed. Cir. 2007) (quoting Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005)); accord Sanders v. United States, 594 F.2d 804, 811 (Ct. Cl. 1979) (en banc), superseded in part by statute, 10 U.S.C. § 628 (2000 & Supp. I 2002), as recognized in Richey v. United States, 322 F.3d 1317, 1323-24 (Fed. Cir. 2003). The Court of Federal Claims does not sit as "a super correction board." Skinner v. United States, 594 F.2d 824, 830 (Ct. Cl. 1979).

In ruling on a motion for judgment on the administrative record, the court makes "factual findings . . . from the record evidence as if it were conducting a trial on the record." Bannum,

---

[28] In so holding, the Supreme Court determined that the "no set of facts" language set forth in Conley, 355 U.S. at 45, "has earned its retirement," Bell Atl. Corp., 127 S. Ct. at 1969.

Inc. v. United States, 404 F.3d 1346, 1357 (Fed. Cir. 2005);[29] see also id. at 1356 ("[J]udgment on the administrative record is properly understood as intending to provide for an expedited trial on the administrative record."). The court's review in military pay cases is not limited to the administrative record but may also encompass de novo evidence. Bray v. United States, 515 F.2d 1383, 1390 (Ct. Cl. 1975) (per curiam); Beckham v. United States, 375 F.2d 782, 785 (Ct. Cl. 1967). "[D]eference is accorded the judgment and expertise of the administrative decision-maker by limiting judicial intervention only to those instances where the administrative decision, on the basis of all the evidence, was arbitrary, capricious, unsupported by substantial evidence, or inconsistent with applicable statutes or regulations." Bray, 515 F.2d at 1391; see also Sanders, 594 F.2d at 814 (noting that a court is not to substitute its judgment for that of the correction board "when reasonable minds could reach differing conclusions"); cf. Dodson v. U.S. Gov't, Dep't of the Army, 988 F.2d 1199, 1204 (Fed. Cir. 1993) ("[M]ilitary administrators are presumed to act lawfully and in good faith . . . , and the military is entitled to substantial deference in the governance of its affairs."). On the other hand, "[a] naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing . . . is inimical to a rational system of administrative determination and ultimately inadequate." Beckham v. United States, 392 F.2d 619, 622-23 (Ct. Cl. 1968); see also id. at 623 (noting that the court could not accord a correction board's "'summary and sketchy findings and reasoning'" the weight it otherwise would have given the board's decision (quoting Loral Elecs. Corp. v. United States, 387 F.2d 975, 980 (Ct. Cl. 1967))).

Specifically, in this case, plaintiff argues both that the Navy violated its own regulations,[30] Opp'n Gov't Mot. Dismiss & Mot. J. Administrative R. ("Opp'n") 16-22, and that the BCNR's May 17, 2006 decision was not supported by substantial evidence, id. at 22-23. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (internal quotation omitted), cited in Dixon v. Dep't of Transp., FAA, 8 F.3d 798, 804 (Fed. Cir. 1993). "Because '[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight,'" the court must evaluate the entire record, "bear[ing] in mind that '[e]xaggeration, inherent improbability, self-contradiction, omissions in a purportedly complete account, imprecision, and errors detract from the weight to be accorded the evidence upon which an administrative board bases its decision.'" Dixon, 8 F.3d at 804 (quoting Spurlock v. Dep't of Justice, 894 F.2d 1328, 1330 (Fed. Cir. 1990)). However, when evaluating the administrative record, the court is not to reweigh the evidence but instead must look to see if exaggeration, improbability, self-contradiction, omissions, imprecision, or errors "detract from the weight of

---

[29] The decision in Bannum was based upon RCFC 56.1, which was abrogated and replaced by RCFC 52.1. RCFC 52.1, however, was designed to incorporate the decision in Bannum. See RCFC 52.1, Rules Committee Note (June 20, 2006).

[30] Although the agency decision at issue in this case is the BCNR's May 17, 2006 decision, this court may review whether the Navy complied with its own regulations. Adkins v. United States, 68 F.3d 1317, 1323 (Fed. Cir. 1995).

that particular evidence." Id. The court may only overturn the BCNR's decision if the detraction is of such a magnitude that "a reasonable fact-finder would not find the charge proved by a preponderance of evidence . . . ." Id.

## III. STATUTORY AND REGULATORY FRAMEWORK

### A. Navy Pay and Separation From the Navy

As previously noted, plaintiff enlisted in the Navy in December 1979 and began active duty on September 2, 1980. AR 115-24. Enlisted members of the Navy are entitled to basic pay if they are "on active duty" or "participating in . . . other full-time duty, provided by law . . . ." See 37 U.S.C. § 204(a) (1994 & Supp. V 2000). "Active duty" is "full-time duty in the active service" in the Navy, id. § 101(18), and "active service" in the Navy refers to "service on active duty," id. § 101(20). "Full-time duty" is not independently defined in title 37 of the United States Code. Enlisted members who receive basic pay are also generally entitled to basic allowances for subsistence and housing. See id. §§ 402-403.

In October 1993, the Navy issued an instruction describing its "Reenlistment Quality Control Program," which established the criteria that an enlisted member must meet to be eligible for reenlistment. See Chief of Naval Operations Instruction ("OPNAVINST") 1160.5C (Oct. 10, 1993); see also Naval Military Personnel Manual ("MILPERSMAN") 1160-120 (Oct. 20, 2005) (referring to the program as the "High Year Tenure Program"). The Navy's program was based primarily on a member's number of years of service and the member's pay grade. OPNAVINST 1160.5C, §§ 1, 5. Relevant to the instant case: "Personnel serving in pay grade E5/E6 are eligible to reenlist/extend up to a maximum of 20 years day-for-day active service. . . . An E5/E6 is not eligible to reenlist/extend beyond completing 20 years day-for-day active military service." Id. § 5.b.(4). Thus, plaintiff, in the E6 pay grade, could not remain on active duty in the Navy beyond twenty years.

Enlisted members of the Navy who are prohibited from reenlisting after twenty years of service may, at their request, be transferred to the Fleet Reserve in lieu of separation. See 10 U.S.C. § 6330(b); accord MILPERSMAN 1830-040, at 1 (Mar. 27, 2000). The administrative record does not include plaintiff's request for transfer to the Fleet Reserve or the Navy's approval of such request,[31] but plaintiff did sign the Certificate of Release or Discharge From Active Duty

---

[31] Navy personnel are required to submit a specified form requesting transfer to the Fleet Reserve between six and eighteen months prior to their requested transfer date via their chain of command. MILPERSMAN 1830-040, at 7. Once approved, the Navy is required to "transmit a message of intent authorizing movement of dependents and/or shipment of household goods," and within two weeks thereafter, "mail [a] package containing the Certificate of Appreciation and other retirement information." Id. Further, the Navy is to "issue the authorization as soon as possible but no later than 120 days prior to the Fleet Reserve transfer date." Id. "Under no circumstances should the member be released from active duty without the final transfer

indicating his apparent acquiescence to his transfer to the Fleet Reserve.[32] Members of the Fleet Reserve, "when not on active duty," are entitled to retainer pay. 10 U.S.C. § 6330(c). There is no indication in the administrative record that plaintiff has separated from the Fleet Reserve. Thus, the court presumes that plaintiff continues to receive retainer pay as a member of the Fleet Reserve.[33] Monthly retainer pay is calculated by multiplying "[r]etainer base pay computed under section 1406(d) or 1407" by the "[r]etainer pay multiplier prescribed under section 1409 for the years of service that may be credited . . . under section 1405." Id. § 6333(a). Accordingly, plaintiff's retainer base pay is the basic pay that he "received at the time of transfer to the Fleet Reserve . . . ." See id. § 1406(d) (indicating the retired pay base for Navy personnel who first became members before September 8, 1980). Plaintiff's retainer pay multiplier is the product of two-and-one-half and his twenty years of creditable service, stated as a percentage (i.e., fifty percent). See id. § 1409. Thus, plaintiff's retainer pay is one-half of his basic pay on September 30, 2000. However, if plaintiff served on active duty after becoming entitled to retainer pay, his retainer pay could be recomputed. See id. § 6330(c)(2).

**B. Deferment of Transfer to the Fleet Reserve for Medical Reasons**

Navy personnel transferring to the Fleet Reserve are required to complete a physical examination within six months of the scheduled transfer date "to permit correction of any minor physical defects or identification of those requiring processing for disability retirement, if disability retirement is indicated, prior to the date otherwise scheduled for retirement." MILPERSMAN 1830-030, § 1.a (Dec. 7, 2005);[34] see also Manual of the Medical Department

---

authorization." Id.; see also id. at 8 (requiring the Navy to include a copy of the authorization with the member's "closed-out service record").

[32] Had plaintiff not sought transfer to the Fleet Reserve, he would have been separated from the Navy due to his ineligibility to reenlist. OPNAVINST 1160.5C, § 5.b.(4). Voluntary retirement would not have been an option for plaintiff because it is only available to enlisted Navy personnel who have completed thirty years of service. See 10 U.S.C. § 6326. Thus, plaintiff would not have been entitled to retirement pay. Accordingly, despite the Navy's failure to produce plaintiff's application for transfer to the Fleet Reserve, the court presumes that plaintiff would have chosen transfer to the Fleet Reserve over separation. Indeed, plaintiff contends as such in his opposition to defendant's motion. See Opp'n 27 ("[Plaintiff] transferred to the Fleet Reserve because [he] was facing mandatory separation or transfer to the Fleet Reserve due to high year tenure.").

[33] The court's presumption is supported by 10 U.S.C. § 6331, which directs the transfer of members of the Fleet Reserve to the retired list after thirty years of combined service on active duty and in the Fleet Reserve, which, in plaintiff's case, would occur in 2010.

[34] Although this section of the Naval Military Personnel Manual was issued after plaintiff's transfer to the Fleet Reserve, plaintiff does not object to defendant's citation of this

("MANMED"), art. 18-25(3)(a)-(b) (Jan. 10, 2005)[35] (noting that the physical examination serves to document a member's "fitness to separate" and to establish "the presence (and equally important, the absence) of any service-connected disability condition that must be referred to the Navy's PEB"). However, those members who opt to transfer to the Fleet Reserve upon reaching their high year tenure cannot defer the transfer for medical reasons "unless [the] member is either hospitalized or a medical board report has been accepted by the PEB for disability evaluation processing prior to the mandatory retirement date."[36] MILPERSMAN 1830-030, § 2.b; accord MILPERSMAN 1830-040, at 4 ("Member who has reached high year tenure (HYT), and for whom transfer to the Fleet Reserve is mandatory, may only be deferred if the member is hospitalized or a medical board report has been accepted by the President, PEB for processing under SECNAVINST 1850.4D, article 3710.").

**1. Medical Evaluation Boards**

**a. Convening a Medical Evaluation Board**

An MEB is "[a] body of physicians . . . convened in accordance with [the Manual of the Medical Department] to identify members whose physical . . . qualification to continue on full duty is in doubt or whose physical . . . limitations preclude their return to full duty within a reasonable period of time." SECNAVINST 1850.4D, § 2042 (Dec. 23, 1998). MEBs "may be convened by commanding officers and officers in charge of naval hospitals and other [medical treatment facilities] designated by the Chief, Bureau of Medicine and Surgery" or "may be ordered by the [Chief of Naval Operations], . . . [the Chief of Naval Personnel], and the [Chief, Bureau of Medicine and Surgery]." Id. § 3104(b).

Because it is not Navy policy "to retain members on active duty . . . to provide prolonged, definitive medical care when it is unlikely the member will return to full military duty," it is the responsibility of "line commanders, commanding officers of [medical treatment facilities,] and

---

section based on its issuance date. However, plaintiff does argue that certain provisions of MILPERSMAN 1830-030 are generally inapplicable in this case. See Opp'n 31-32.

[35] Although chapter eighteen of the Manual of the Medical Department was issued after plaintiff's transfer to the Fleet Reserve, defendant raises no objections to plaintiff's citation to this document.

[36] This language contradicts plaintiff's contention that a hospitalization need not occur prior to the mandatory retirement date. See Opp'n 31. Further, plaintiff's argument that the hospitalization need not occur prior to the mandatory retirement date because the "more specific provision"–MILPERSMAN 1830-040–controls the "more general provision"–MILPERSMAN 1830-030, Opp'n 31-32, is without merit. The parties do not cite any Navy regulation that permits a hospitalization that occurs after a member's transfer to the Fleet Reserve to retroactively defer the transfer.

individual medical and dental officers [to] promptly identify for evaluation by Medical Boards . . . those members presenting for medical care whose physical . . . fitness to continue naval service is questionable." Id. § 1005; cf. id. § 3106 ("Commanding officers of [medical treatment facilities] and individual medical and dental officers are to identify promptly for referral to the [Naval Disability Evaluation System] those members presenting for medical care whose Fitness for active duty is questionable."). Generally, members with medical conditions preventing them from "operating in a medically unrestricted duty status for 90 days or greater duration" must be referred to an MEB for placement on temporary limited duty or referral to the PEB. MANMED, art. 18-4(4); see also SECNAVINST 1850.4D, § 1008 (indicating that a member may be assigned thirty days of light duty and if, after thirty days, the member cannot return to full duty, the member "will be placed in [medical treatment facility] Medical Hold for up to 30 additional days, pending evaluation by a Medical Board for the purpose of placement on [temporary limited duty] or referral to the PEB"[37]). "Any condition that appears to significantly interfere with performance of duties . . . will be considered for MEB evaluation." SECNAVINST 1850.4D, § 8001(e); accord MANMED, art. 18-4(2). Included among those conditions are "[i]nternal derangement of the knee when there is residual instability following remedial measures such as surgery or physical therapy," SECNAVINST 1850.4D, § 8002(b)(5); knee range of motion below ninety degrees of flexion or fifteen degrees of extension, id. § 8002(b)(6)(b); certain other joint conditions, id. § 8002(g); scoliosis that causes a "deterioration in performance of required duties," id. § 8002(j)(1); deviation of curvature of the spine that is "[m]ore than moderate," interferes "with function," or causes an "unmilitary appearance," id. § 8002(j)(2)(e); and neurological disorders, id. § 8012(m). Accord MANMED, art. 18-4(3) (indicating that although "the primary consideration in determining whether an MEB should be convened is the professional judgment of the attending physician," the list of conditions in sections 8001 to 8016 in SECNAVINST 1850.4D "should be consulted frequently by providers and patient administration staff"). However,

> the presence of the condition alone is often not a criteria for submission of a[n] MEB report–the member must have been tried on appropriate courses of medication (and proper use of [limited duty] status), been unresponsive to them, required untoward number of visits for medical care or hospitalizations and, just as importantly, the condition must be Unfitting.

SECNAVINST 1850.4D, § 8001(g).

The attending physician who determines that referral to an MEB is necessary shall immediately personally inform the member of the referral and whether the referral is for limited

---

[37] Based upon this quotation from the Manual of the Medical Department, it appears that plaintiff's assertion that the failure of an MEB to refer a report to the PEB prevented him from being placed on a medical hold status is slightly off the mark. See Opp'n 17. Instead, a member is placed on a medical hold status pending the convening of an MEB, regardless of whether the MEB places the member on temporary limited duty or refers its report to the PEB.

duty or for further review by the PEB. MANMED, art. 18-7(1)-(2). Further, the physician is required to:

> ensure that the patient immediately reports to the patient administration/MEB section for additional counseling and administrative processing. (This step is crucial in that numerous critical elements of information are gathered at this juncture to protect the patient's rights, to ensure appropriate notifications are made to the patient's parent command, and to ensure the [medical treatment facility] complies with timeliness and completion factors for processing the [MEB report].)

Id. art. 18-7(3). "Immediately upon concluding that a patient is to be referred to an MEB, the attending physician determining the need for the patient's referral[] will personally annotate this decision in the patient's medical record." Id. art. 18-8(1)(a).

**b. Actions by the Medical Evaluation Board**

After receiving a case, MEBs "evaluate and report on the diagnosis; prognosis for return to full duty; plan for further treatment, rehabilitation, or convalescence; estimate of the length of further disability; and medical recommendation for disposition of such members." SECNAVINST 1850.4D, § 2042. The MEB will either place a member on temporary limited duty or refer a member to the PEB.[38] MANMED, art. 18-4(1). If the MEB finds that a "member's Fitness for continued active service [is] questionable," SECNAVINST 1850.4D, § 3201(a), "because the member's condition most likely is permanent, and/or any further period of temporary limited duty (TLD) is unlikely to return the member to full duty,"[39] id. § 3102(a), it will prepare a report and refer the case to the PEB, id. §§ 3102(a)-(b), 3201(a). However, an MEB report should not be forwarded to the PEB if the member "is being processed for separation or retirement for reasons other than physical disability, unless . . . the member's physical condition reasonably prompts doubt that he or she is Fit to continue to perform" his or her duties. Id. § 3202(g). As cautioned in the Manual of the Medical Department:

> Navy members in the waning aspects of their service facing non-punitive separation . . . often encounter situations requiring a difficult resolution of whether a health problem should force their being retained on active duty beyond the previously established date of separation. The cases are increasingly difficult given that separation from active duty decisions are personnel actions that must be

---

[38] Accordingly, plaintiff's argument that his purported placement on medical hold required an MEB to refer its report to the PEB, Opp'n 17, is incorrect.

[39] "A condition is considered permanent when the nature and degree of the condition render the member unable to continue naval service within a reasonable period of time (normally 12 months or less)." SECNAVINST 1850.4D, § 3102(a).

> effected in compliance with the Federal laws regulating eligibility for care within [the Department of Defense Military Health System]. Accordingly, when a separation or retirement date has been established, every effort must be made to effect the servicemember's discharge on that date. Only the respective service headquarters can alter a servicemember's date of discharge. [Medical treatment facilities] caring for patients who have an impending separation date who present with or incur conditions for which care is neither deferrable nor elective, and for which the course of care cannot be completed prior to the scheduled separation date, must ensure that respective service headquarters are made aware of such situations immediately. For patients whose care is deferrable and/or elective, it is not appropriate for [medical treatment facilities] caring for patients with an impending separation date who present with conditions for which care is deferrable and elective to attempt to forestall the established separation or retirement date. [Medical treatment facility] staffs shall be attentive in these situations to not launching an elective course of care which cannot be expected to be completed prior to the scheduled separation date.

MANMED, art. 18-25(1).

The MEB report "shall make a clear statement" of the MEB's "opinion that the member's condition does or does not render the member 'unable to continue naval service by reason of physical impairment.'" SECNAVINST 1850.4D, § 3901(a). The MEB's "opinion must be supported by objective medical data displaying the nature and degree of the impairment, if any." Id.; accord id. § 3201(a). In addition, the MEB must "comprehensively describe the physical condition of a member" and "the nature and extent of the physical impairments . . . ." Id. § 3901(a). The MEB report must include (1) "the results of a complete medical physical examination"; (2) "all available information," properly authenticated, concerning "aggravation by service"; (3) "other significant facts pertaining to the impairments"; and (4) a nonmedical assessment. Id. The MEB is prohibited from making a finding of unfitness in its report, as such a conclusion is within the sole province of the PEB. Id. § 3901(c). Members are entitled to receive a copy of the MEB report, "be counseled regarding the opinions and recommendations of the medical board," discuss the "opinions and recommendations with each member of the MEB," and "submit a statement regarding any portion of the MEB report." Id. § 3208(a).

**2. Physical Evaluation Boards**

The PEB accepts a case referred by an MEB when it has received "all medical and non-medical information necessary to evaluate the case appropriately . . . ." Id. § 3102(b); see also id. § 3203 (describing when the PEB may defer or reject a case). Nonmedical information may include "an assessment of the member's performance of duty by his or her chain of command," which "may provide better evidence of the member's ability to perform his or her duties than a clinical estimate by a physician." Id. § 3205(a). Nonmedical information may also include "[p]ertinent personnel records." Id. § 3205(b)(4). The PEB will only consider the cases of those

members who suffer from a condition that constitutes a physical disability. Id. § 3401; see also id. §§ 8001-8016 (describing the "medical conditions and physical defects which normally are cause for referral to the physical evaluation board").

Upon accepting a case, the "Informal PEB conducts a record review" and makes preliminary findings. Id. § 3102(b); accord id. §§ 4201, 4208. The PEB notifies the member of the preliminary findings and the member has fifteen days in which to accept or reject the findings. Id. § 3102(b); accord id. §§ 4213-4214. If the member accepts the findings or does not respond within fifteen days, the "case is finalized and service headquarters is requested to make an appropriate disposition . . . ." Id. § 3102(b); accord id. §§ 4213(a)(1), (b)(1), (c)(1), (d)(1), 4214(e), 4215-4216. If the member rejects the findings, "the member can request reconsideration of that decision by the same Informal PEB and/or demand/request a personal appearance before a Formal PEB." Id. § 3102(b); accord id. §§ 4213(a)(2), (b)(2), (c)(2), (d)(2), 4313. "If the Formal PEB hears a case, it makes findings, and, subsequent to legal review and/or quality assurance review[,] findings are sent to the member . . . ." Id. § 3102(b); accord id. §§ 4329-4330, 4336. Once again, if the member accepts the findings, an appropriate disposition is made. Id. § 3102(b). However, if the member rejects the findings, he or she may petition the Director of the Naval Council of Personnel Boards within fifteen days. Id.; accord id. §§ 4336(b)(1), (3), 4338, 5001-5006. Further, at any time after a final decision has been reached, a member may petition the BCNR. Id. § 3102(b); accord id. §§ 4336(b)(1), 4338.

The PEB uses only one standard in determining whether a member should be separated or retired due to physical disability: "Unfitness to perform the duties of office, grade, rank or rating because of disease or injury incurred or aggravated while entitled to basic pay." Id. § 3301; accord id. § 3306(b). "A service member shall be considered Unfit when the evidence establishes that the member, due to a physical disability, is unable to reasonably perform" his or her duties. Id. § 3302(a). "[S]ervice members who are pending retirement at the time they are referred" to the PEB enter the PEB review process "under a rebuttable presumption that they are physically Fit." Id. § 3305(a); accord Dep't of Defense Instruction ("DoD Instr.") 1332.38, pt. 3, § E.1 (Nov. 14, 1996). The rebuttable presumption of fitness was established because the purpose of the PEB is to "compensate disabilities when they cause or contribute to career termination," which may not be the case when a member continues to perform his or her duties until "approved for length of service retirement . . . ." SECNAVINST 1850.4D, § 3305(a); accord DoD Instr. 1332.38, pt. 3, § E.1. An enlisted member is considered to be "pending retirement" when the MEB report is dictated after the "member's request for voluntary retirement is approved" or the "member is within 12 months of High Year Tenure (HYT) or expiration of active obligated service (EAOS), and will be eligible for retirement at HYT/EAOS." SECNAVINST 1850.4D, § 3305(b); accord DoD Instr. 1332.38, pt. 3, § E.2. Plaintiff was within twelve months of his high year tenure beginning in September 1999 and the first mention in the administrative record of the possible convening of an MEB was in a medical record from September 2000. See AR 56. Thus, plaintiff would be presumed fit. The presumption of fitness "shall be overcome when":

a. Within the presumptive period an acute, grave illness or injury occurs that would prevent the member from performing any further duty if he or she were not retiring; or

b. Within the presumptive period a serious deterioration of a previously diagnosed medical condition, to include a chronic condition, occurs and the deterioration would preclude further duty if the member were not retiring; or

c. The condition for which the member is referred is a chronic condition and a preponderance of evidence establishes that the member was not performing duties befitting either his or her experience in the office, grade, rank, or rating before entering the presumptive period. When there has been no serious deterioration within the presumptive period, the ability to perform duty in the future shall not be a consideration.

DoD Instr. 1332.38, pt. 3, § E.3; see also SECNAVINST 1850.4D, §§ 3305(c)(1) (indicating that a member can overcome the presumption of fitness by establishing, by a preponderance of evidence, that (1) "an otherwise Unfitting medical condition" deteriorates "to the point where it could warrant a permanent disability rating of 60 percent"; (2) "a previously diagnosed condition" seriously deteriorated to the point of precluding "further duty if the member were not retiring"; or (3) the member has a chronic condition and "was not performing duties . . . before entering the presumptive period"), 3305(c)(2) (noting that the presumption of fitness cannot be overcome if "there has been no serious deterioration within the presumptive period").

## IV. DISCUSSION

### A. Transfer to the Fleet Reserve

As the Navy regulations indicate, plaintiff could only defer his transfer to the Fleet Reserve if he was hospitalized on the date of transfer or if an MEB report had been accepted by the PEB prior to the transfer date.[40] MILPERSMAN 1830-030, § 2.b; MILPERSMAN 1830-040, at 4. The court examines each exception in turn.

#### 1. Hospitalization

Plaintiff alleges that his hospitalization should have triggered the deferment of his transfer to the Fleet Reserve. See Am. Compl. ¶ 23. However, none of the medical records included in the administrative record reflects a hospitalization. Nevertheless, there may be an

---

[40] Accordingly, plaintiff's reliance upon Krauss v. United States, 40 Fed. Cl. 834 (1998), Ferrell v. United States, 23 Cl. Ct. 562 (1991), and Golding v. United States, 48 Fed. Cl. 697 (2001), see Opp'n 19-22, is misplaced because none of these cases concerns an enlisted member of the Navy facing mandatory separation for length of service.

explanation for the lack of affirmative evidence. The only medical records included in plaintiff's service record, AR 61-214, are the records from his physical examinations at enlistment and separation, see id. at 73-74, 141-42, 183-84, 190-91. The remaining medical records in the administrative record come from two sources. The majority of the records, spanning from March 1999 through December 2004, were apparently provided to the BCNR by the VA.[41] See id. at 216-366. The remaining medical records appear to have been provided to the BCNR by plaintiff. See id. at 21-60. The court is not convinced that the administrative record contains the entire universe of plaintiff's medical records, especially for the time period most relevant to this case–March 1999 through May 2001.

First, it appears that none of the entities that might be the repository for the complete copy of plaintiff's service medical record actually possesses it. Record requests to the Navy Personnel Command, BUPERS, the RMC, the Naval Reserve Personnel Center, and the National Naval Medical Center were unfulfilled.[42] See id. at 288, 325-26, 337. Second, a significant record in this case–Dr. Cullom's September 2000 examination report containing the "medical hold" language–appears only in the records provided to the BCNR by plaintiff and is not among those provided by the VA, even though it presumably is part of plaintiff's service medical record. Third, additional records from plaintiff's service medical record are clearly missing. In particular, the records from plaintiff's two visits to the emergency room at Andrews Air Force Base prior to August 9, 2000, see id. at 313, are missing. Thus, if plaintiff was hospitalized on September 30, 2000, it appears possible that records of the hospitalization might not be included in the administrative record. However, the completeness of the medical records is ultimately immaterial because plaintiff alleges that he was not hospitalized until October 2000,[43] Am. Compl. ¶ 42, after his transfer to the Fleet Reserve.[44] Because the hospitalization must have

---

[41] The organization of the administrative record does not make this point clear. However, the records are included with the various VA ratings decisions and other VA correspondence.

[42] Because the BCNR was not privy to plaintiff's entire service medical record, the court is unclear as to how that tribunal arrived at the conclusion that plaintiff was "treated for a number of minor illnesses and medical conditions during [his] career." See AR 3.

[43] In his September 13, 2001 letter to the BCNR, plaintiff asserted that he "began treatment at Bethesda Naval Medical Center" on September 26, 2000. AR 40. However, the administrative record contains a medical report from Dr. Cullom at the National Naval Medical Center dated September 27, 2000, indicating that plaintiff was an outpatient at that time. Id. at 306.

[44] Furthermore, plaintiff does not argue that the Navy or the VA failed to maintain a complete copy of his medical records. Nor does plaintiff argue that such a failure entitles him to an adverse presumption against the Navy that he was hospitalized at the National Naval Medical Center. Accordingly, such arguments are waived. See Doyle v. United States, 599 F.2d 984,

occurred prior to transfer, plaintiff has not plead facts that entitle him to relief for a deferment of his transfer to the Fleet Reserve on the basis of hospitalization.

**2. Acceptance of a Medical Evaluation Board Report by the Physical Evaluation Board**

In the absence of a qualifying hospitalization, plaintiff's only viable allegation is that the Navy did not properly follow its own regulations concerning the MEB and PEB. Plaintiff does not allege that the PEB accepted an MEB report concerning his medical condition, nor is there evidence in the administrative record that the PEB accepted such an MEB report. The absence of the necessary allegations or evidence that the PEB accepted an MEB report, on its face, appears fatal to plaintiff's argument. However, the PEB's acceptance of an MEB report has procedural prerequisites, and thus the Navy's failure to comply with these requirements may keep plaintiff's claim alive. In particular, the PEB may not have accepted an MEB report because (1) an MEB was not convened in plaintiff's case or (2) an MEB was convened but it did not refer its report to the PEB. Because the PEB could not accept an MEB report that did not exist or that it never saw, plaintiff may be able to state a claim for relief if he shows, as a threshold matter, that the Navy violated its own regulations by (1) failing to convene an MEB that was either requested by his physician or warranted by his medical condition or (2) improperly processing plaintiff's MEB report, if one existed. Thus, the court first examines whether plaintiff can demonstrate a basis for the convening of an MEB in his case.

As the court noted above, Navy regulations articulate the following bases for convening an MEB: (1) when a member's fitness to continue naval service is questionable, SECNAVINST 1850.4D, §§ 1005, 3106; (2) when a member's "physical . . . qualification to continue on full duty is in doubt" or "physical . . . limitations preclude [the member's] return to full duty within a reasonable period of time," id. § 2042; and (3) when a member is prevented from engaging in unrestricted duty for ninety or more days, MANMED, art. 18-4(4). However, the determination of whether a member has a condition that would trigger any of the bases is left primarily to "the professional judgment of the attending physician." Id. Further, the mere presence of a particular

---

1000-01 (Ct. Cl.) (en banc), modified, 609 F.2d 990 (Ct. Cl. 1979) (en banc). However, even if not waived, plaintiff would find it difficult to establish the adverse presumption. See Cromer v. Nicholson, 455 F.3d 1346, 1350-51 (Fed. Cir. 2006) (holding that plaintiff, a veteran seeking compensation for a purported service-connected injury, was not entitled to either (1) a presumption that the government acted negligently by failing to preserve his medical records that were destroyed in a fire or (2) an adverse presumption for service connection, because both presumptions were "contrary to the general evidentiary burden in veterans' benefit cases" and neither Congress nor the VA had "expressly carved out any exceptions to the general rule"); see also Jandreau v. Nicholson, 492 F.3d 1372, 1375-76 (Fed. Cir. 2007) (holding that when invoking "traditional evidentiary adverse inference rules," the party seeking to use the missing evidence must show that (1) the evidence custodian was required to preserve the evidence, (2) the evidence was destroyed with a "culpable state of mind," and (3) "the destroyed evidence was relevant to the party's claim or defense" (internal quotations omitted)).

condition is "often not a criteria for submission of a[n] MEB report." SECNAVINST 1850.4D, § 8001(g).

All of the bases for convening an MEB depend upon plaintiff's ability to perform his military duties. See id. §§ 1005, 2042, 3102(a), 3106, 8001(e); MANMED, art. 18-4(2), (4); cf. SECNAVINST 1850.4D, § 3202 (noting that an MEB report should not be forwarded to the PEB if the member "is being processed for separation or retirement for reasons other than physical disability, unless . . . the member's physical condition reasonably prompts doubt that he or she is Fit to continue to perform" his or her duties). In other words, if there are no allegations or evidence that plaintiff was not performing his military duties, there would be no basis to convene an MEB.[45]

The court finds that plaintiff's service record lacks any indication that he was unable to perform his military duties through September 30, 2000.[46] Nor does plaintiff allege that he was unable to perform his duties during this time period. Indeed, the medical records that are included in the administrative record suggest that plaintiff was performing his duties. See, e.g., AR 294-95 (indicating that plaintiff's left knee pain improved with daily activities), 303 (indicating that plaintiff had "scored outstanding on all of his physical readiness tests up through April 30, 1999). Because plaintiff has not offered allegations or evidence of his inability to perform his duties, he cannot establish any of the bases described by Navy regulations for

---

[45] The BCNR concluded that there was no basis to convene an MEB in plaintiff's case because of the lack of evidence in the record indicating plaintiff's inability to engage in his military duties. See AR 3-4 (noting that plaintiff had no significant complaints during his preretirement physical examination, that "there was no objective evidence of significant spinal pathology," and that there was no "credible evidence of [plaintiff's] inability to perform military duty"). However, the court notes that the BCNR did not explain the basis for its conclusion that "there was no objective evidence of significant spinal pathology" in plaintiff's case. The BCNR did not discuss the results of the June 15, 1999 spine x-ray, see id. at 297, 299; the results of the August 31, 2000 MRI scan, see id. at 291-92; or Dr. Cullom's referral of plaintiff to a neurosurgeon, see id. at 56.

[46] The court notes, however, that plaintiff's service record does not appear to be complete. As noted above, for the time period that plaintiff served at the NMCRC–April 2, 1998, to September 30, 2000–the only records of a nonmedical nature in plaintiff's service record are two Evaluation Reports & Counseling Records covering the period spanning March 8, 1998, to November 15, 1999. See AR 93-94, 132-33. There are no service records from plaintiff's last ten-and-one-half months of active duty, and it is plausible that those records might reflect any difficulties plaintiff might have been experiencing at his job. Further, as noted previously, plaintiff's service medical record was not produced, and the body of medical records from this same time period appear to be incomplete. See supra Part IV.A.1. Despite the apparent gaps in the record, plaintiff does not allege that there are other records, missing from the administrative record, that indicate his inability to perform his duties through September 30, 2000.

convening an MEB. Furthermore, plaintiff's suggestion that he was actually placed on medical hold pending the convening of an MEB is ultimately immaterial.

There is some evidentiary support for plaintiff's suggestion that a medical hold had been initiated. First, the medical record reflecting plaintiff's September 2000 appointment with Dr. Cullom contains a partially illegible notation concerning "medical hold status." See id. at 56 ("To request member be placed on medical hold status [illegible] the problem can be corrected. Requ[illegible] an appt. not to exceed [illegible] until [illegible]."). There is no indication of who made the notation, nor is the notation sufficiently legible to determine whether plaintiff was actually placed on a medical hold status. However, the notation, at a minimum, raises the possibility that plaintiff was placed on medical hold. The possibility is further supported by a second piece of evidence: plaintiff's sworn statement that he received counseling about the medical hold process from Dr. Cullom and Mr. Walker, the Assistant Manager of the Medical Boards Service at National Naval Medical Center. See Decl. Jeffrey G. Walls ("Walls Decl.") ¶¶ 18-19. Such counseling is required by Navy regulations. See MANMED, art. 18-7(1)-(3). The third piece of evidence supporting the possibility that plaintiff was placed on medical hold is plaintiff's representation that he confirmed his medical hold status with Chief Smallwood at BUPERS. See AR 44-45, 47. Despite providing support for plaintiff's suggestion that a medical hold had been initiated, the court accords the latter two pieces of evidence little weight. Plaintiff is hardly a disinterested party and these two statements were made in support of the instant claims. Therefore, they cannot be accepted as true in the absence of a contemporaneous medical or service record.

Even if the court found that this evidence sufficiently demonstrated that plaintiff was placed on medical hold pending the convening of an MEB, such a finding would not alter the legal conclusion that plaintiff was not entitled to defer his transfer to the Fleet Reserve.[47] Despite plaintiff's argument to the contrary, Opp'n 17, none of the Navy regulations cited by the parties indicates that a member's placement on a medical hold status pending the convening of an MEB, standing alone, is sufficient to defer transfer to the Fleet Reserve. Instead, to defer transfer to the Fleet Reserve, the MEB must have both (1) prepared a report and (2) referred its report to the PEB instead of recommending temporary limited duty. MILPERSMAN 1830-030, § 2.b; MILPERSMAN 1830-040, at 4. Since plaintiff's alleged placement on medical hold had not yet matured into an MEB report, as reflected by the lack of any reference to an MEB report in the

[47] Although there is no indication that the BCNR considered any of the above evidence in its May 17, 2006 decision when it concluded that there was no basis to convene an MEB, had the BCNR considered this evidence and concluded that plaintiff was placed on medical hold pending the convening of an MEB, it would not have changed its ultimate conclusion. When plaintiff first informed the BCNR of his conversation with Chief Smallwood in May and August 2002, AR 44-45, 47, the BCNR responded to plaintiff in December 2002 by indicating that while "at least some of the material you submitted is new, it is not material," id. at 43. Thus, even in 2002, the BCNR recognized that the possibility that plaintiff was placed on medical hold was not legally significant.

relevant portions of the administrative record or any direct allegation by plaintiff that an MEB report was actually prepared, his transfer to the Fleet Reserve could not have been deferred. Thus, plaintiff has not plead facts that entitle him to relief for a deferment of his transfer to the Fleet Reserve on the basis of a failure of an MEB to refer its report to the PEB. Accordingly, plaintiff has failed to state a claim upon which relief could be granted that the Navy improperly transferred him to the Fleet Reserve effective October 1, 2000.

**B. Back Pay**

In addition to alleging that the Navy improperly transferred him to the Fleet Reserve effective October 1, 2000, plaintiff alleges that he "did not receive his basic pay, housing allowance, or subsistence allowance from October 1, 2000 until his discharge from the [National Naval Medical Center] in mid-May 2001." Am. Compl. ¶ 56; accord Opp'n 2-3. Plaintiff was only entitled to basic pay if he was "on active duty" or "participating in . . . other full-time duty, provided by law . . . ." See 37 U.S.C. § 204(a). Since the court has already determined that plaintiff's transfer to the Fleet Reserve was proper and because plaintiff's transfer to the Fleet Reserve was coupled with his release from active duty, see AR 172 ("Certificate of Release or Discharge From Active Duty"); see also MILPERSMAN 1830-040, at 9 (indicating that a Fleet Reservist is required to "[m]aintain readiness for active service in the event of war or national emergency"), plaintiff was not "on active duty" as defined in title 37 of the United States Code. Thus, the question is whether plaintiff was "participating in . . . other full-time duty, provided by law" from October 1, 2000, to mid-May 2001.

There is no evidence in the administrative record that plaintiff performed any military duties after September 30, 2000. However, in the First Amended Complaint, plaintiff alleges that while he was "stationed" at the National Naval Medical Center, he was required to live in the barracks, sign in and sign out of the barracks, abide by a curfew, wear his uniform, make his room available for inspection, and perform certain administrative duties. See Am. Compl. ¶¶ 44-48. Since these allegations, if proven, might support a claim for back pay for full-time duty, the court cannot dismiss them pursuant to RCFC 12(b)(6). Thus, the court reviews the findings of the BCNR. The BCNR concluded that "[t]he available records do not show that [plaintiff] performed any military duties during the 1 October 2000–1 April 2001 period" and that therefore, plaintiff was "not entitled to any additional 'treatment, service, and reimbursement' for that period."[48] AR 4. The evidence before the BCNR consisted of plaintiff's allegations that he

[48] The BCNR's reference to April 1, 2001, instead of mid-May 2001 is due to the fact that plaintiff, in his pro se complaint that was being considered by the BCNR, indicated that he remained hospitalized at National Naval Medical Center until either April 2001, Compl. ¶¶ 4-5, 13, April 30, 2001, id. ¶ 8, or March 30, 2001, id. ¶ 10. Plaintiff now alleges that he was hospitalized through the middle of May 2001. Am. Compl. ¶ 55. Despite the differences in the date, plaintiff was referring to the same event in both his pro se complaint and his First Amended Complaint–his discharge from National Naval Medical Center. Thus, had plaintiff alleged a mid-May 2001 discharge date in his pro se complaint, the court presumes that the BCNR would

remained on active duty at the National Naval Medical Center through April 2001 and the lack of records from the National Naval Medical Center that supported plaintiff's allegations. However, at the time it issued its May 17, 2006 decision, the BCNR was unaware of plaintiff's allegations that first appeared in the August 20, 2007 First Amended Complaint.[49] Despite the BCNR's lack of knowledge concerning plaintiff's new allegations, the court, when evaluating these new allegations in conjunction with the evidence in the administrative record considered by the BCNR, cannot conclude that the BCNR erred in finding that plaintiff did not perform any military duties for the relevant time period. There is no evidence, outside of plaintiff's sworn declaration, Walls Decl. ¶¶ 21-23, that plaintiff was "stationed" at the National Naval Medical Center and performed duties there. Plaintiff's allegations are insufficient to overcome the absence of affirmative evidence in the administrative record. See Dixon, 8 F.3d at 804. Thus, the court finds that the decision of the BCNR was not arbitrary, capricious, contrary to law, or unsupported by substantial evidence.

## V. CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART** and **DENIES IN PART** defendant's motion to dismiss and **GRANTS** defendant's motion for judgment on the administrative record. The clerk is directed to enter judgment accordingly. No costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

have extended to mid-May 2001 its conclusion that plaintiff did not perform any military duties after September 30, 2000.

[49] Although the failure to raise a legal argument before the BCNR constitutes a waiver of that argument, see Doyle, 599 F.2d at 1000-01, the court is permitted to consider new factual evidence, Bray, 515 F.2d at 1390.